# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

American Bancorporation,                        Bky. Case No. 14-31882 (KAC)

                 Debtor.                        Chapter 11

---

## NOTICE OF HEARING, MOTION FOR EXPEDITED HEARING AND MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING SALE AND AUCTION PROCEDURES; (B) APPROVING BIDDING PROTECTIONS FOR STALKING-HORSE BIDDER; (C) APPROVING PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (D) APPROVING FORM AND MANNER OF NOTICE; AND (II) AN ORDER (A) AUTHORIZING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS;  AND (B) GRANTING RELATED RELIEF

---

TO:    The Parties in Interest identified in Local Rule 9013-3.

1.    American Bancorporation (the "Debtor"), through its undersigned legal counsel, respectfully moves the Court for an order under 11 U.S.C. §§ 105(a), 363 and 365 and Rule 2002, 6004, 6006 and 9014(a) of the Federal Rules of Bankruptcy Procedure for Entry of (I) an Order (A) Approving Sale and Auction Procedures; (B) Approving Bidding Protections for Stalking-Horse Bidder; (C) Approving Procedures Related to Assumption and Assignment of Executory Contracts; and (D) Approving Form and Manner of Notice; and (II) an Order (A) Authorizing Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (B) Granting Related Relief, and gives notice of an expedited hearing.

2.      The Court will hold a hearing (the "Sales Procedures Hearing") on this verified Motion (the "Sale Motion") at **2:00 p.m.** on **October 29, 2014**, before the Honorable Katherine A. Constantine, United States Bankruptcy Judge, in Courtroom 2C, 2nd Floor of the United States Courthouse, 316 N. Robert Street, St. Paul, Minnesota. In addition, it is anticipated that the Court will hold a further hearing (the "Sale Approval Hearing") on this Sale Motion at **2:00 p.m**. on **December 11, 2014** at the sale location.

3.      Any response to the relief sought at the Sale Procedures Hearing must be filed with the Court and served by mail or delivery not later than October 24, 2014, which is five (5) days before the hearing (including Saturdays, Sundays and holidays). However, due to the expedited relief requested, the Debtor will not object to responses filed 24 hours prior to the Sale Procedures Hearing. Any response to the relief sought at the Sale Approval Hearing must be filed and served by mail or delivery not later than December 6, 2014, which is five (5) days before the hearing (including Saturdays, Sundays and holidays), or such date provided in a subsequent notice. **UNLESS A RESPONSE OPPOSING THE SALE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE SALE MOTION WITHOUT A HEARING.**

**PRELIMINARY STATEMENT**

4.      To maximize the return to the bankruptcy estate and creditors, the Debtor, subject to approval of the Bankruptcy Court and the conclusion of an auction process, seeks approval to sell its assets, including without limitation the issued and outstanding shares of capital stock (the "Bank Shares") of American Bank of St. Paul (the "Bank")

2

owned by the Debtor which includes all operations and assets of the Bank, including the Bank's sole ownership interest in AmeriNational Community Services, Inc. ("ACS"), free and clear of liens, claims, encumbrances and interests to full extent available under applicable law to Deerwood Bank, a Minnesota Banking corporation (the "Stalking-Horse Bidder"), or to one or more other qualified bidders that have submitted a bid or bids that are determined to be higher or otherwise better offers (the "Successful Bidder(s)").

5.    The Debtor files this Motion seeking two distinct, but related, forms of relief.  First, the Debtor seeks the entry of an order that (a) approves (i) procedures pursuant to which the Debtor will solicit and consider additional qualified bids to purchase assets, (ii) bidding protections in the form of a break-up fee and/or expense reimbursement for the Stalking-Horse Bidder, (iii) procedures governing the conduct of an auction, which will take place in the event that the Debtor receives more than one qualified bid, (iv) procedures for the assumption and assignment of the Debtor's executory contracts and unexpired leases, if any, that may be designated by a Successful Bidder, or bidders, in connection with the sale or sales, and (vi) the form and manner of notice relating to the auction and sale process; and (b) schedules a hearing to approve, among other things, the Successful Bid(s).  Second, the Debtor seeks entry of an order that (a) approves the sale and transfer of the Bank Shares to the Successful Bidder free and clear of liens, claims, encumbrances and other interests, and (b) the assumption and assignment of certain executory contracts and unexpired leases, if any, designated by the Successful Bidder(s).

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005, and Local Rule 1070-1. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     This Motion arises under 11 U.S.C. §§ 105, 363 and 365 and Fed. R. Bankr. P. 2002, 6004 and 6006. This Motion is filed under Fed. R. Bankr. P. 9013 and 9014 and Local Rule 9013.

## PROCEDURAL BACKGROUND

8.     An involuntary petition commencing the Chapter 11 bankruptcy case of the Debtor was filed on May 1, 2014 (the "Petition Date"). The Debtor consented to the entry of an order for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and the Court entered the Order for Relief on May 27, 2014. The bankruptcy case is pending in this Court.

9.     The Debtor continues to manage its property and affairs as a debtor and debtor-in-possession under 11 U.S.C. §§ 1107 and 1108.

10.     No trustee, examiner or official committee of unsecured creditors has been appointed in this case.

## BUSINESS BACKGROUND

A.     **The Debtor's Business**

11.     American Bancorporation is the consolidated bank holding company registered under the Bank Holding Company Act of 1956, with its primary asset

4

consisting of shares it owns of American Bank of St. Paul (the "Bank"), a Minnesota corporation and state chartered bank insured by the Federal Deposit Insurance Corporation ("FDIC").

12.     The Bank, which is not a debtor and continues to operate in the ordinary course of business, operates six full-service bank branches throughout Minnesota in St. Paul, Apple Valley, Inver Grove Heights, Mendota Heights, Alden and, Albert Lea.  The Bank holds in excess of $300 million in total assets and has approximately 75 employees.

13.     The Bank also owns 100 percent of the issued and outstanding shares of and operates AmeriNatonal Community Services, Inc. ("ACS"), a Minnesota corporation. ACS provides loan servicing and other financial services, principally for housing agencies, municipal clients and non-profit organizations and specializes in servicing loans made by cities, non-profits and other governmental agencies under affordable housing programs.  As of June 30, 2014, ACS had more than 70 full and part-time employees in multiple locations servicing more than 64,000 loans with a principal balance of approximately $5 billion.

14.     The Debtor, like many other similarly situated financial institutions, fell victim to the financial crisis in 2008 and its effect on residential and commercial property values and has been subject to substantial regulatory oversight and directives. The Debtor and the Bank have managed assets within this regulatory system and today the Bank's capital ratios exceed the regulatory definition for a "well capitalized" institution. The Debtor's efforts to restructure have been hampered by its capital

5

structure, which includes two issuances of "trust preferred securities" ("TruPS") through a series of transactions (of a type commonly used by bank holding companies to take advantage of favorable regulatory, tax and accounting treatment), which enabled the Debtor to raise capital in the public markets.

B.     **Regulatory Oversight**

15.    Both the Debtor and the Bank are highly regulated institutions. The principal regulators of the Debtor and the Bank are the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of Minneapolis, the FDIC and the Minnesota Department of Commerce. The Bank undergoes periodic examinations by those authorities.

16.    On July 22, 2009, the Debtor and the Bank entered into a Written Agreement with the Federal Reserve Bank of Minneapolis imposing certain restrictions and requirements on them, including the requirement that no dividends be paid by the Bank to the Debtor.

C.     **The Debtor's Capital Structure**

17.    As of the Petition Date, the Debtor's assets consisted of (i) approximately $8,881 in cash, (ii) interests in certain statutory trusts, (iii) the value of the Bank Shares, and (iii) a note receivable due from an officer in the amount of approximately $84,776.

18.    As of the Petition Date, the Debtor had outstanding secured indebtedness of approximately $1,316,750 under a promissory note that is secured by a pledge of the Bank Shares as well as unsecured indebtedness totaling approximately $51,218,951, primarily consisting of principal and interest owed to holders of TruPS.

19.     Prior to the Petition Date, the Debtor issued certain junior, subordinated debentures to certain trusts under the TruPS transaction model in the aggregate amount of approximately $40 million, which were sold to third-party investors. The trusts then delivered the proceeds of the sales of the TruPS to the Debtor in return for the issuances of junior, subordinated debentures. The subordinated debentures have the same principal and interest payment schedule as the TruPS such that the payments made by the Debtor on the subordinated debentures provide the trusts with a source of funds for payment with respect to the principal and interest due on the TruPS.

20.     Each of the subordinated debentures provided for the payment of interest, but allowed the Debtor, in certain circumstances, to defer the payment of interest for a period of time. The deferral of interest payments also permits the trusts to defer the corresponding distributions to the TruPS for the same period. Beginning in 2008, the Debtor exercised its right to defer interest payments under each of the subordinated debentures and continued to defer interest for the maximum period permitted. At the end of the deferral period, however, if the Debtor failed to pay the deferred distributions on the junior, subordinated debentures to the trusts, the trusts would be unable to pay distributions to the holders of the TruPS and the institutional trustees for the trusts, or holders of a certain specified percentage of the liquidation amount of the TruPS would have the right (after expiration of any applicable grace period), to declare an event of default.

