## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

American Bancorporation,                                    Chapter 11

                        Debtor.                    Case No. 14-31882 (KAC)

**ORDER (I) APPROVING (A) SALE AND AUCTION PROCEDURES, (B) BIDDING PROTECTIONS FOR STALKING-HORSE BIDDER, AND (C) FORM AND MANNER OF NOTICE; (II) SCHEDULING FURTHER HEARING; AND (III) GRANTING RELATED RELIEF**

This matter came before the Court on October 29, 2014 and October 31, 2014 on the verified Motion of American Bancorporation (the "Debtor") for Entry of (I) an Order (A) Approving Sale and Auction Procedures; (B) Approving Bidding Protections for Stalking-Horse Bidder; (C) Approving Procedures Related to Assumption and Assignment of Executory Contracts; and (D) Approving Form and Manner of Notice; and (II) an Order (A) Authorizing Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (B) Granting Related Relief (the "Sale Motion"). [1]

Based on (i) the Sale Motion and all exhibits thereto; (ii) the arguments of counsel concerning entry of this Order (the "Sale Procedures Order"); (iii) the evidence proffered or adduced at the hearing regarding the Sale Procedures (the "Sale Procedures Hearing"); and (iv) all the files, records and proceedings herein, the Court being advised in the

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Sale Motion unless the context requires otherwise.

1

premises, and for those reasons stated and recorded in open court following the close of

evidence:

**THE COURT HEREBY FINDS**:[2]

A.      This Court has jurisdiction to hear and determine the Sale Motion with

respect to the matters set forth below pursuant to 28 U.S.C. §§ 157 and 1334 and Local

Rule 1070-1 and this matter is a core proceeding pursuant to 28 U.S.C §§ 157(b)(2)(A)

and (N).

B.      On October 21, 2014 and through additional service effectuated by the

Debtor on or before the date hereof, the Debtor filed the Sale Motion and served copies

of the Sale Motion in compliance with Local Rules 2002-1, 2002-4, 6004-1, and 9013-3.

C.      The entry of the Sale Procedures Order and the relief granted herein was

supported by the U.S. Trustee, Alesco Preferred Funding II, Ltd., Alesco Preferred

Funding XV, Ltd. and Alesco Preferred Funding XVI, Ltd. and no other party in

interest, including Hennepin Capital, LLC, has objected.

D.      As demonstrated by the testimony or other evidence proffered or adduced

at the Sale Procedures Hearing, the Debtor has articulated good and sufficient reasons

for: (i) approving the sale procedures as defined in Exhibit A attached to this Order (the

"Sale Procedures"); (ii) approving the form of the Notice of Sale; (iii) approving the

auction process set forth in the Sale Procedures (the "Auction"); (iv) scheduling the

hearing (the "Sale Approval Hearing") to approve the Sale Motion and the sale of the

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall
be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

DOCS-#4375749-v4

assets of the Debtor (the "<u>Assets</u>") described therein (the "<u>Sale</u>"); and (v) any other relief granted herein.

E.      The Debtor's Notice of Sale and Sale Procedures attached to this Order as <u>Exhibit B</u> (the "<u>Notice of Sale</u>") is appropriate and reasonably calculated to provide interested parties with timely and proper notice, and no further notice is required subject to its proper service on or before November 4, 2014.

F.      The Sale Procedures are beneficial to the Debtor's estate and creditors because they should ensure a competitive and efficient bidding process and will enhance the Debtor's ability to maximize the value of its assets for the benefit of its creditors and other parties-in-interest. The terms and conditions of the Sale Procedures are fair and reasonable and are the product of extensive good faith, arm's-length negotiations between the Debtor and the Stalking-Horse Bidder and were necessary to induce the Stalking-Horse Bidder to enter into the Purchase Agreements. Under the circumstances, the Sale Procedures constitute a reasonable, sufficient, adequate, and proper means to provide potential competing bidders with an opportunity to submit and pursue higher and better offers for the Assets.  The Debtor has demonstrated a sound business justification for the Sale Procedures.

G.      Entry of this Sale Procedures Order is in the best interests of the Debtor and its estate, creditors and other parties-in-interest.

**IT IS ORDERED:**

<u>**General Provisions**</u>

1.      The Motion for expedited hearing is granted.

2.      The Sale Motion is hereby granted to the extent provided herein.

3.      Notice of the Sale Procedures Hearing was fair and equitable under the circumstances.

### Sale Procedures

4.      The Sale Procedures are hereby APPROVED subject to compliance with all applicable laws, rules, regulations, and obtaining all required approvals and consents, and subject to further order of this Court. The Debtor is hereby authorized and empowered to act in accordance with the Sale Procedures.

### Stalking-Horse Bidder Provisions

5.      The Stalking-Horse Bidder Fee, the ACS Stalking-Horse Bidder Fee and the Expense Reimbursement are each reasonable under the circumstances and a component of the sale process under which the Stalking-Horse Bidder agreed to serve as the stalking-horse for the purchase of Assets under the proposed Purchase Agreements and are, subject to further order of the Court at the Sale Approval Hearing that will include a determination of the amount of the Expense Reimbursement, hereby APPROVED as part of the approval of the Sales Procedures as provided hereinabove. The Stalking-Horse Bidder may present evidence of its actual, documented and reasonable expenses and costs as part of a request for the Expense Reimbursement in the form of one or more affidavit(s) or unsworn declaration(s) filed on behalf of the Stalking-Horse Bidder.

### Objection Deadline to Sale Order and Sale Approval Hearing

DOCS-#4375749-v4

6.      The Sale Approval Hearing will take place on December 11, 2014 at 8:00 a.m. prevailing Central Time in the courtroom of the Honorable Katherine A. Constantine, United States Bankruptcy Judge, in Courtroom 2C of the United States Courthouse, 316 N. Robert Street, Saint Paul, Minnesota.