21.     All accrued, unpaid and deferred interest came due and payable in 2013, and remains unpaid. Holders of the TruPS filed lawsuits against the Debtor in New

DOCS-#4373682-v2

York and Minnesota for breach of contract for failure to pay deferred interest and one or more holders obtained a judgment against the Debtor shortly before the commencement of this bankruptcy case.

D.   **The Debtor's Prepetition Efforts to Market the Bank**

22.   Prior to the Petition Date and the litigation commenced by the holders of the TruPS, the Debtor considered a number of strategies, engaged other professionals, including another financial advisor, to assist with raising capital or the potential sale of the Bank. The Debtor also attempted to negotiate modified terms of the indenture relating to the subordinated debentures and the TruPS. The Debtor, however, was not successful in its efforts.

23.   On May 1, 2014, the holders of TruPS commenced this involuntary bankruptcy case.

## ASSERTED LIENS

24.   All of the Debtor's right, title and interest in and to the Bank Shares, which constitute substantially all of the Debtor's assets and includes all operations and assets of the Bank including the Bank's sole ownership of ACS, are proposed to be sold in a sale free and clear of all liens, claims, encumbrances and interests to the full extent permissible under 11 U.S.C. § 363(f). Hennepin Capital, LLC claims a lien or interest in capital stock owned by the Debtor and, among other things, has possession of the share certificate evidencing the Bank Shares pursuant to that certain Pledge Agreement, dated as of January 29, 2013, and that certain Assignment of Pledge Agreement, dated as of June 11, 2013, and other related instruments.

DOCS-#4373682-v2

25.     The Debtor seeks to sell its property free and clear of all liens, claims, encumbrances and interests to the full extent permissible under 11 U.S.C. § 363(f) and expects that Hennepin Capital, LLC will either consent to such sale or the price at which the Bank Shares are to be sold will be greater than the aggregate value of all liens on such property.  The liens asserted by Hennepin Capital, LLC will attach to the cash proceeds of the sale in the same order of priority, with the same validity, force and effect that such liens, claims and encumbrances had prior to the sale, subject to any claims and defenses the Debtor and the bankruptcy estate may possess with respect thereto.

## NEED FOR PROMPT SALE PROCESS

26.     The Debtor and its professionals firmly believe that a prompt sale of the Bank Shares including the operations and assets of the Bank, which would include the Bank's sole ownership of ACS, is in the best interests of creditors and other stakeholders because it will maximize the going concern value of the business, provide greater certainty for depositors and regulatory authorities by removing the cloud associated with the bankruptcy filing, and provide an increased return to parties in interest. The Stalking-Horse Bidder or any other Successful Bidder(s) for the Bank Shares must also be approved by the regulators of the Bank and the Debtor, and the Bank's subsidiary, ACS, has certain contracts and licenses which are due to be renewed in less than 60 days and it is anticipated that certain approvals will be required in connection with such renewals or a change of control transaction. The sooner the parties have certainty as to the identity of the Successful Bidder(s), the greater certainty there will be as to the

9

value of the Bank Shares to the Debtor.  In any instance, this sale is subject in all respects to an auction process and higher and better offers. The Stalking-Horse Bidder is also expected, but not obligated, to offer employment to essentially all of the Bank's employees.

27.     The Debtor and its professionals have also consulted extensively with representatives for the holders of certain TruPS, which hold the largest claims in this case and were petitioning creditors, since the commencement of the bankruptcy case regarding the sale process and all of the matters that are the subject of this Motion.  The Debtor anticipates that the holders of such TruPS will support the relief requested in this Motion.

28.     Given the circumstances surrounding this bankruptcy case, the cash needs of the Debtor, the regulatory issues implicated by a bankruptcy filing that confront the Bank and ACS, and the unavailability of substantial capital necessary for the Debtor to pursue alternative business plans, the Debtor believes that the coordinated sale process outlined in this Motion will produce a result that is superior to any other alternative currently available. A prompt, competitive and orderly sale process will maximize value and reduce administrative costs.  The Debtor, in consultation with Carl Marks as well as with the representatives for the holders of certain TruPS, have designed the sale and the Sale Procedures with the intention of maximizing the return to the Debtor's bankruptcy estate. The Debtor believes that prospective purchasers at the Auction will have been, prior to the date thereof, afforded time to conduct extensive due diligence and will have an additional opportunity to conduct due diligence and to formulate

10

topping bids for the assets. The Auction will present an opportunity to conduct sale negotiations openly and fairly, with the input of the Debtor's financial advisors and the creditors who have the greatest economic stake in the process.  The Debtor has a good, sufficient and sound business purposes for the sale  and the sale process, and the sale is not is being conducted for the purpose of hindering, delaying or defrauding creditors.

## THE MARKETING PROCESS

29.     On June 16, 2014, the Debtor engaged Carl Marks Securities, LLC ("Carl Marks") as its investment banker and financial advisor. Carl Marks is an investment banking firm and registered broker-dealer that provides a wide array of investment banking, financial advisory services, including merger and acquisition advice, financial restructuring advice, sourcing of capital, valuations and expert testimony. Carl Marks professionals also provide services through Carl Marks Advisory Group LLC ("CMAG"), an affiliate of Carl Marks. CMAG is a respected restructuring advisory and turnaround firm, having been named one of the outstanding turnaround firms in the United States for thirteen consecutive years by Turnarounds & Workouts, a national publication focused on distressed businesses in the U.S. and Canada.

30.     Carl Marks was engaged by the Debtor to, among other things, evaluate various strategic and financial alternatives to maximize the value of the Debtor's business for the benefit of all constituents. The Carl Marks team conducted a comprehensive strategic, operational and financial assessment, which included a number of due diligence sessions with management and key personnel of the Debtor, the Bank and ACS. The Debtor, its management and Carl Marks determined, after

11

extensive analysis and consideration, and in consultation with representatives for the holders of certain TruPS, that the Debtor's best opportunity to maximize value for the benefit of the bankruptcy estate is to conduct one or more sales for its stock in the Bank in conjunction with a coordinated auction process that would permit consideration of offers for the sale by the Bank of its wholly-owed subsidiary, ACS, in a prompt and orderly, yet flexible manner.

31.     The Debtor, upon consultation with its professionals and representatives for the holders of certain TruPS, has determined that an orderly, structured and flexible auction process in which the Debtor seeks bids for its businesses, including direct and indirect subsidiaries, the Bank and ACS, will best maximize value.

32.     During the past several months, the Debtor, with the assistance of Carl Marks and other professionals, has been actively engaged in marketing efforts that included soliciting interest in a purchase of the Bank, including with and without its ACS business as well as soliciting interest in a purchase of the ACS business. As part of an exhaustive marketing process, approximately 165 prospective parties (strategic and financial buyers, both domestic and international) were contacted. The Debtor and Carl Marks developed a confidential, electronic due diligence data room which includes material contracts, financial statements, documents and other information believed necessary for a third party to evaluate the businesses and assets of the Debtor, the Bank and ACS in connection with a possible investment, financing or acquisition transaction of the Bank Shares or the shares owned by the Bank in ACS or both. In addition, the Debtor and Carl Marks prepared a marketing memorandum and other presentation

materials (the "Marketing Materials") designed to elicit interest from potential interested parties.

33.     Carl Marks identified potential investors, financiers and purchasers and distributed the Marketing Materials to 35 parties who expressed interest and executed a confidentiality agreement. Carl Marks distributed the Marketing Materials to these prospective investors, lenders, purchasers and other parties in interest. Carl Marks also provided interested parties with access to an electronic due diligence data room and conducted periodic conference calls and/or meetings with management to address strategic alternatives, the sale process and respond to information requests.

34.     Executive officers and employees of the Debtor, the Bank and ACS participated in meetings and conference calls with potential investors, lenders and purchasers and interested parties conducted due diligence and discussed the potential business opportunity with Carl Marks.

35.     Carl Marks received 9 initial, non-binding indications of interest and 5 subsequent second-round letters of intent to purchase some or all of the assets of the Debtor as a result of the above marketing efforts. The Debtor and its professionals, in consultation with representatives of certain holders of the TruPS, analyzed the bids received to date. Based upon the bids, the Debtor entered into substantial negotiations with potential purchasers with the advice of Carl Marks. During the course of those discussions, Carl Marks continued to respond to other indications of interest and discussed opportunities with interested parties.

DOCS-#4373682-v2

36.     The negotiations between the Debtor and the prospective purchasers culminated in the Debtor entering into alternative stock purchase agreements with the Stalking-Horse Bidder which ultimately submitted the highest and best offer(s) for the Bank Shares. The purchase agreements contemplate a flexible and competitive bidding process for the sale of the Bank Shares, which upon the exclusive election of the Debtor may include or exclude the Bank's sole ownership interest in ACS so as to maximize value at the Auction, and is subject to higher and otherwise better offers.