7.      Objections to the relief sought in the Sale Motion shall be filed with this Court and served upon (a) the Debtor, American Bancorporation, 1060 Dakota Drive, Mendota Heights, Minnesota 55120-1266 (Attn: Russell Gaydos, e-mail, rgaydos@americanbankmn.com); (b) counsel for the Debtor, Lindquist & Vennum LLP, 4200 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402 (Attn: George H. Singer, e-mail, gsinger@lindquist.com); (c) financial adviser for the Debtor, Carl Marks Securities LLC, 900 Third Avenue, 33rd Floor, New York, New York, 10022-4775 (Attn: Evan Tomaskovic, e-mail, etomaskovic@carlmarks.com); (d) counsel for Alesco Preferred Funding XV, Ltd. and Alesco Preferred Funding XVI, Ltd., through their collateral manager ATP Management LLC, Hunton & Williams, LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219 (Attn: Jason W. Harbour, e-mail, jharbour@hunton.com); (e) counsel for the Stalking-Horse Bidder, Stinson Leonard Street LLP, 150 South Fifth Street, Suite 2300, Minneapolis, Minnesota 55402 (Attn: Adam D. Maier, email, adam.maier@stinsonleonard.com); (f) financial adviser for the Stalking-Horse Bidder, Hovde Group, LLC, 343 W. Erie Street, Suite 430, Chicago, Illinois 60654 (Attn: Douglas Hillhouse, e-mail, dhillhouse@hovdegroup.com); and (g) counsel to the United States Trustee, 1015 U.S. Courthouse, 300 South 4th Street,

5

Minneapolis,    Minnesota    55402    (Attn:    Colin    Kreuziger,    e-mail,

Colin.Kreuziger@usdoj.gov).

8.    This Court shall retain jurisdiction over any matter or dispute arising from

or related to implementing this Sale Procedures Order.

Dated:    *November 3, 2014*          /e/ Katherine A. Constantine

          Katherine A. Constantine
          United States Bankruptcy Judge

> NOTICE OF ELECTRONIC ENTRY AND
> FILING ORDER OR JUDGMENT
> Filed and Docket Entry made on *11/03/2014*
> Lori Vosejpka, Clerk, by ED

DOCS-#4375749-v4

**EXHIBIT A**

**AMERICAN BANCORPORATION**

**SALE PROCEDURES**

AMERICAN BANCORPORATION (the "Company") is a debtor in possession in a bankruptcy proceeding pending in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court") under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). [Bky. Case No. 14-31822]

To maximize the return to the Company's bankruptcy estate and creditors, the Bankruptcy Court has authorized the Company to conduct an auction (the "Auction") concerning the sale of the Company's assets, including without limitation the issued and outstanding shares of capital stock of AMERICAN BANK OF ST. PAUL (the "Bank") owned by the Company (the "Bank Shares"), and certain related transactions, including without limitation the sale of the issued and outstanding shares of stock of AMERINATIONAL COMMUNITY SERVICES, INC. ("ACS") owned by the Bank (the "Bank Subsidiary Shares"), pursuant to procedures approved by the Bankruptcy Court which, among other things, set forth the process by which the highest or otherwise best offer or offers will be determined at the Auction (the "Sale Procedures Order").  [Dkt. No. ___.] For the purposes of clarity and the avoidance of doubt, although the sale procedures (the "Sale Procedures") also contemplate the marketing, potential sale, and auction of the Bank Subsidiary Shares, any such sale of the Bank Subsidiary Shares by the Bank would not receive the protections of an order of the Bankruptcy Court approving such sale because the Company asserts the Bank's ownership of the Bank Subsidiary Shares is not property of the Company's bankruptcy estate.

The following are the Sale Procedures approved by the Bankruptcy Court:

1.    **The Sale.**

The Sale Procedures set forth the process by which prospective bidders, if any, may qualify for and participate in the Auction, thereby competing to make the highest or otherwise best offer or offers to maximize the return to the Company's bankruptcy estate and creditors. The Company shall request that the Bankruptcy Court enter an order (the "Sale Order") authorizing the Company to enter into the sale transaction or transactions, to which the Company is a party, determined at the Auction to be the highest or otherwise best offer or offers.  The Company intends that the sale transaction or transactions determined at the Auction to be the highest or otherwise best offer or offers (individually or collectively, a "Sale") will be free and clear of all pledges, liens, encumbrances, claims and other interests to the full extent available under applicable law.

1

2.        **Stalking-Horse Bidder and Alternative Bids.**

The Company has entered into alternative stock purchase agreements each dated October 21, 2014 with DEERWOOD BANK (the "Stalking-Horse Bidder"), in each case, subject to higher or otherwise better offers submitted in accordance with the process set forth in these Sale Procedures, and subject to approval by the Bankruptcy Court in the Sale Order.

Under the terms of one of the stock purchase agreements, the Stalking-Horse Bidder has agreed to purchase the Bank Shares, which includes all operations and assets of the Bank *including* the Bank's sole ownership of ACS (the "Stalking-Horse Agreement"), in exchange for a purchase price in cash equal to (1) the product of (A) 65%, multiplied by (B) the "Adjusted Book Value" of the Bank as of the "Determination Date," minus (2) the "Loan Loss Reserve Adjustment" (as such terms are defined in the Stalking-Horse Agreement). As of June 30, 2014 (assuming a Loan Loss Reserve Adjustment), the resulting purchase price payable to the bankruptcy estate by the Stalking-Horse Bidder in connection with the consummation of transactions contemplated by the Stalking-Horse Agreement would have been $15,756,925 ("Purchase Price"). Under the Stalking-Horse Agreement, the Company has the absolute right, power and privilege to make an election to proceed with either a Sale transaction pursuant to the terms of the Stalking-Horse Agreement or a Sale transaction pursuant to the terms of an alternative purchase agreement with the Stalking-Horse Bidder (the "Alternative Transaction Agreement"). Under the terms of the Alternative Transaction Agreement, the Stalking-Horse Bidder has agreed to purchase the Bank Shares which includes all of the operations and assets of the Bank *excluding* the Bank's sole ownership interest in ACS in exchange for a purchase price in cash equal to (1) the product of (A) 41.4%, multiplied by (B) the Adjusted Book Value of the Bank as of the Determination Date, minus (2) the Loan Loss Reserve Adjustment. As of June 30, 2014, the resulting purchase price payable to the bankruptcy estate by the Stalking Horse Bidder in connection with the consummation of the transactions contemplated by the Alternative Transaction Agreement would have been $10,000,000 ("Alternative Purchase Price"), which would require delivery to the Stalking-Horse Bidder an amount equal to the book value associated with ACS, which was $9,692,081 as of June 30, 2014, *provided, however*, that the Bank Subsidiary Shares would be available for sale by the Bank to third parties under the Alternative Transaction Agreement and that any amount paid for the Bank Subsidiary Shares above the book value associated with ACS would be received by the Company.  In that scenario, the Stalking-Horse Bidder would receive the book value associated with ACS, although ownership of ACS and its assets and business operations would transfer to the third party.

The Stalking Horse Bidder's offers under the Stalking-Horse Agreement and the Alternative Transaction Agreement are not revocable as long as all conditions to closing

set forth in the agreement pursuant to which the Company has elected to proceed have been satisfied.