37.     The Stalking-Horse Bidder is Deerwood Bank, a Minnesota state chartered bank with its corporate headquarters located in Baxter, Minnesota and several locations throughout Northern Minnesota. Deerwood Bank has a recent history of successfully acquiring other banks and bank branches.  It is also a well-capitalized bank and not subject to any pending regulatory actions or restrictions.  Deerwood Bank has represented that it has engaged in meaningful discussions with applicable banking regulatory authorities and also represented that it believes it can close the transaction from a regulatory perspective, subject only to customary exceptions in transactions of this size and nature.

38.     As a result of the marketing efforts and extensive negotiations, the Debtor and the Stalking-Horse Bidder have entered into two alternative Stock Purchase Agreements dated on October 21, 2014 (the "Purchase Agreements"), copies of which are attached to this Motion as Exhibit 1A and 1B, whereby the Stalking-Horse Bidder has agreed to purchase under the sale process proposed either (i) all of the Bank Shares, which includes all operations and assets of the Bank *including* the Bank's sole ownership

14

of ACS (the "Stalking-Horse Agreement"), or (ii) if the Debtor, in its sole and absolute

discretion, makes an election to proceed with a sale transaction pursuant to the terms of

an alternative stock purchase agreement with the Stalking-Horse Bidder (the

"Alternative Transaction Agreement"), the Stalking-Horse Bidder has agreed to

purchase the Bank Shares which includes all of the operations and assets of the Bank

*excluding* the Bank's sole ownership interest in ACS, which will be available for sale to

other Qualified Bidders separately from the Bank Shares.   Under the Stalking-Horse

Agreement, the Debtor is allowed to make an election whether to proceed with the

Stalking-Horse Agreement or an alternative transaction at the Auction in order to

maximize the value of assets.   Each of the Purchase Agreements with the Stalking-Horse

Bidder is subject to higher and otherwise better offers, but only one of the Purchase

Agreements between the Debtor and the Stalking-Horse Bidder would be

consummated.

39.   Accordingly, the Debtor respectfully requests that the Court enter an

order substantially in the form attached hereto as Exhibit 2 (the "Sale Procedures

Order") that: (i) authorizes the Debtor, through Carl Marks, to solicit bids and conduct

one or more auctions for the sale of the Bank Shares, which includes all operations and

assets of the Bank including the Bank's sole ownership of ACS; (ii) approves the Sale

Procedures (as defined and outlined below); (iii) approves the Stalking-Horse Bidder

Fee, Expense Reimbursement, and other protections to the Stalking-Horse Bidder; (iv)

approves the form and manner of notice; (v) schedules December 11, 2014 at 2:00 p.m.,

or as soon thereafter as counsel may be heard (the "Sale Approval Hearing"), as the

date and time for the Sale Approval Hearing to approve the sale of the Bank Shares to

the Stalking-Horse Bidder or one or more Successful Bidders in the Auction free and

clear of any and all liens, claims, interests and encumbrances; and (vi) grants related

relief.

40.     The Debtor requests that the Court enter an order at the conclusion of the

Sale Approval Hearing substantially in the form attached hereto as Exhibit 3 (the "Sale

Order") (i) authorizing the sale of (a) all of the Bank Shares, *including* the Bank's sole

ownership interest in ACS, or (b) all of the Bank Shares, *excluding* the Bank's sole

ownership interest in ACS, which may be sold to another Qualified Bidder separately

from the Bank Shares, to the Stalking-Horse Bidder, or to another bidder or bidders

submitting one or more Successful Bids, free and clear of all liens, claims, interests and

encumbrances which such liens, claims, interests and encumbrances; (ii) approving the

stock purchase agreement(s) of the Successful Bidder(s) and authorizing the Debtor to

perform its obligations and comply with the terms of the purchase agreement(s) and all

other documents and agreements and transactions contemplated thereby or entered

into in connection therewith; and (iii) granting related relief. The requested findings and

provisions of the proposed Sale Order, which are incorporated herein by reference, are

appropriate and customary in connection with bank sale transactions of this size and

nature under Section 363 and are consistent with orders entered in bankruptcy cases

involving 363 sales of banks and contain the type of provisions bank regulators would

generally be accustomed to seeing in such orders.

16

## THE STALKING-HORSE BIDDER PURCHASE AGREEMENTS

41.     The two alternative Stock Purchase Agreements are the result of extensive, arm's-length negotiations with the Stalking-Horse Bidder. The basic terms of the Purchase Agreements are summarized as follows (with all capitalized terms not defined herein having those meanings set forth in the Purchase Agreements unless the context requires otherwise):[1]

| | |
|---|---|
| **Purchase Price for the Stalking-Horse Agreement:** | For the Bank Shares, including all operations and assets of the Bank *including* the Bank's sole ownership of ACS, purchase price in cash equal to (1) the product of (A) 65%, multiplied by (B) the "Adjusted Book Value" of the Bank as of the "Determination Date," minus (2) the "Loan Loss Reserve Adjustment" (as such terms are defined in the Stalking-Horse Agreement). A sample calculation of the Purchase Price using the Bank's Call Report dated June 30, 2014 and such date as the Determination Date, the resulting purchase price payable to the bankruptcy estate would have been $15,756,925 (the "<u>Purchase Price</u>"). |
| **Purchase Price for Alternative Transaction Agreement**: | For the Bank Shares, including all operations and assets of the Bank *excluding* the Bank's sole ownership interest in ACS a purchase price in cash equal to (1) the product of (A) 41.4%, multiplied by (B) the Adjusted Book Value of the Bank as of the Determination Date, minus (2) the Loan Loss Reserve Adjustment.  A sample calculation of the Purchase Price using the Bank's Call Report dated June 30, 2014 and such date as the Determination Date, the resulting purchase price payable to the bankruptcy estate would have been $10,000,000 ("<u>Alternative Purchase Price</u>"), which includes a capital requirement equivalent to the book value associated with ACS, equivalent to $9,692,081 as of June 30, 2014, *provided, however*, that the Bank Subsidiary Shares would be |

---

[1] This summary is necessarily abbreviated and qualified in its entirety by reference to the provisions of the Purchase Agreements and related schedules and exhibits. To the extent that there are any inconsistencies between the summary contained herein and the Purchase Agreements, the Purchase Agreements shall control.

available for sale to third parties under the Alternative Transaction Agreement and that any amount paid for the Bank Subsidiary Shares above the book value associated with ACS would be delivered to the Debtor by either dividend or in the form of an increase in the Alternative Purchase Price.

**Sale Election:** The Debtor and the Stalking-Horse Bidder have agreed that the Debtor shall have the absolute right, power and privilege to make an election to proceed with the Sale transaction pursuant to the Stalking-Horse Agreement or the Sale transaction pursuant to the Alternative Transaction Agreement.  The Sale Election may be exercised by notice (which may be oral or written) at any time, and from time to time, before the conclusion of the Auction, or if not Auction, at the Sale Approval Hearing unless otherwise agreed by the parties.  Only one of the Purchase Agreements between the Stalking-Horse Bidder and the Debtor would, however, become effective.

**Deposit:** Cash in the amount of $250,000 has been deposited as earnest money to Debtor's counsel and will be held in a non-interest bearing account until the Sale.

**Acquired Assets:** All of the Debtor's right, title and interest in, to and under the Bank Shares, free and clear of all liens, claims and encumbrances, consisting of all of the properties, assets, and rights of the Debtor related to the Bank and its Business, including, without limitation (unless a Sale Election is made by the Debtor and an Alternative Transaction Agreement is effective), all right title and interest of the Bank in the issued and outstanding shares of capital stock of ACS.

**Representations:** The parties have each made representations and warranties that are customary in connection with transactions of this size and nature.

**Closing:** The consummation of the transactions contemplated by the Purchase Agreements shall occur following the satisfaction or waiver by the appropriate party of the conditions specified in Article 7 of the Purchase Agreement no later than February 28, 2015.

DOCS-#4373682-v2

**Closing Conditions:** Closing is subject to certain conditions, including (i) the continued accuracy of representations and warranties, (ii) the performance by Debtor in all material respects of its obligations under the Purchase Agreement, (iii) the entry of the Orders by the Bankruptcy Court relating to the sale of the Bank Shares, (iv) obtaining necessary regulatory approvals, and (v) the absence of a Material Adverse Effect.

**Stalking-Horse Bidder Fees:** In the event the Stalking-Horse Bidder is not the Successful Bidder under either the Stalking-Horse Agreement or the Alternative Transaction Agreement and the Debtor closes on the Sale contemplated by such agreements with another bidder or bidders, the Stalking-Horse Bidder will be entitled to receive a fee from the proceeds received in connection with such Sale in the amount of $450,000 and the Expense Reimbursement described below.

**ACS Stalking-Horse Bidder Fee:** In the event that the Stalking-Horse Bidder is not the Successful Bidder under the Stalking-Horse Agreement and the Stalking-Horse Bidder has consummated the Alternative Transaction, the Stalking-Horse Bidder will be entitled to receive a fee in the amount of $350,000, but would not be entitled to receive any Expense Reimbursement.