The Stalking-Horse Bidder has submitted a Deposit (as defined below) in the amount of $250,000. Such Deposit shall be treated in the same manner as other Deposits received from other Qualified Bidders as set forth below.

In the event the Stalking-Horse Bidder is not the Successful Bidder under either the Stalking-Horse Agreement or the Alternative Transaction Agreement, as set forth in these Sale Procedures, and the Company closes on the Sale contemplated by such agreements with another bidder or bidders, the Stalking-Horse Bidder will be entitled to receive a fee from the proceeds received in connection with such Sale in the amount of $450,000 (the "Stalking-Horse Bidder Fee") plus reimbursement of all actual, documented and reasonable expenses and costs incurred by the Stalking-Horse Bidder in connection with the transactions contemplated by the Stalking-Horse Agreement (including the negotiations, due diligence and bidding process relating thereto) up to $250,000 (the "Expense Reimbursement") on the terms and conditions provided in the Stalking-Horse Agreement. In the event that the Stalking-Horse Bidder is not the Successful Bidder under the Stalking-Horse Agreement and the Stalking-Horse Bidder has consummated the Alternative Transaction, the Stalking-Horse Bidder will be entitled to receive a fee in an amount equal to $350,000 (the "ACS Stalking-Horse Bidder Fee") but, provided, for avoidance of doubt, that under such circumstances the Stalking-Horse Bidder would not be entitled to receive any Expense Reimbursement. Any amount that may be due and payable by the Company with respect Stalking-Horse Bidding Fee and Expense Reimbursement, or with respect to the ACS-Stalking Horse Bidder Fee, will be paid from the proceeds received from the Sale(s) to another bidder(s). If more than one Successful Bidder prevails, the Stalking-Horse Bidder Fee shall paid as follows: $350,000 shall be paid by the Successful Bidder of the Bank Shares, excluding the Bank Subsidiary Shares and $100,000 paid by the Successful Bidder of the Bank Subsidiary Shares. The Expense Reimbursement, under such circumstances, would be divided by two and paid by the two Successful Bidders.

3.    **Key Dates.**

Below are important dates relating to the bidding, the Auction and the Sale:

*Bid Deadline:*    December 5, 2014 by 5:00 p.m. (prevailing Central Time)

*Auction:*    December 10, 2014 at 9:00 a.m. (prevailing Central Time)

*Sale Approval Hearing:*    December 11, 2014 at 8:00 a.m. (prevailing Central Time)

3

4.         **Access to Information and Due Diligence.**

Information relevant to the Company, the Bank and ACS, shall be made available to those potential bidders whom the Company reasonably determines have the capability to submit a Qualified Bid (as defined below). The Company will provide reasonable access to such information as soon as practicable following the execution by potential bidders of a nondisclosure agreement that is in form and substance reasonably acceptable to the Company. Such information will include, without limitation, a form of purchase agreement for the Bank Shares and/or a form of purchase agreement for the Bank Subsidiary Shares based on the Stalking-Horse Agreement or the Alternative Transaction Agreement, as applicable (each, a "Form of Purchase Agreement").

Parties interested in bidding should contact the Company's investment banker and financial advisor, CARL MARKS SECURITIES LLC ("Carl Marks"), to request a copy of the confidentiality agreement and coordinate access to information and due diligence. Carl Marks can be contacted as follows: Evan Tomaskovic (etomakovic@carlmarks.com), Chris Wu (cwu@carlmarks.com), Scott Chabina (schabina@carlmarks.com) and Matt McInerney (mmcinerney@carlmarks.com).

5.         **Participation Requirements.**

The Company will consider only formal, binding and irrevocable bids from qualified overbidders (each, a "Bid") that remain irrevocable until the Outside Date (as defined below).  In order to be a qualified bidder, a potential bidder must submit a package (the "Bid Package") in accordance with these Sale Procedures on or before the Bid Deadline (as defined below) that includes all of the following items:

(a)       Acknowledgement. The Bid shall include a written acknowledgement by the bidder that it agrees to all of the terms for bidding and participation in the Auction as set forth in these Sale Procedures and consents to the exclusive jurisdiction and venue of the Bankruptcy Court with respect to all matters and disputes relating to its Bid.

(b)       Bidder Purchase Agreement.  With respect to a Bid to (A) purchase the Bank Shares and retain the Bank's ownership interest in ACS or purchase the Bank Shares without retaining ownership of ACS, a proposed purchase agreement (the "Bidder Purchase Agreement") executed by the bidder that is on substantially the same terms and conditions as those in the Stalking-Horse Agreement or the Alternative Transaction Agreement, as applicable; or (B) to purchase the Bank Subsidiary's Shares (the "ACS Bidder Purchase Agreement"), a proposed purchase agreement executed by the bidder that sets forth the terms and conditions for the bidder to complete the transaction proposed by the Bid (*provided, however*, that the ACS Bidder Purchase Agreement must be in the form of a stock purchase agreement and must provide for

termination or expiration at closing of all representations, warranties and obligations made by the Bank).

(c)     <u>Red-Lined Documents</u>. A redlined or marked-up version of the Bidder Purchase Agreement showing any changes to the corresponding form of Stalking-Horse Agreement, and a red-lined or marked-up version of the Bidder Purchase Agreement or the ACS Bidder Purchase Agreement, as the case may be, in each case showing any changes to the applicable Form of Purchase Agreement.

(d)     <u>Identity of Bidder</u>. The bidder shall fully disclose the identity of each entity and its affiliates that will be a bidder at the Auction or otherwise participating in connection with such Bid.

(e)     <u>Closing Deadline</u>. A proposed closing date that is not later than the Closing Deadline (as defined below).

(f)     <u>Authorizations</u>.  A bidder must represent that it has obtained all necessary organizational approvals to make its Bid and to enter into and perform all of its obligations under the Bidder Purchase Agreement and close the transactions contemplated thereby not later than the Outside Date and include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Bidder Purchase Agreement or the ACS Bidder Purchase Agreement, as the case may be.

(g)     <u>Due Diligence</u>.  A bidder must represent that (i) the bidder has had an opportunity to conduct any and all due diligence regarding the Company, the Bank, ACS and all other relevant matters; (ii) it has relied solely upon its own review, investigation and/or inspection of the Company, the Bank, ACS and other relevant matters in making its Bid; and (iii) it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise or the completeness of any information provided in connection therewith (in all cases, other than as set forth in the Bidder Purchase Agreement or the ACS Bidder Purchase Agreement, as applicable).