**Expense Reimbursement:** In the event the Stalking-Horse Bidder is not the Successful Bidder under either the Stalking-Horse Agreement or the Alternative Transaction Agreement, the Stalking-Horse Bidder will be entitled to reimbursement of up to $250,000 of actual, documented and reasonable expenses and costs (including the negotiations, due diligence and bidding process) incurred in connection with the transactions contemplated by the Stalking-Horse Agreement.

**Payment:** Any amount that may be due and payable by the Debtor with respect to the Stalking-Horse Bidder Fee and Expense Reimbursement, or with respect to the ACS Stalking-Horse Bidder Fee, will be paid from the proceeds received from the Sale(s) to another Successful Bidder(s). If more than one Successful Bidder prevails, the Stalking-Horse Bidder Fee shall paid as follows: $350,000 shall be paid by the Successful Bidder of the Bank Shares, excluding the Bank Subsidiary Shares, and $100,000 shall be paid by the Successful Bidder of

19

the Bank Subsidiary Shares. The Expense Reimbursement, under such circumstances, would be divided by two and paid by the two Successful Bidders.

**Termination:**     The Purchase Agreement lists customary termination provisions, including the right of the Stalking-Horse Bidder to terminate in the event that the Sale Order approving the Sale to the Stalking-Horse Bidder is not entered on or before 60 calendar days after the date of the Sale Procedures Order, and that the Closing shall not have occurred by February 28, 2015, unless otherwise extended as otherwise provided in the Purchase Agreement. Either the Company or the Buyer may terminate the Purchase Agreements upon written notice from a Governmental Authority that it will not grant any of the Buyer Required Approvals or that the agreement violates any applicable Legal Requirement. The termination of the Purchase Agreements will, under certain circumstances, entitle the Stalking-Horse Bidder to a Stalking-Horse Bidder Fee and Expense Reimbursement or the ACS Stalking-Horse Bidder Fee.

## STALKING-HORSE BIDDER PROTECTION PROVISIONS

42.     In order to encourage initial bids and the Purchase Agreements being subject to termination in the event that the Debtor receives a higher and better bid(s) consistent with the Sale Procedures, Section 6.16 of the Purchase Agreements provides for a break-up fee of either (i) $450,000 (the "Stalking-Horse Bidder Fee"), which is less than 2.9% of the estimated total cash value of the Purchase Price, in the event the Stalking-Horse Bidder is not the Successful Bidder under either the Stalking-Horse Agreement or the Alternative Transaction Agreement, or (ii) $350,000, (the "ACS Stalking-Horse Bidder Fee") which is 3.5% of the estimated total cash value of the Alternative Purchase Price, but likely a much lower percentage of the total consideration to be received by the Debtor's bankruptcy estate when including the

20

value of the sale of ACS, in the event the Stalking-Horse Bidder is not the Successful Bidder under the Stalking-Horse Agreement and instead has consummated the Alternative Transaction pursuant to an Alternative Transaction Agreement.

43.     In the event the Stalking-Horse Bidder is not the Successful Bidder under either the Stalking-Horse Agreement or the Alternative Transaction Agreement, the Stalking-Horse Agreement also affords the Stalking-Horse Bidder an expense reimbursement of up to $250,000 in the aggregate for all actual, documented and reasonable costs and expenses incurred by the Stalking-Horse Bidder in connection with execution and delivery of the transactions contemplated by the Stalking-Horse Agreement in the event that the Stalking-Horse Bidder is not the Successful Bidder under either the Stalking-Horse Agreement or the Alternative Transaction Agreement (the "Expense Reimbursement"). Section 6.16 of the Stalking-Horse Agreement sets forth circumstances under which the Expense Reimbursement shall become due and payable.

44.     The Stalking-Horse Bidder Fee, the ACS Stalking-Horse Bidder Fee and the Expense Reimbursement are subject to approval of the Bankruptcy Court of the Stalking-Horse Agreement and Alternative Transaction Agreement as well as the sale(s) and shall be treated as administrative expenses in the Bankruptcy Case and paid from the proceeds received from the sale of the closing of a transaction with a Successful Bidder(s) who is not the Stalking-Horse Bidder.  Any amounts owed to the Stalking-Horse Bidder are to be paid within one Business Day of the date on which the Debtor consummates a transaction that yields proceeds in an amount sufficient to pay the

DOCS-#4373682-v2

Stalking-Horse Bidder Fee, the ACS Stalking-Horse Bidder Fee and/or the Expense Reimbursement.

45.     The Debtor, after consultation with Carl Marks, believes the amount of the Stalking-Horse Bidder Fee, the ACS Stalking-Horse Bidder Fee and the Expense Reimbursement, the conditions under which the Stalking-Horse Bidder Fee, the ACS Stalking-Horse Bidder Fee and the Expense Reimbursement are payable to the Stalking-Horse Bidder, and the other protections afforded the Stalking-Horse Bidder to assure payment of the Stalking-Horse Bidder Fee, the ACS Stalking-Horse Bidder Fee and the Expense Reimbursement if such payments become due, are reasonable under the circumstances. The Stalking-Horse Bidder has devoted substantial resources to the proposed transaction and conducted extensive due diligence. The protections and covenants contained in the Purchase Agreements for the benefit of the Stalking-Horse Bidder, as the stalking-horse for the contemplated sale process, reflect the amount of time and money that the Stalking-Horse Bidder has invested in making its bid and are commensurate with the benefits conferred upon the estate as a result of the bids.

## PROPOSED SALE PROCEDURES

46.     To ensure that the Debtor has maximized the value of its assets for the benefit of creditors and other stakeholders, the Stalking-Horse Bidder has agreed that the sale of assets must be subject to higher and otherwise better offers. The proposed sale and auction procedures (the "Sale Procedures") are described in detail in Exhibit 4 to this Motion. The proposed Sale Procedures are typical for transactions of this size and nature and provide a fair and competitive process designed to generate maximum

recovery. The Debtor intends to afford each potential bidder the time and opportunity to conduct due diligence up to the time of the Bid Deadline (as defined below). The Debtor shall furnish potential bidders with access to all due diligence information provided to the Stalking-Horse Bidder and any other potential bidder.

47.     As set forth in the Sale Procedures, the deadline for a potential bidder to submit bids shall be December 3, 2014 at 5:00 p.m. (prevailing Central Standard Time) (the "Bid Deadline").   Among other components specified in the Sale Procedures, any bid ("Bid"), to be a "Qualified Bid" must include the following items:

- With respect to a Bid to (A) purchase the Bank Shares and retain the Bank's ownership interest in ACS or purchase the Bank Shares without retaining ownership of ACS, a proposed purchase agreement (the "Bidder Purchase Agreement") executed by the bidder that is on substantially the same terms and conditions as those in the Stalking-Horse Agreement or the Alternative Transaction Agreement, as applicable; or (B) purchase the Bank Subsidiary's Shares (the "ACS Bidder Purchase Agreement"), a proposed purchase agreement executed by the bidder that sets forth the terms and conditions for the bidder to complete the transaction proposed by the Bid (provided, however, that the ACS Bidder Purchase Agreement must be in the form of a stock purchase agreement and must provide for the  termination or expiration at closing of all representations, warranties and obligations made by the Bank).

- A written acknowledgement by the bidder that it agrees to all of the terms for bidding and participation in the Auction as set forth in the Sale Procedures and consents to the exclusive jurisdiction and venue of the Bankruptcy Court with respect to all matters and disputes relating to its Bid.

- If a Bid contemplates the acquisition of the Bank Shares and the Bank retaining ownership of ACS, the aggregate purchase price or consideration to the Company to be paid for the Bank Shares must be in an amount at least $16,481,925, which includes an amount equal to the sum of (i) the Stalking-Horse Bidder Fee and (ii) the maximum Expense Reimbursement, plus (iii) $25,000. If a Bid contemplates the acquisition of the Bank Shares and the Bank selling the Bank Subsidiary Shares, the

proposed purchase price to be paid for the Bank Shares must be in an amount at least $10,500,000, which includes an amount equal to the sum of (i) the ACS Stalking-Horse Bidder Fee, plus (ii) $25,000.   If a Bid contemplates the acquisition of only of the Bank Subsidiary Shares, the proposed purchase price must be an amount of at least $12,042,081.

- A good faith deposit equal to $250,000 (the "Deposit"). The Deposit shall be held in escrow and will be refunded on the terms set forth below.

- Evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Bidder Purchase Agreement or the ACS Bidder Purchase Agreement, as the case may be.

- Evidence reasonably satisfactory to the Debtor of the bidder's financial ability to pay the purchase price and consummate the transaction.  In the event the bidder is an entity formed for the purpose of entering into the transaction identified in the bidder's Bid, such evidence must include that of the equity holders or sponsors of the bidder who must guarantee the obligations of the bidder.

- A redlined or marked-up version of the Bidder Purchase Agreement showing any changes to the corresponding form of Stalking-Horse Agreement, and a red-lined or marked-up version of the Bidder Purchase Agreement or the ACS Bidder Purchase Agreement, as the case may be, in each case showing any changes to the applicable Form of Purchase Agreement.