(h)     <u>Proof of Financial Ability to Perform</u>. A bidder must provide written evidence reasonably satisfactory to the Company of the bidder's financial ability to pay the purchase price and consummate the transaction.  In the event the bidder is an entity formed for the purpose of entering into the transaction identified in the bidder's Bid, such evidence must include that of the equity holders or sponsors of the bidder who must guarantee the obligations of the bidder.

    (i)    <u>No Contingencies</u>.  A bidder must provide written acknowledgement that the Bid is unconditional and not contingent upon any event, including, without limitation, any due diligence investigation, the receipt of financings, or any further bidding approval, except regulatory approval or such other contingencies as may be set forth in the Stalking Horse Agreement. Without limiting the foregoing, such acknowledgement also must provide that the Bid is not contingent upon Bankruptcy Court approval of the assumption and assignment of any unexpired leases or executory contracts.

    (j)    <u>Minimum Overbid</u>. If a Bid contemplates the acquisition of the Bank Shares and the Bank retaining ownership of ACS, the aggregate purchase price or consideration to the Company to be paid for the Bank Shares must be in an amount at least $16,481,925, which includes an amount equal to the sum of (i) the Stalking-Horse Bidder Fee and (ii) the maximum Expense Reimbursement, plus (iii) $25,000.  If a Bid contemplates the acquisition of the Bank Shares and the Bank selling the Bank Subsidiary Shares, the proposed purchase price to be paid for the Bank Shares must be in an amount at least $10,500,000, which includes an amount equal to the sum of (i) the ACS Stalking Horse Bidder Fee, plus (ii) $25,000.  If a Bid contemplates the acquisition of only of the Bank Subsidiary Shares, the proposed purchase price must be an amount of at least $12,042,081.  For illustrative purposes, the minimum overbid to be considered a Qualified Bidder would be the following assuming no change in the base Purchase Price payable to the bankruptcy estate:

| Bid Structure | Purchase Price | Min. Bid Increment | Stalking Horse Bidder Fee | Expense Reimbursement | Total |
|---|---|---|---|---|---|
| Bank Shares including ACS | $15,756,925[1] | $25,000 | $450,000 | $250,000 | $16,481,925 |
| Bank Shares excluding ACS | $10,000,000[2] | $25,000 | $350,000 | $125,000 | $10,500,000 |
| ACS Only | $11,692,081[3] | - | $350,000[4] | - | $12,042,081 |

Notes:

[1] 65.0% of Adjusted Book Value, less Loan Loss Reserve Adjustment (as of June 30,

6

2014).

[2] 41.4% of Adjusted Book Value, less Loan Loss Reserve Adjustment and excluding the ACS Transaction Dividend (as of June 30, 2014).

[3] Book equity value of ACS ($9,692,081 as of June 30, 2014) plus $2,000,000.

[4] If the Stalking-Horse Bidder is not the Successful Bidder for the Bank Shares without ACS, the ACS Only Successful Bidder would pay a $100,000 Stalking-Horse Bidder Fee and up to $125,000 in Expense Reimbursement.

(k)    Deposit. A bidder must provide a deposit ("Deposit") in the amount of $250,000 in the form of a cashier's check or wire transfer payable to the order of Lindquist & Vennum LLP, counsel to the Company, which (i) if the bidder is a Successful Bidder shall be retained as a nonrefundable good faith deposit for application as set forth below, including without limitation against the purchase price of the bidder at the closing of the transaction on the Bid, or (ii) if the bidder is not a Successful Bidder returned to the bidder in accordance with these Sale Procedures. No Deposit provided by a bidder shall earn interest.

(l)    Bid Irrevocable.  A bidder must provide written confirmation that its Bid shall, except as and to the extent set forth in the last paragraph of Section 10 of these Sale Procedures, remain open and irrevocable until the earlier of the closing of a Sale or Sales to the Successful Bidder(s) or no later than March 31, 2015, or such later date as may be agreed by the Company (the "Closing Deadline").

(m)    No Breakup Fee.  The Bid must disclaim any right to receive any fee analogous to the Stalking-Horse Bidder Fee, the ACS Stalking Horse Bidder Fee, any transaction or breakup fee, expense reimbursement or similar fee or payment or compensation under section 503(b) of the Bankruptcy Code for making a substantial contribution. By submitting a Bid, the bidder agrees that it shall not be entitled to any such fee, reimbursement, payment or compensation.

(n)    Regulatory Approval. A bidder shall provide written evidence or a summary satisfactory to the Company that the bidder, to the extent bidding on the Bank Shares, has consulted with applicable banking or other regulatory agencies concerning the bidder's ability and likelihood of receiving timely regulatory approval(s) required to consummate the transaction, including a written statement containing a representation that the bidder has reasonable prospect for gaining such approval(s) in a prompt manner, setting forth the basis for such belief.  A Bid for the Bank Shares shall also provide for the recapitalization of the Bank on terms acceptable to applicable regulatory authorities.

(o)    <u>Good Faith</u>. The bidder must represent that it has acted in good faith, as such term is used in section 363(m) of the Bankruptcy Code, in connection with the Bid, and must covenant that it will act in good faith, as such term is used in section 363(m) of the Bankruptcy Code, in connection with the Auction and Sale.  If the bidder discusses any Bid or potential Bid (whether such Bid includes the Bank Shares or only the Bank Subsidiary Shares) with any other potential bidder, then the bidder must inform the Company (i) of such discussions, and (ii) of the nature of such discussions.

(p)    <u>Additional Information</u>. The bidder shall provide such other information that the Company may reasonably request.

Each Person that submits a Bid shall be deemed to have consented to the Debtor making the contents of such Bid public, including in filings in the Bankruptcy Court.

To be a "<u>Qualified Bid</u>," a Bid received by a bidder must meet the requirements set forth above.  The Company shall have the right to determine whether a Bid received by a bidder (and any Bid submitted at the Auction) meets such requirements. The Stalking-Horse Agreement and the Alternative Transaction Agreement each has been deemed a Qualified Bid. The Stalking-Horse Bidder and any entity(ies) that is (are) determined by the Company to have submitted a Qualified Bid shall each be deemed to be a "<u>Qualified Bidder</u>."