- A representation that it has acted in "good faith," as such term is used in section 363(m) of the Bankruptcy Code, in connection with its Bid, and a covenant that it will act in good faith, as such term is used in section 363(m) of the Bankruptcy Code, in connection with the Auction and Sale.

- Disclosure of sufficient information regarding both the potential bidder and partner(s), if any, to satisfy the Debtor with respect to the requirements enumerated in section 363(n) of the Bankruptcy Code.

- Such other information as may be reasonably requested by the Debtor.

In addition, any Bid must:

- be on terms that are not materially more burdensome or conditional than the terms of the Purchase Agreements;

24

- not be conditioned on obtaining financing or the outcome of any due diligence by the bidder; and

● not request or entitle the bidder to any break-up fee, expense reimbursement or similar type of payment.

48. The Stalking-Horse Bidder, which has approved and consented to the Sale Procedures, is a Qualified Bidder and the Stalking-Horse Agreement and Alternative Transaction Agreement are each a Qualified Bid.

49. If the Debtor does not receive any Qualified Bids apart from the bids submitted by the Stalking-Horse Bidder, then the Debtor will not conduct an Auction; the Debtor will promptly report the same to the Bankruptcy Court and seek approval of the Bankruptcy Court to effect the sale of the Bank Shares pursuant to the Stalking-Horse Agreement.

50. If Qualified Bids (other than the bid submitted by the Stalking-Horse Bidder) are received by the Bid Deadline, the Debtor shall conduct an auction (the "Auction") on December 9, 2014, at 9:00 a.m. (prevailing Central Time). The Debtor shall notify all Qualified Bidders of the place of the Auction.

51. As set forth more fully in the Sale Procedures, at the Auction, bidding shall begin initially with the highest Qualified Bid(s) as determined by the Debtor (upon consultation with its professionals and counsel to Alesco XV and XVI), and subsequently continue with minimum increments of $100,000. All Qualified Bidders will have the opportunity to increase the amount of their Qualified Bids. Upon conclusion of the bidding, the Auction shall be closed and the Debtor shall (after consultation with the its professionals and counsel to Alesco XV and XVI) identify

25

which highest or best offer(s) that will provide the greatest amount of net value to the Debtor and the bankruptcy estate. The Qualified Bidder(s) whose final bid(s) is deemed by the Debtor (upon consultation with its professionals and counsel to Alesco XV and XVI) to be the next highest or best bid shall be the "Back-Up Bidder(s)."

52.     After the selection of the Successful Bidder(s) and the Back-Up Bidder(s), the Debtor will return all Deposits as provided in the Sale Procedures. If the Successful Bidder approved by the Bankruptcy Court fails to close, its Deposit shall be deemed liquidated damages and retained by the Debtor.

53.     Each bid that is submitted shall constitute an irrevocable offer and be binding on the Successful Bidder and the Back-Up Bidder from the time the bid is submitted until the entry of the Sale Order. The Debtor will be deemed to have accepted a Qualified Bid or Qualified Bids only when such bid(s) is declared the Successful Bid(s) at the Auction, definitive documentation has been executed in respect thereof and such bid(s) has been approved by the Bankruptcy Court at the Sale Approval Hearing (as defined in the Sale Procedures and below). The Debtor will seek from the Bankruptcy Court approval of the Successful Bid for the Bank Shares and may also seek approval of the Back-Up Bid at such hearing.

54.     The proposed Sale Procedures provide a fair and reasonable framework for selling the Debtor's assets and ensuring that the Debtor obtains the highest or best offer or offers attainable under the circumstances.

## NOTICE OF SALE AND SALE APPROVAL HEARING

DOCS-#4373682-v2

55.     Rule 2002(a) and (c), Rule 6004 and Rule 6006, of the Federal Rules of Bankruptcy Procedure require the Debtor to notify its creditors and other parties in interest of the proposed sale, including a disclosure of the time and place of the Auction, the terms and conditions of the sale, and the deadline for filing objections. The Debtor requests that notice of this Motion and the relief requested herein, in addition to the other notices proposed to be furnished and as described herein, be deemed adequate and sufficient. The Debtor believes that the notice provided, and to be provided, is adequate and proper notice of the Sale Procedures, the proposed sale of the Bank Shares and its assets and business, including the sale of the issued and outstanding shares of ACS owned by the Bank, and satisfies the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and Local Rule 6004-1. Accordingly, the Debtor requests the Court to approve such notice.

56.     The Debtors also seek approval of the Notice of Sale substantially in the form attached as **Exhibits 5** and approval of the procedure for mailing of the notice.  On or before October 31, 2014, the Debtor intends to send the Notice of Sale (substantially in the form attached as Exhibit 5) by mail to each entity listed on the creditor matrix maintained by Local Rule 1007-2 in the bankruptcy cases, including the entities specified in the preceding paragraph.

57.     Additionally, the Debtor proposes that the Court hold a hearing to consider the relief requested in the Motion as it pertains to the entry of the Sale Order for **2:00 p.m.** (prevailing Central Time) on **December 11, 2014** (the "Sale Approval Hearing"), with objections to the sale of the Bank Shares to the Stalking-Horse Bidder or

27

the Successful Bidder, or the Back-Up Bidder, as the case may be, at the Auction due to be filed with the Court no later than **12:00 p.m.** (prevailing Central Time) on **December 10, 2014** and served in accordance with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules Such dates would permit the Court to consider evidence introduced and legal arguments presented at the Sale Approval Hearing.

58.     The Debtor believes that notice described in the preceding paragraphs complies with Bankruptcy Rule 6004(a) and Local Rules 6004-1(e), 2002-1(b)(2) and 2002-4(a) and should be approved and confirmed by the Court.

## NOTICE OF ASSUMED AND ASSIGNED CONTRACTS

59.     The Debtor has a small number of contracts primarily consisting of insurance contracts.  Under the Stalking-Horse Agreement, the Stalking-Horse Bidder does not identify executory contracts and unexpired leases (the "Acquired Company Contracts") it wishes the Debtor to assume and assign.  To the extent that the Stalking-Horse Bidder elects to effectuate an assumption and assignment of such Acquired Company Contracts, it will be responsible for all cure costs.  If the Debtor's proposal regarding assumption and assignment of an Acquired Company Contract changes, whether due to a change by the Stalking-Horse Bidder or a Successful Bidder or Back-Up Bidder or for any other reason, the Debtor will promptly give reasonable notice of such change to the affected counterparty to the Acquired Company Contract.  If there is any change in the identity of the proposed assignee after the Auction, such notice will be given as promptly as possible after the Auction.  If the Debtor is unable to give such notice prior to the Sale Approval Hearing, then the Debtor will request at the Sale

28

Approval Hearing that the Court set a hearing to consider any objection to the assumption-assignment of such Acquired Company Contracts, so as to give affected counterparties reasonable notice. The Debtor believes that the procedures described above for such Company Contracts satisfies the requirements of § 365 of the Bankruptcy Code and Rule 6006 of the Federal Rules of Bankruptcy Procedure and request that the Court approve such procedures.

**SALE ORDER EFFECTIVE IMMEDIATELY**

60.    Bankruptcy Rules 6004(g) and 6006(g) provide that orders authorizing the sale of property or the assignment of executory contracts are stayed until the expiration of 14 days after the entry of an order approving the sale or assignment. Time is of the essence in approving the sale of the Bank Shares at the Sale Approval Hearing and subsequently closing the transactions. A waiver is necessary to accommodate a prompt closing schedule and to allow for an orderly and prompt transition of the Business. Accordingly, this Court should waive the 14-day period staying any order to sell or assign property of the estate imposed by Bankruptcy Rules 6004(g) and 6006(d).

**EXPEDITED RELIEF IS NECESSARY**

61.    The Debtor requests that its Motion be granted on an expedited basis. The Debtor believes it will maximize value, provide greater certainty for depositors and regulatory authorities by removing the cloud associated with the bankruptcy filing, and provide an increased return to parties in interest by providing notice of the sale and Auction process. The Debtor and Carl Marks will require a period to time to conduct final marketing efforts prior to the Auction, and with the upcoming holidays, and year-

29

end, completing the sale and obtaining court approval will allow the Stalking-Horse Bidder or any other Successful Bidder(s) for the Bank Shares to seek approval by the regulators of the Bank and the Debtor. Additionally, the Bank's subsidiary, ACS, has certain contracts and licenses which are due to be renewed in less than 60 days and it is anticipated that certain approvals will be required in connection with such renewals. The sooner the parties have certainty as to the identity of the Successful Bidder(s), the greater certainty there will be as to value of the Bank Shares to the Debtor and the Bankruptcy Estate.

62. The Debtor and its professionals have consulted with certain holders of the TruPS holding the largest claims in these cases regarding its marketing process, the selection of the Stalking-Horse Bidder and this Motion. The Debtor believes they support the sale process proposed.

**GENERAL**

63. The Debtor reserves the right to file a supplemental memorandum of law or response in reply to objections, if any, that may be interposed with respect to the relief requested in this Motion.

64. Pursuant to Local Rule 9013-2(a), this Motion is accompanied by a memorandum of law, proposed order(s) and proof of service.