### 6.    Bid Deadline.

All Bids and Bid Packages must be submitted via electronic mail or such other means so that they are actually received no later than 5:00 p.m. prevailing Central Time on **December 5, 2014** (the "<u>Bid Deadline</u>").  Each bidder must deliver its Bid by the Bid Deadline to: (i) American Bancorporation, 1060 Dakota Drive, Mendota Heights, Minnesota 55120-1266 (Attn: Russell Gaydos, e-mail, <u>rgaydos@americanbankmn.com</u>); (ii) counsel for the Company, Lindquist & Vennum LLP, 4200 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402 (Attn: George H. Singer, e-mail, <u>gsinger@lindquist.com</u>); (iii) Carl Marks Securities LLC, 900 Third Avenue, 33rd Floor, New York, New York, 10022-4775 (Attn: Evan Tomaskovic, e-mail, <u>etomaskovic@carlmarks.com</u>); and (iv) counsel for Alesco Preferred Funding XV, Ltd. and Alesco Preferred Funding XVI, Ltd., through their collateral manager ATP Management LLC (collectively, "<u>Alesco XV and XVI</u>"), Hunton & Williams, LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219 (Attn: Jason W. Harbour, e-mail, <u>jharbour@hunton.com</u>).

### 7.    Evaluation of Bid Packages.

The Company will analyze each Bid Package based upon the criteria set forth herein to determine which Bids will be treated as Qualified Bids based on the capability

to close a transaction and the value of such Bid(s) to the Company and its stakeholders, among other factors. The Company may contact bidders to discuss or clarify the terms and to indicate any terms which may need to be modified in order to conform a Bid to a Qualified Bid. The Company will provide a list of all Bids, including Qualified Bids and each Bidder Purchase Agreement or ACS Bidder Purchase Agreement, when in final form, to each Qualified Bidder, including the Stalking-Horse Bidder and to counsel for Alesco XV and XVI, promptly upon receipt.

8.    **No Auction if Only One Qualified Bid.**

If the only Qualified Bid submitted by the Bid Deadline is the Stalking-Horse Bid, the Company shall not conduct an Auction and, instead, shall seek entry of the Sale Order by the Bankruptcy Court approving the Stalking-Horse Purchase Agreement at the Sale Hearing (as defined below) and request that the Sale Order be immediately effective upon entry, notwithstanding the provisions of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure and Rule 62(g) of the Federal Rules of Civil Procedure.

9.    **Auction.**

If by the Bid Deadline, more than one Qualified Bid has been received by the Company, the Company will conduct the Auction with all Qualified Bidders. THE AUCTION WILL BE CONVENED AT 9:00 A.M. CENTRAL TIME ON **DECEMBER 10, 2014** AT THE OFFICES OF LINDQUIST & VENNUM LLP, 4200 IDS CENTER, 80 SOUTH EIGHTH STREET, MINNEAPOLIS, MINNESOTA or at such later time or other location selected by the Company with notice to each party that has submitted a Qualified Bid and to counsel for Alesco XV and XVI. The Auction may be postponed or adjourned by the Company at any time, and from time to time, in its sole discretion.

10.    **Auction Procedures.**

(a)    The business day before the Auction, the Company will announce by e-mail to the Qualified Bidders and counsel to Alesco XV and XVI (a) if any, (i) the highest or otherwise best Qualified Bid for the Bank Subsidiary Shares, (ii) the highest or otherwise best Qualified Bid for the Bank Shares that contemplates the sale of the Bank Subsidiary Shares, and (iii) the highest or otherwise best Qualified Bid for the Bank Shares that contemplates the Bank retaining the Bank Subsidiary Shares; and (b) the overall highest or otherwise best Qualified Bid or Qualified Bids. The bidding at the Auction will start at the highest or otherwise best Qualified Bid(s) identified in the preceding sentence in (a)(i), (ii), and (iii), as determined by the Company. To extent that there are competing Qualified Bids for the Bank Subsidiary Shares and the Bank Shares that contemplate the Bank retaining the Bank Subsidiary Shares, the Company will provide Qualified Bidders with the value it ascribes to the Bank Subsidiary Shares

portion of the Bid for the Bank to allow Qualified Bidders to compare that portion of their Bids to the Qualified Bids for the Bank Subsidiary Shares. At the Auction, the Company may decide to solicit Bids on different assets at different times. For example, the Company may decide (i) first, to solicit Bids for the Bank Subsidiary Shares, (ii) second, to solicit Bids for the Bank Shares that contemplate the sale of the Bank Subsidiary Shares, (iii) third, to solicit Bids for the Bank Shares that contemplate the Bank retaining the Bank Subsidiary Shares, and (iv) fourth, to solicit Bids for assets for which the highest or otherwise best Qualified Bid is not the overall highest or otherwise best Qualified Bid(s).

(b)     The following procedures will govern the Auction:

(i)     the Auction shall be recorded by a stenographer employed by the Company;

(ii)     only the Company, the Bank, ACS, Alesco XV and XVI, Qualified Bidders, and the representatives and advisors of the foregoing, shall be entitled to attend the Auction;

(iii)     bidding will proceed as reasonably determined by the Company and conducted by "open outcry" with all participants entitled to hear each Bid with other Qualified Bidders having the opportunity to increase their Bids;

(iv)     each subsequent Bid shall be in value increments of no less than $100,000 in excess of the prior highest or otherwise best Bid;

(v)     the Company, in consultation with its professionals and counsel to Alesco XV and XVI, will evaluate each Bid made at the Auction and will determine if such Bid is higher or otherwise better that the prior Bid made; such determination will be announced by the Company at the Auction and shall be final, subject to the approval of the Bankruptcy Court;

(vi)     immediately before concluding the Auction, the Company, upon consultation with its professionals and counsel to Alesco XV and XVI, shall: (A) review the final Bid of each Qualified Bidder for its financial and contractual terms, including conditions to closing, expected timeline to closing, regulatory risk and such other factors relevant to the Sale process (including, but not limited to, the Qualified Bidder's financial and regulatory situation and ability to perform its obligations under the Bidder Purchase Agreement) and the best interests of the Company's bankruptcy estate, its creditors and other parties-in-interest therein that the Company may deem advisable; and (B) determine and identify the overall highest or otherwise best Qualified Bid or Qualified Bids in the event the overall highest or otherwise best Bids

10

consist of Qualified Bids for different assets (the "<u>Successful Bid(s)</u>") and the Qualified Bidder(s) submitting such Bid(s) (the "<u>Successful Bidder(s)</u>");

(vii)    the Company may also designate a Bid of a Qualified Bidder, or Bids of Qualified Bidders in the event the overall second highest or otherwise best Bid(s) consist of Qualified Bids for different assets, to be a back-up bid or bids (the "<u>Back-Up Bid(s)</u>");

(viii)   without limiting the foregoing, the Company may deem a Bid of a Qualified Bidder, or Bids of Qualified Bidders, to be the Successful Bid(s) or the Back-Up Bid(s), notwithstanding the receipt of an apparently higher Bid or Bids from another Qualified Bidder or Qualified Bidders, if the Company reasonably concludes that one or more of the apparently higher Qualified Bidder(s) may not be able to close on a timely basis or for any other reason;