65. Pursuant to Local Rule 9013-2(c), the Debtor gives notice that it may, if necessary, call one or more of the following individuals to testify about the factual matters raised in and relevant to this Motion: Russell Gaydos, Chief Restructuring Officer of the Debtor, and Evan Tomaskovic, Principal and Chief Executive Officer of

30

Carl Marks Securities LLC. Other representatives of the Debtor or Carl Marks may also be called.

WHEREFORE, the Debtor respectfully requests that the Court grant the Motion and enter Orders substantially in the forms attached hereto:

A.    Authorizing, subject to final hearing, the Debtor to sell substantially all of its assets to the Stalking-Horse Bidder, or to another bidder or bidders submitting the Successful Bid(s) or the Back-Up Bid(s), free and clear of all liens, claims, interests and encumbrances which such liens, claims, interests and encumbrances attaching to the proceeds of the Sale ultimately attributable to the property against or in which such liens, claim, encumbrances and interests are asserted, all with the same validity, dignity, priority, effect and to the same extent as existed prior to the Sale and in all cases subject to any and all rights, claims and defenses that the Debtor and its estate may have with respect thereto;

B.    Approving the Stalking-Horse Bidder Fee, the ACS Alternative Transaction Fee, and the Expense Reimbursement;

C.    Approving the Sale Procedures;

D.    Approving the form and manner of notices of the Sale;

E.    Waiving the requirements of Bankruptcy Rules 6004(g) and 6006(d);

F.    Scheduling a final hearing, the Sale Approval Hearing, for December 11, 2014 at 2:00 p.m. (prevailing Central Time), or as soon thereafter as counsel and interested parties may be heard at which the sale and assignment to the Stalking-Horse Bidder or to the Successful Bidder(s) or the Back-Up Bidder(s) may be approved; and

31

G.      Granting such further, different or additional relief as is just and proper.

DATED:   October 20, 2014                    LINDQUIST & VENNUM LLP


By   /e/ George H. Singer
George H. Singer (0262043)
Jeffrey D. Smith (0387035)

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)
gsinger@lindquist.com
jsmith@lindquist.com

ATTORNEYS FOR
AMERICAN BANCORPORATION

DOCS-#4373682-v2

## VERIFICATION

    I, Russell Gaydos, am the Chief Restructuring Officer of American Bancorporation. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding motion are true and correct according to the best of my knowledge, information and belief.

Dated:October 21, 2014

Signed: _Russell Gaydos_

Russell Gaydos
Chief Restructuring Officer

DOCS-#4373682-v2

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

American Bancorporation,                    Bky. Case No. 14-31882 (KAC)

                    Debtor.                  Chapter 11

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING SALE AND AUCTION PROCEDURES; (B) APPROVING BIDDING PROTECTIONS FOR STALKING-HORSE BIDDER; (C) APPROVING PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (D) APPROVING FORM AND MANNER OF NOTICE; AND (II) AN ORDER (A) AUTHORIZING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS;  AND (B) GRANTING RELATED RELIEF**

American Bancorporation requests that the Court enter an order (I) an Order (A) Approving Sale and Auction Procedures; (B) Approving Bidding Protections for Stalking-Horse Bidder; (C) Approving Procedures Related to Assumption and Assignment of Executory Contracts; and (D) Approving Form and Manner of Notice; and (II) an Order (A) Authorizing Sale of Assets Free and Clear of Liens, Claims and Encumbrances and Other Interests; and (B) Granting Related Relief.

## BACKGROUND

The facts supporting the relief requested are set forth in the verified Motion. All capitalized terms have the meaning ascribed to them in the Motion, the Purchase Agreements or the Sale Procedures.

## ARGUMENT

I.    **THE PROPOSED SALE SATISFIES THE BUSINESS JUDGMENT TEST, IS IN THE BEST INTERESTS OF THE BANKRUPTCY ESTATE AND SHOULD BE APPROVED.**

Section 363 of the Bankruptcy Code governs a debtor's ability to sell property of the estate outside of the ordinary course of business. 11 U.S.C. § 363(b)(1). Although this section does not set forth a standard for determining when it is appropriate to authorize such a sale, courts have uniformly held that such a sale should be approved when it is justified by a sound business purpose. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n.16 (8th Cir. 1997); *Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Crystalin LLC*, 293 B.R. 455, 463-64 (8th Cir. B.A.P. 2003); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991). The burden of establishing a rational business justification is on the debtor. *Lionel*, 722 F.2d at 1070-71. However, once the debtor makes such a showing, a presumption will attach that the decision was made on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company. *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

Applying § 363, courts accord a debtor substantial deference in formulating procedures for selling assets. *See, e.g., Integrated Resources*, 147 B.R. at 656-57 (noting that

2

overbid procedures and break-up fee arrangements that have been negotiated by a debtor-in-possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same). Indeed, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales. *See, e.g., Integrated Resources*, 147 B.R. at 659 (such procedures should "encourage bidding and . . . maximize the value of the Debtor's assets"); *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and . . . provide for a fair and efficient resolution of bankrupt estates").

The proposed Sale and Sale Procedures should be approved. The Debtor has determined, after consultation with its financial advisors and representatives for the holders of certain TruPS, and careful evaluation of its business prospects and alternatives, that an auction will yield the greatest return. The Debtor, with the assistance of Carl Marks, has marketed the sale and business opportunities associated with the Bank and its Business to over 165 prospective purchasers. The Business was actively marketed postpetition for a substantial period of time, involved the solicitation of bids, presentations to interested parties and culminated in the negotiation of the Purchase Agreements with the Stalking-Horse Bidder. The Stalking-Horse Agreement represents the highest and best offer for the Bank Shares to date, and remains subject to

3

higher and better offers in the Auction. The Stalking-Horse Agreement, which is the product of extensive negotiations, is fair and reasonable under the circumstances and the sale contemplated thereby constitutes a sound exercise of the Debtor's business judgment and has been proposed in good faith. A prompt sale of the Bank Shares would also minimize the administrative expenses of the Debtor's bankruptcy estate. Further, the sale and public auction process contemplated by the Sale Procedures, which provides other interested parties the opportunity to overbid, represents the best prospect for the Debtor to maximize value of assets for benefit of the bankruptcy estate, creditors and other parties in interest. The proposed sale and auction process are designed to foster an open, competitive and fair sale process, while maximizing value.

The sale and the Purchase Agreements are supported by ample business justification and are reasonable and appropriate under the circumstances of this case. The Debtor believes that the Sale Procedures will ensure that the sale process is fair and reasonable and will yield the maximum value for the bankruptcy estate, creditors and all interested parties.  The Debtor requests that the Court approve the sale and the Sale Procedures as fair and reasonable under the circumstances and authorize the Debtor to proceed in accordance with them.

**II.     THE COURT SHOULD APPROVE THE STALKING-HORSE BIDDER FEE, THE EXPENSE REIMBURSEMENT AND OTHER BIDDER PROTECTIONS.**

In order to induce the Stalking-Horse Bidder to enter into the Purchase Agreements and serve as a stalking-horse for other potential bidders at the Auction, and as a part of extensive negotiations between the Stalking-Horse Bidder and the

4

Debtor, the Stalking-Horse Bidder required, and the Debtor agreed to grant, a Stalking-Horse Bidder Fee in the amount of $450,000 and an expense reimbursement in an amount not to exceed $250,000, or an ACS Stalking-Horse Bidder Fee in the amount of $350,000, as provided in and subject to the terms and conditions set forth in the Purchase Agreements.

In the context of bankruptcy cases, it is appropriate and customary to provide protections to prospective purchasers. Courts have found such fees, expense reimbursements and other protections afforded to stalking-horse bidders to be "important tools to encourage bidding and to maximize the value of the debtor's assets …" *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992). Buyer protections (including expense reimbursements and break-up fees) are designed to compensate a prospective purchaser for the costs and risks involved in preparing and proposing a bid that will establish a minimum standard for competing bids. *See In re APP Plus, Inc.*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998) (break-up fees compensate a prospective purchaser "for the time, efforts, resources, lost opportunity costs and risks incurred"). Without such protections, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence." *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992).

In recognition of the benefits conferred upon the sale process by a stalking-horse bidder, courts frequently approve break-up fee and expense reimbursement provisions

5

in connection with bankruptcy sales. In *Integrated Resources*, the court identified the following factors in determining whether to approve a break-up fee or expense reimbursement: (1) whether the negotiations of the break-up fee or expense reimbursement are tainted by self-dealing or manipulation; (2) whether the existence of the break-up fee or expense reimbursement hampers rather than encourages other bidding; and (3) whether the amount of the break-up fee or expense reimbursement is reasonable relative to the proposed purchase price. *Integrated Resources*, 147 B.R. at 662. *See also APP Plus*, 223 B.R. at 875. In the present case, the Stalking-Horse Bidder Fee, the Expense Reimbursement, the ACS Stalking-Horse Bidder Fee, and other protections afforded the Stalking-Horse Bidder are the result of arm's-length negotiations between the Debtor and the Stalking-Horse Bidder.