(ix)     the determination of the Successful Bid(s) and the Back-Up Bid(s) by the Company at the conclusion of the Auction shall be final, subject to approval of the Bankruptcy Court.  If the Successful Bid(s) is terminated or fails to close within the time period specified in the Successful Bid(s), the Company shall be authorized, but not required, to consummate the Sale transaction with the Back-Up Bidder(s).  The Back-Up Bid(s) shall remain open until the earlier of (x) the first (1st) business day following the consummation of the Sale to the Successful Bidder(s), (y) the 20th day after entry of the Sale Order; and

(x)      the Company shall be deemed to have accepted a Qualified Bid or Qualified Bids only when (A) such Bid(s) is declared the Successful Bid(s) at the Auction; (B) definitive documentation has been executed in respect thereof; and (C) the Bankruptcy Court has entered an order approving such Successful Bid(s).

In addition to the procedures outlined above, the Company may employ and announce at the Auction other procedural rules that it believes to be reasonable under the circumstances for conducting the Auction; *provided, however*, that such rules are (i) not inconsistent with these Sale Procedures, the Bankruptcy Code or any order the Bankruptcy Court, and (ii) disclosed to each Qualified Bidder at the Auction.

EACH QUALIFIED BID SUBMITTED SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE APPLICABLE QUALIFIED BIDDER FROM THE TIME THE BID IS SUBMITTED UNTIL THE ENTRY OF THE SALE ORDER BY THE BANKRUPTCY COURT. THE BACK-UP BID(S) SHALL BE IRREVOCABLE AND BINDING ON THE APPLICABLE BACK-UP BIDDER UNTIL THE EARLIER OF (x) THE FIRST BUSINESS DAY FOLLOWING CLOSING OF THE SALE TO THE SUCCESSFUL BIDDER(S), AND (y) THE 20TH DAY AFTER THE SALE ORDER IS ENTERED BY THE BANKRUPTCY COURT. ALL QUALIFIED BIDDERS AT THE

AUCTION SHALL BE DEEMED TO HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND TO HAVE WAIVED ANY RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY DISPUTES RELATING TO THE AUCTION OR THE SALE AND THE CONSTRUCTION AND ENFORCEMENT OF ANY SALE TRANSACTION DOCUMENTS.

11.     **Sale Hearing.**

A hearing will take place on **December 11, 2014 at 8:00 a.m.** in the courtroom of the Honorable Katherine A. Constantine, United States Bankruptcy Judge, in Courtroom 2C of the United States Courthouse, 316 N. Robert Street, Saint Paul, Minnesota (the "Sale Hearing") to consider the approval of the Sale(s) to the Successful Bidder(s), or to approve the Stalking-Horse Agreement if no Auction is held.  In the event the Successful Bidder(s) does not close on the Sale within the period specified in the Successful Bid(s), the Company shall be authorized, but not required, to consummate the Sale transaction with the applicable Back-Up Bidder.

12.     **Return of Deposits.**

(a)     Except as otherwise provided below with respect to any Successful Bidder or Back-Up Bidder, the Deposits of all Qualified Bidders required to submit a deposit under these Sale Procedures shall be returned within three (3) business days after the Auction concludes, or, if no Auction is held, within three (3) business days after the conclusion of the Sale Hearing.

(b)     Subject to the remainder of this paragraph, the Deposit of any Successful Bidder shall be held until the closing of such transaction with the Successful Bidder and applied in accordance with such Successful Bid.  If any Sale to a Successful Bidder fails to close on or before the Closing Deadline for any reason other than due to a default by the Company or the Bank, then such Successful Bidder's Deposit shall be forfeited to, and retained by, the Company.

13.     **Reservation of Rights.**

The Company reserves the right, upon notice to all parties that have demonstrated an interest in bidding, to (i) waive the terms and conditions set forth herein with respect to any or all potential bidders; (ii) impose additional terms and conditions with respect to any or all potential bidders; (iii) extend the deadlines set forth herein; (iv) cancel or reschedule the Auction; and (v) amend the Sale Procedures as it determines to be in the best interests of the bankruptcy estate; *provided, however*, that any material change to these Sale Procedures must be with the prior written consent of the Stalking Horse Bidder or by order of the Bankruptcy Court; *provided, further, however*, that any extension of the dates identified in these Sale Procedures, or

12

rescheduling of the Auction to a later date no more than seven (7) days after the date set forth herein, shall not be a material change.  The Company also reserves the right to withdraw any motion to approve the Sale at any time without prejudice.

### 14.   Consultation.

Notwithstanding anything else set forth in these Sale Procedures, the Company and its advisors shall consult with counsel for Alesco XV and XVI with respect to its decisions concerning the Sales, the Sale Procedures and the Auction, including without limitation (i) any amendments to, any waiver of the terms and conditions of, or any change to the deadlines in, the Sale Procedures; (ii) the determination of whether a potential bidder has the capability to submit a Qualified Bid; (iii) the determination of whether a potential bidder qualifies as a Qualified Bidder; (iv) the determination of whether a Bid is a Qualified Bid; (v) the determination, prior to and at the Auction, of which Qualified Bid(s) is (a) the highest or otherwise Bid for (1) the Bank Subsidiary Shares, (2) the Bank Shares that contemplates the Sale of the Bank Subsidiary Shares, and (3) the Bank Shares that contemplates the Bank retaining the Bank Subsidiary Shares, and (b) the overall highest or otherwise best Bid or Bids; (vi) the determination of the order in which to solicit Bids on different assets at the Auction; (vii) the determination of the Successful Bidder(s) and Back-Up Bidder(s); and (viii) all other material actions by the Company contemplated under these Sale Procedures; *provided, however*, that nothing herein shall prohibit the Company from exercising its reasonable business judgment regarding any of the issues identified in the foregoing (i) – (viii) or authorize any person to control or direct the Company's exercise of its business judgment.

### 15.   General.

Nothing contained herein or in any order approving these Sale Procedures shall create any rights in any bidder other than the rights expressly granted to the Stalking-Horse Bidder under the Sale Procedures Order.  To the extent that there are any inconsistencies between these Sale Procedures and the Sale Procedures Order, the Sale Procedures Order shall govern.