With respect to the second *Integrated Resources* factor, the Purchase Agreement will enhance the bidding for the assets by generating increased interest among other potential bidders and providing a baseline by which the Debtor can evaluate competing bids, including the minimum acceptable terms on which the proposed transaction can proceed. *Id*. A number of interested parties have communicated a desire to participate in a court-approved auction process. The Purchase Agreements, which set forth representations, warranties and disclosure schedules, provide a ready framework for interested parties to bid. Therefore, rather than "chilling" the bidding process, the Debtor believes that the Stalking-Horse Bidder Fee, the Expense Reimbursement and the ACS Stalking-Horse Bidder Fee support the bidding process, will encourage the bidding process, and should be approved by the Court. *See In re Wintz Companies*, 230

6

B.R. 840, 846 (8th Cir. B.A.P. 1999), *aff'd*, 219 F.3d 807 (8th Cir. 2000) (noting that courts have permitted break-up fees when they encourage rather than discourage bidding and when, taken as a whole, the transaction makes sense). The Stalking-Horse Bidder Fee and the maximum amount of the Expense Reimbursement, or in the alternative the ACS Stalking-Horse Bidder Fee, are not unreasonable in comparison to the size of the applicable proposed transactions. The Stalking-Horse Bidder Fee represents approximately 2.9% of the estimated total cash value of the Purchase Price. The ACS Stalking-Horse Bidder Fee represents approximately 3.5% of the estimated total cash value of the Alternative Purchase Price, but likely a much lower percentage of the total consideration to be received by the Debtor's bankruptcy estate when including the value of the separate sale of ACS.  Particularly given the nature and extent of due diligence performed by the proposed Stalking-Horse Bidder with respect to the Business and extensive negotiations that have transpired relative to the Stalking-Horse Agreement, the maximum amount of the Expense Reimbursement is also fair and reasonable. *See, e.g., Integrated Resources*, 147 B.R. at 662 (breakup fee of up to 3.2%, *plus* reimbursement of expenses, found to be reasonable; expert testimony acknowledged that average break-up fee is 3.3%); *In re Mid-American Waste Systems, Inc.*, Case No. 97-00104 (PJW) (Bankr. D. Del., January, 1997) (approving break-up fee of approximately 3.3%, *plus* up to $1 million in expense reimbursement); *In re Maritime Group, Ltd.*, Case No. 95-08153 (ERG) (Bankr. S.D. Miss., December 20, 1995) (approving break-up fee of approximately 2.9%); *In re Smith Corona Corp.*, Case No. 95-788 (HSB) (Bankr. D. Del., November 6, 1995) (approving break-up fee of approximately 3.9%); *cf. In re Twenver,*

7

*Inc.*, 149 B.R. 954 (Bankr. D. Colo. 1992) (rejecting break-up fee, in part, because it exceeded 10% of total proposed transaction price). *See also In re Fortunoff Fine Jewelry & Silverware, LLC*, BKY Case No. 08-10353, 2008 WL 61986 (Bankr. S.D.N.Y. Feb. 15, 2008) (Hon. James M. Peck) (approving buyer protections that included priority and lien protection for break-up fee and expense reimbursement as part of sale transaction).

In light of the risks, expense and complications associated with the proposed transaction, the Stalking-Horse Bidder would not enter into the Purchase Agreements without the protection of the Stalking-Horse Bidder Fee, the Expense Reimbursement and the ACS Stalking-Horse Bidder Fee. Therefore, absent the Stalking-Horse Bidder Fee, the Expense Reimbursement, and the ACS Stalking-Horse Bidder Fee, the Stalking-Horse Bidder would not have negotiated or entered into the Purchase Agreements, which Purchase Agreements will confer value upon Debtor's estate by, among other things, (i) initiating the bidding process for the assets, (ii) establishing a bid standard or minimum for other bidders early in the bidding process, (iii) placing the assets in a sales configuration mode to attract other bidders, and (iv) serving, by the Stalking-Horse Bidder's identity and level of expressed interest and due diligence conducted, as a catalyst for other potential bids.  The protections afforded to the Stalking-Horse Bidder are clearly in the best interests of the Debtor's estate and creditors.

## III.    THE PROPOSED SALE AND SALE PROCEDURES WILL RESULT IN A GOOD FAITH SALE OF THE ASSETS.

Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of

a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . ." 11 U.S.C. § 363(m). As such, a prospective purchaser is afforded a safe-harbor and related protections when a purchase is made in "good faith." *See id.* This provision serves the important purpose of encouraging good-faith transactions and preserving the finality of the bankruptcy court's order unless stayed pending an appeal. *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).

The terms of the Purchase Agreements between the Stalking-Horse Bidder and the Debtor have been negotiated extensively at arms' length and in good faith. In addition, the Sale Procedures that have been developed will encourage a competitive sale. The Court will have the opportunity at the Sale Approval Hearing to approve the sale to ensure that the Successful Bidder(s) and the Back-Up Bidder(s) are entering into the sale in good faith and have had no unfair advantage. The Debtor and Carl Marks, in consultation with the representatives for the holders of certain TruPS, have designed the sale and the Sale Procedures with the intention of maximizing the return to the Debtor's bankruptcy estate. The Debtor believes that prospective purchasers at the Auction will have been, prior to the date thereof, afforded time to conduct extensive due diligence and will have an additional opportunity to conduct due diligence and to formulate topping bids for the assets. The Auction will present an opportunity to conduct sale negotiations openly and fairly, with the input of the Debtor's financial advisors and the creditors who have the greatest economic stake in the process. If the Court approves the sale as requested in the Motion, it should also invoke § 363(m) to

9

protect the purchaser's or purchasers' (i.e., the Successful Bidder(s) and the Back-Up

Bidder(s)) acquisition by explicitly finding that the purchaser(s) have acted in good

faith. *See In re Apex Oil Co.*, 92 B.R. 847, 874 (Bankr. E.D. Mo. 1988).

## IV. THE PROPOSED TRANSACTION SATISFIES ALL APPLICABLE LEGAL STANDARDS FOR A SALE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES.

The Debtor believes this Motion, the Purchase Agreements and the transactions

contemplated thereby are in the best interests of the bankruptcy estate and in the best

interests of all interested parties in this Chapter 11 case. Section 363(f) of the Bankruptcy

Code authorizes a debtor to use, sell or lease property of the estate outside of the

ordinary course of business, free and clear of any interest in such property. 11 U.S.C.

§ 363(f). The Debtor requests authority to sell free and clear of all interests, liens, claims

and encumbrances. Any such interests, liens, claims and encumbrances would attach to

the proceeds of the sale of the assets ultimately attributable to the property against or in

which such interest, lien, claim or encumbrance with the same validity, priority, force

and effect that such interests, liens, claims and encumbrances had against the assets

sold.

Pursuant to § 363(f) of the Bankruptcy Code, a debtor may sell property free and

clear of liens, claims and encumbrances if one of the following conditions is met:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute;

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). The existence of any one of the five conditions provides authority to sell free and clear of liens. *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988).

Under § 363(f)(2) of the Bankruptcy Code, a sale free and clear of all interests, liens, claims and encumbrances is permissible if all parties asserting liens on or other interests in the assets to be sold consent. The Debtor is providing proper notice of this transaction and the Sale Approval Hearing to creditors claiming an interest in the assets, thereby giving them the opportunity to object to this transaction. Provided that no creditors claiming an interest in the assets object to this transaction, § 363(f)(2) will be satisfied. *See, e.g., Veltman v. Whetzal*, 93 F.3d 517, 521 n.5 (8th Cir. 1996) (in a Chapter 7 case, stating that "some courts have found implied consent, however, when a party with an interest in the bankruptcy estate fails to object after receiving notice of the sale under subsection 363(f)(2)") (citing *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988); *In re Shary*, 152 B.R. 724, 725-26 (Bankr. N.D. Ohio 1993).

Approval of the sale free and clear of all interests, liens, claims and encumbrances in these bankruptcy cases is in the best interests of the estate and all of its constituents. The relief requested is appropriate and is consistent with the letter and spirit of § 363(f).

## V.     THE COURT SHOULD APPROVE THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

The ability to reject, assume and assign executory contracts and unexpired leases allows a debtor to maximize the value of its estate by assuming contractual arrangements that are beneficial and rejecting those that are burdensome. The assumption and assignment by the Debtor to the Successful Bidder(s) of certain executory contracts may be an integral part of the proposed sale and should be approved by the Court. Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume any executory contract or unexpired lease subject to the bankruptcy court's approval, and § 365(f) allows for assignments. Section 365(b) of the Bankruptcy Code requires a debtor to satisfy certain requirements at the time of assumption if a default that is material and economically significant exists under the contract or lease to be assumed.

A bankruptcy debtor's decision to assume or reject an executory contract or unexpired lease is governed by the "business judgment" test. *In re Food Barn Stores, Inc.*, 107 F.3d 558, 567 n.16 (8th Cir. 1996); *In re Chi-Feng Huang*, 23 B.R. 798, 800 (B.A.P. 9th Cir. 1982). *See also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Pesce Baking Co., Inc.*, 43 B.R. 949, 956 (Bankr. N.D. Ohio 1984). Under the business judgment test, a court should approve a debtor's proposed assumption or rejection if it will benefit the estate. *Id.* A debtor's decision to assume or reject an executory contract should be accepted unless evidence is presented that the decision

12

was "clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Richmond Leasing*, 762 F.2d at 1309.