# # # # #

13

<u>**EXHIBIT B**</u>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

---

In re:

  American Bancorporation,     Bky. Case No. 14-31882 (KAC)

      Debtor.       Chapter 11

---

**NOTICE OF SALE AND SALE PROCEDURES**

To: The United States Trustee, all Creditors and Equity Security Holders, Indenture Trustees and Other Parties-In-Interest:

**Notice:** Pursuant to a motion filed on October 21, 2014 by American Bancorporation (the "<u>Debtor</u>") with the Bankruptcy Court (the "<u>Sale Motion</u>"), on **December 11, 2014, at 8:00 a.m. (CDT)** in Courtroom 2C, 2nd Floor, United States Courthouse, 316 N. Robert Street, St. Paul, Minnesota, the Debtor will ask the Bankruptcy Court to approve a sale of substantially all of its assets (the "<u>Assets</u>") free and clear of all liens, claims, encumbrances and interests (collectively, the "<u>Liens</u>"), with all such Liens to attach to the sale proceeds (the "<u>Sale Hearing</u>"). The Sale Hearing may be continued from time to time without further notice.

The Assets being sold include substantially all of the Debtor's assets, including without limitation the issued and outstanding shares of capital stock (the "<u>Bank Shares</u>") of American Bank of St. Paul owned by the Debtor which includes all operations and assets of the Bank, including the Bank's sole ownership interest in AmeriNational Community Services, Inc. ("<u>ACS</u>"). The Bank Shares will be sold pursuant to Sale Procedures approved by the Bankruptcy Court on or about November 3, 2014 (the "<u>Sale Procedures</u>"). The Sale Procedures contemplate the sale of the Bank Shares to Deerwood Bank (the "<u>Stalking-Horse Bidder</u>") or to another Qualified Bidder that has submitted a bid that is determined at the conclusion of an auction (the "<u>Auction</u>") to be the highest or otherwise best offer for the Bank Shares. The Sale Procedures also contemplate the marketing, potential sale, and auction, of the Bank's sole ownership interest in ACS to a Qualified Bidder that has submitted a bid that is determined at the conclusion of the Auction to be the highest or otherwise best offer for the Bank's ownership interest in ACS; provided, however, that any such sale of the Bank's ownership interest in ACS would not receive the protections of an order of the Bankruptcy Court approving such sale because the Debtor asserts the Bank's ownership interest in ACS is not property of the Debtor's bankruptcy estate.

The Debtor and the Stalking-Horse Bidder have entered into alternative stock purchase agreements (the "Purchase Agreements"), in each case subject to higher or otherwise better offers and Bankruptcy Court approval, whereby the Stalking-Horse Bidder has agreed to purchase under the sale process proposed either (i) all of the Bank Shares, which includes all operations and assets of the Bank *including* the Bank's sole ownership of ACS (the "Stalking-Horse Agreement"), or (ii) if the Debtor, in its sole and absolute discretion, makes an election to proceed with a sale transaction pursuant to the terms of an alternative stock purchase agreement with the Stalking-Horse Bidder (the "Alternative Transaction Agreement"), the Stalking-Horse Bidder has agreed to purchase the Bank Shares which includes all of the operations and assets of the Bank *excluding* the Bank's sole ownership interest in ACS, which will be available for sale to another Qualified Bidder at the Auction separately from the Bank Shares. Each of the Purchase Agreements with the Stalking-Horse Bidder is subject to higher and otherwise better offers, but only one of the Purchase Agreements between the Debtor and the Stalking-Horse Bidder would become effective.

The Sale Procedures set the following deadlines:

*Final Bids (received by)*:   December 5, 2014 by 5:00 p.m. (prevailing Central Time)
*Auction*:  December 10, 2014 at 9:00 a.m. (prevailing Central Time)
*Hearing to Approve Sale*: December 11, 2014 at 8:00 a.m. (prevailing Central Time)

If no higher or otherwise better bid is obtained, the Debtor intends to seek approval from the Bankruptcy Court to sell the Bank Shares to the Stalking-Horse Bidder pursuant to one of the Purchase Agreements on file with the Bankruptcy Court. The basic terms of Purchase Agreements are summarized as follows (with all capitalized terms not defined herein having those meanings set forth in the Stalking-Horse Agreement):

| | |
|---|---|
| **Purchase Price for the Stalking-Horse Agreement:** | For the Bank Shares, including all operations and assets of the Bank *including* the Bank's sole ownership of ACS, purchase price in cash equal to (1) the product of (A) 65%, multiplied by (B) the "Adjusted Book Value" of the Bank as of the "Determination Date," minus (2) the "Loan Loss Reserve Adjustment" (as such terms are defined in the Stalking-Horse Agreement). A sample calculation of the Purchase Price using the Bank's Call Report dated June 30, 2014 and such date as the Determination Date, the resulting purchase price payable to the bankruptcy estate would have been $15,756,925 (the "Purchase Price"). |
| **Purchase Price for Alternative Transaction** | For the Bank Shares, including all operations and assets of the Bank *excluding* the Bank's sole ownership interest in ACS a purchase price in cash equal to (1) the product of (A) |

**Agreement**: 41.4%, multiplied by (B) the Adjusted Book Value of the Bank as of the Determination Date, minus (2) the Loan Loss Reserve Adjustment. A sample calculation of the Purchase Price using the Bank's Call Report dated June 30, 2014 and such date as the Determination Date, the resulting purchase price payable to the bankruptcy estate would have been $10,000,000 ("Alternative Purchase Price"), which includes a capital requirement equivalent to the book value associated with ACS, equivalent to $9,692,081 as of June 30, 2014, *provided, however*, that the Bank Subsidiary Shares would be available for sale to third parties under the Alternative Transaction Agreement and that any amount paid for the Bank Subsidiary Shares above the book value associated with ACS would be delivered to the Debtor by either dividend or in the form of an increase in the Alternative Purchase Price.

**Sale Election:** The Debtor and the Stalking-Horse Bidder have agreed that the Debtor shall have the absolute right, power and privilege to make an election to proceed with the Sale transaction pursuant to the Stalking-Horse Agreement or the Sale transaction pursuant to the Alternative Transaction Agreement. The Sale Election may be exercised by notice (which may be oral or written) at any time, and from time to time, before the conclusion of the Auction, or if not Auction, at the Sale Hearing unless otherwise agreed by the parties. Only one of the Purchase Agreements between the Stalking-Horse Bidder and the Debtor would, however, become effective.

**Deposit:** Cash in the amount of $250,000 has been deposited as earnest money to Debtor's counsel and will be held in a non-interest bearing account until the Sale.