The Debtor does not presently intend to seek approval of the assumption and assignment to the Stalking-Horse Bidder.  However, if another Successful Bidder(s) and/or Back-Up Bidder(s) ultimately is selected by the Debtor pursuant to the Sale Procedures, and seeks to have certain executory contracts and unexpired leases related to the Business assumed and assigned (all such executory contracts and unexpired leases being collectively referred to as the "Acquired Company Contracts"), except for those executory contracts and unexpired leases rejected by the Debtor pursuant to Court order, then prior to the Sale Approval Hearing, the Debtor will serve the counterparties (the "Counterparties") to the Acquired Company Contracts with a notice (the "Contract Notice") that contains the following information: (a) notice of the Debtor's intent to assume and assign certain of the Acquired Company Contracts to the Successful Bidder(s) and/or Back-Up Bidder(s)ultimately selected by the Debtor pursuant to the Sale Procedures), effective as of the date of the closing of the transaction with such parties ("Closing"); (b) a list of the Acquired Company Contracts and the monetary defaults (if any) related to each Acquired Company Contract that are required to be cured pursuant to § 365 of the Bankruptcy Code (the "Cure Amounts"); and (c) the procedures for filing any objections to the assumption and assignment of the Acquired Company Contracts, including any objections to the proposed Cure Amounts which, if any, will be paid the Successful Bidder(s) and/or Back-Up Bidder(s).

13

Based on the foregoing, the Debtor respectfully requests that the Court approve the procedure for the assumption and assignment of Acquired Company Contracts. The Debtor's decision to assume and assign those Acquired Company Contracts in connection with the proposed Sale transaction stems from the sound exercise of the Debtor's business judgment as they are necessary to maximize the value of the Bank Shares to the Stalking-Horse Bidder and therefore to the bankruptcy estate.

## Expedited Relief

Fed. R. Bankr. P. 9006(c) provides that the Court, on request of a party and for cause shown, may order a notice period reduced.  Local Rule 9006-1(d) provides that if expedited relief is necessary, the party seeking such relief must request an expedited hearing and take all reasonable steps to provide the most expeditious service and notice possible.

The Debtor asserts cause exists for shortening the notice period in this case.  The Debtor and Carl Marks will require a period to time to conduct final marketing efforts prior to the Auction.  The Debtor believes it will maximize value, provide greater certainty for depositors and regulatory authorities by removing the cloud associated with the bankruptcy filing, and provide an increased return to parties in interest by providing notice of the sale and auction process, completing the sale and obtaining court approval to allow the  Stalking-Horse Bidder or any other Successful Bidder(s) for the Bank Shares to seek approval by the regulators of the Bank and the Debtor prior to the upcoming holidays and year-end.  Additionally, the Bank's subsidiary, ACS, has certain contracts and licenses which are due to be renewed in less than 60 days and it is

14

anticipated that certain approvals will be required in connection with such renewals. The sooner the parties have certainty as to the identity of the successful bidder(s), the greater certainty there will be as to value of the Bank Shares to the Debtor. The Debtor and its professionals have also consulted with counsel to Alesco XV and XVI, petitioning creditors holding the largest claims in these cases, regarding its marketing process, the selection of the Stalking-Horse Bidder, the Sale Procedures and the relief requested in this Motion and believe they support the sale process proposed.

<u>CONCLUSION</u>

For the foregoing reasons, the Debtor respectfully requests that this Court approve the relief requested in the Motion.

DATED:   October 21, 2014          LINDQUIST & VENNUM LLP


By: /e/ George H. Singer
George H. Singer (0262043)
Jeffrey D. Smith (0387035)

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)
gsinger@lindquist.com
jsmith@lindquist.com

ATTORNEYS FOR
AMERICAN BANCORPORATION

15

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

    American Bancorporation

        Debtor.

Bky Case No: 14-31882 (KAC)

Chapter 11

## <u>CERTIFICATE OF SERVICE</u>

    Gayle Hildahl of the city of Minneapolis, County of Hennepin, State of Minnesota, states that on October 21, 2014 she served the following document:

1.    Notice of Hearing, Motion for Expedited Hearing and Motion for Entry of (I) An Order (A) Approving Sale and Auction Procedures; (B) Approving Bidding Protections for Stalking-Horse Bidder; (C) Approving Procedures Related to Assumption and Assignment of Executory Contracts; and (D) Approving Form And Manner of Notice; and (II) An Order (A) Authorizing Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (B) Granting Related Relief; Exhibits;

upon:

Alesco Preferred Funding II, Ltd.
Cohen & Company Financial Management LLC
c/o Peter Addei
Circa Centre
2929 Arch Street
17th Floor
Philadelphia, PA 19104

Alesco Preferred Funding XV & XVI, Ltd
Attn: Jason Harbour
Shannon E. Daily
Hunton & Williams, LLP
951 East Byrd Street
Richmond, VA 23219-4074

Alesco Preferred Funding XV & XVI, Ltd.
 ATP Management, LLC
c/o Constantine M. Dakolias
1345 Avenue of the Americas
Floor 46
New York, NY 10105-0302

AmeriNational Community Services, Inc.
217 South Newton Ave
Albert Lea, MN 56007-2563

American Bancorporation
1578 University Avenue West
St. Paul, MN 55104-3908

Norlin G. Boyum, Vice Chairman
Secretary & Treasurer
7800 Metro Parkway, Suite 200
Minneapolis, MN  55425

Andy Schweizer
1215 – 12th Avenue NW
New Brighton, MN 55112-6423

IRS Office of Chief Counsel
650 Galtier Plaza
380 Jackson Street
St. Paul, MN 55101-3883

Norbert J. Conzemius, Chairman
1125 Park Avenue
Mahtomedi, MN 55115

David R. Metzen
906 Highview Circle South
Mendota Heights, MN 55118

Russ Gaydos
11250 Beechwood Lane
Woodbury, MN 55129

Houston Specialty Insurance Company
800 Gessner Road, Suite 600
Houston, TX 77024-4538

Jeffrey Klobucar
Bassford Remele, P.A.
33 South Sixth Street, Ste. 3800
Minneapolis, MN 55402-3707

Mike Maglich
16700 Grays Bay Blvd
Wayzata, MN 55391

Berkley Regional Insurance Company
475 Steamboat Road
Greenwich, CT 06830-7144

Chubb Group of Insurance Companies
Federal Insurance Company
c/o Chubb Group of Insurance Cos.
Great Northern Insurance Company
c/o Chubb Group of Insurance Cos.
15 Mountain View Road
Warren, NJ 07059-6711

Federal Reserve Bank, Diann Townsend
Federal Reserve Bank of MN, Gregory Aase
Federal Reserve Bank of Mpls, Frederick Miller
90 Hennepin Avenue
Minneapolis, MN 55401-1804

Barry O'Meara
1874 Brenner Avenue
Roseville, MN   55113

Tom Palmer
122 EastBank Court North
Hudson, WI   54016

Hennepin Capital, LLC
Attn: Donald McNeil, Esq.
Heley, Duncan & Melander, PLLP
8500 Normandale Lake Blvd, Suite 2110
Minneapolis, MN 55437-3813

Department of Revenue
Collection Enforcement Division
551 Bankruptcy Section
PO Box 64447
St. Paul, MN 55164-0447

Minnesota Department of Commerce
Attn: M. Shane Deal
Deputy Commissioner
85 7th Place East, Suite 500
St. Paul, MN 55101-2198

2

Revocable Trust of Austin
Chapman dated 8-13-1973
8301 Creekside Circle #630
Bloomington MN 55437

Federal Deposit Insurance Corp.
Attn: Brian Geraets, Supervisory Examiner
9220 Bass Lake Road, Suite 220
New Hope, MN 55428-3015

Travelers Insurance Company
385 Washington Street
St. Paul, MN 55102

US Trustee
1015 US Courthouse
300 S 4th Street
Minneapolis, MN 55415-3070

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia PA 19101-7346

Robert Thurston
9196 Lake Avenue S
Spicer, MN 56288-8619

Terry Maglich
473 Willoughby Way East
Minnetonka, MN 55305-5343

U.S. Bank N.A., as Trustee
Attn: David Jason, Vice President
Global Corporate Trust Services
190 S LaSalle Street
Chicago, IL 60603-3410

Wilmington Trust Co., as Trustee
Attn: Corp Trust Administration
Rodney Square North
1100 North Market Street
Wilmington, DE 19890

via Federal Express or Express Mail to the addresses listed above and electronically by Notice of
Electronic Filing upon all parties who have requested service in this case by filing the same via
ECF with the Bankruptcy Court in the District of Minnesota..

                                    _____/e/ Gayle Hildahl_____
                                    Gayle Hildahl

3

DOCS-#4234308-v5