**Acquired Assets:** All of the Debtor's right, title and interest in, to and under the Bank Shares, free and clear of all liens, claims and encumbrances, consisting of all of the properties, assets, and rights of the Debtor related to the Bank and its Business, including, without limitation (unless a Sale Election is made by the Debtor and an Alternative Transaction Agreement is effective), all right title and interest of the Bank in the issued and outstanding shares of capital stock of ACS.

3

| | |
|---|---|
| **Representations:** | The parties have each made representations and warranties that are customary in connection with transactions of this size and nature. |
| **Closing:** | The consummation of the transactions contemplated by the Purchase Agreements shall occur following the satisfaction or waiver by the appropriate party of the conditions specified in Article 7 of the Purchase Agreements no later than February 28, 2015. |
| **Closing Conditions:** | Closing is subject to certain conditions, including (i) the continued accuracy of representations and warranties, (ii) the performance by Debtor in all material respects of its obligations under the Purchase Agreements, (iii) the entry of the Orders by the Bankruptcy Court relating to the sale of the Bank Shares, (iv) obtaining necessary regulatory approvals, and (v) the absence of a Material Adverse Effect. |
| **Stalking-Horse Bidder Fees:** | In the event the Stalking-Horse Bidder is not the Successful Bidder under either the Stalking-Horse Agreement or the Alternative Transaction Agreement and the Debtor closes on the Sale contemplated by such agreements with another bidder or bidders, the Stalking-Horse Bidder will be entitled to receive a fee from the proceeds received in connection with such Sale in the amount of $450,000 and the Expense Reimbursement described below. |
| **ACS Stalking-Horse Bidder Fee:** | In the event that the Stalking-Horse Bidder is not the Successful Bidder under the Stalking-Horse Agreement and the Stalking-Horse Bidder has consummated the Alternative Transaction, the Stalking-Horse Bidder will be entitled to receive a fee in the amount of $350,000, but would not be entitled to receive any Expense Reimbursement. |
| **Expense Reimbursement:** | In the event the Stalking Horse Bidder is not the Successful Bidder under either the Stalking-Horse Agreement or the Alternative Transaction Agreement, the Stalking-Horse Bidder will be entitled to reimbursement of up to $250,000 of actual, documented and reasonable expenses and costs (including the negotiations, due diligence and bidding process) incurred in connection with the transactions contemplated by the Stalking-Horse Agreement. |

4

**Payment:**
Any amount that may be due and payable by the Debtor with respect to the Stalking-Horse Bidder Fee and Expense Reimbursement, or with respect to the ACS Stalking-Horse Bidder Fee, will be paid from the proceeds received from the Sale(s) to another Successful Bidder(s). If more than one Successful Bidder prevails, the Stalking-Horse Bidder Fee shall paid as follows: $350,000 shall be paid by the Successful Bidder of the Bank Shares, excluding the Bank Subsidiary Shares, and $100,000 shall be paid by the Successful Bidder of the Bank Subsidiary Shares. The Expense Reimbursement, under such circumstances, would be divided by two and paid by the two Successful Bidders.

**Termination:**
The Purchase Agreements list customary termination provisions, including the right of the Stalking-Horse Bidder to terminate in the event that the Sale Order approving the Sale to the Stalking-Horse Bidder is not entered on or before 60 calendar days after the date of the Sale Procedures Order, and that the Closing shall not have occurred by February 28, 2015, unless otherwise extended as otherwise provided in the Purchase Agreements. Either the Company or the Buyer may terminate the Purchase Agreements upon written notice from a Governmental Authority that it will not grant any of the Buyer Required Approvals or that the agreement violates any applicable Legal Requirement. The termination of the Purchase Agreements will, under certain circumstances, entitle the Stalking-Horse Bidder to a Stalking-Horse Bidder Fee and Expense Reimbursement or the ACS Stalking-Horse Bidder Fee.

The Debtor will provide separate notice to counterparties of any unexpired leases and executory contracts, if any, that the Debtor may seek to assume and assign to the Stalking-Horse Bidder or potentially to another bidder(s) as part of the sale process, and will identify the proposed assignee as promptly as possible after the Auction and separately schedule a hearing if necessary with the Bankruptcy Court to approve any such assumption and assignment.

**Objections to the relief to be requested at the Sale Hearing must be served on the parties below and must also be served and filed in accordance with Local Rule 9006-1(c)**. Any objections shall be filed and served by mail or delivery not later than **December 5, 2014**, which is six (6) days (including Saturdays, Sundays, and legal holidays), before the time set for the Sale Hearing, except that objections to the Sale based on events following such deadline may be served so as to be received and filed not later than 8:00 a.m. (prevailing Central Time) on December 11, 2014.

| | | |
|---|---|---|
| **Debtor's Counsel:** | **Prospective Buyer's Counsel:** | **United States Trustee:** |
| George H. Singer, Esq. | Adam Maier, Esq. | Colin Kreuziger, Esq. |
| Lindquist & Vennum LLP | Stinson Leonard Street LLP | US. Trustee's Office |
| 4200 IDS Center | 150 South Fifth Street | 1015 U.S. Courthouse |
| 80 South Eighth Street | Suite 2300 | 300 South Fourth Street |
| Minneapolis, MN 55402 | Minneapolis, MN 55402 | Minneapolis, MN 55415 |
| Fax: (612) 371-3207 | Fax: (612) 335-1657 | Fax: (612) 335-4032 |
| gsinger@lindquist.com | adam.maier@stinsonleonard.com | Colin.Kreuziger@usdoj.gov |

**Financial Advisor to Debtor:**

Evan Tomaskovic
Carl Marks Securities LLC
900 Third Avenue, 33rd Flr.
New York, NY 10022
(212) 909-8458
Fax: (212) 752-9753
etomaskovic@carlmarks.com

**Counsel to Alesco XV and XVI:**

Jason W. Harbour, Esq.
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Fax: (804) 343-4834
jharbour@hunton.com

**Financial Advisor to Prospective Buyer:**
Douglas Hillhouse
Hovde Group, LLC
343 W. Erie Street, Suite 430
Chicago, IL 60654
Fax: (312) 274-9775
dhillhouse@hovdegroup.com

**Copies of the Sale Motion(which you should have previously received), the Purchase Agreements, the Sale Procedures and the order of the Bankruptcy Court approving the Sale Procedures are available on the Court's web site at www.mnb.uscourts.gov or from Debtor's counsel upon request.** Additional information may be obtained on request from the Debtor's counsel.

Date: November 3, 2014

George H. Singer, Esq.
Lindquist & Vennum LLP
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone: (612) 371-3211
Fax: (612) 371-3207
E-mail: gsinger@lindquist.com
*Attorneys for American Bancorporation*