UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

American Bancorporation,                    Bky. Case No. 14-31882 (KAC)

                        Debtor.                    Chapter 11

UNSWORN DECLARATION OF RUSSELL GAYDOS
IN SUPPORT OF DEBTOR'S MOTION FOR SALE OF ASSETS

Russell Gaydos, under penalty of perjury, states as follows:

1.      I am the Chief Restructuring Officer of American Bancorporation, the debtor (the "Debtor") in the above-captioned bankruptcy case. I make this unsworn declaration in support of the Debtor's Motion for Entry of (I) an Order (A) Approving Sale and Auction Procedures; (B) Approving Bidding Protections for Stalking-Horse Bidder; (C) Approving Procedures Related to Assumption and Assignment of Executory Contracts; and (D) Approving Form and Manner of Notice; and (II) an Order (A) Authorizing Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (B) Granting Related Relief that was filed on October 21, 2014 [Dkt. No. 42] (the "Sale Motion").

2.      The terms of the form of the alternative stock purchase agreements as the stalking-horse bidder attached to the Sale Motion and the terms of the amended and restated stock purchase agreement since the Auction have been negotiated with Deerwood Bank in good faith and at arm's length and are fair and reasonable. Both

parties have been represented by legal counsel. A copy of the executed Amended and Restated Stock Purchase Agreement (the "Bank Purchase Agreement") entered into by and between American Bancorporation and Deerwood Bank  is attached as <u>Exhibit A</u> hereto.

3.    The Debtor has the full corporate power and authority to execute, deliver and perform its obligations under the Bank Purchase Agreement and all other documents required to be executed and delivered pursuant to such agreement.

4.    The Debtor did not engage in any collusion with Deerwood Bank in connection with the Auction or other conduct which would allow the transactions contemplated by the Bank Purchase Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code.

5.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on December 19, 2014

_____
Russell Gaydos

# Exhibit A

**AMENDED AND RESTATED STOCK PURCHASE AGREEMENT**

by and between

**AMERICAN BANCORPORATION**

and

**DEERWOOD BANK**

## AMENDED AND RESTATED STOCK PURCHASE AGREEMENT

**THIS AMENDED AND RESTATED STOCK PURCHASE AGREEMENT** (this "Agreement") is made as of December 18, 2014, by and between AMERICAN BANCORPORATION, a Minnesota corporation (the "Company"), and DEERWOOD BANK, a Minnesota banking corporation (the "Buyer").

## R E C I T A L S

A.    The Company and the Buyer entered into that certain Stock Purchase Agreement, dated October 21, 2014 (the "Prior Agreement") and desire to amend and restate the Prior Agreement in its entirety pursuant to the terms of this Agreement.

B.    The Company owns all of the issued and outstanding shares of capital stock of American Bank of St. Paul, a Minnesota state chartered bank (the "Bank"), consisting of 20,000 shares of common stock (hereinafter collectively referred to as the "Bank Shares").

C.    The Company is a debtor in possession in a proceeding (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), currently pending in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court").

D.    The Prior Agreement provided for an auction process to sell the Shares (the "Auction").  Following the Auction, the Buyer was declared the successful bidder for the Shares, subject to approval of the Bankruptcy Court.

E.    The Company desires to sell, assign and transfer to the Buyer and the Buyer desires to purchase, accept and receive from the Company, all of the Bank Shares and certain other assets of the Company free and clear of all Encumbrances (as hereinafter defined) on the terms and subject to the conditions set forth in this Agreement.

F.    The sale and purchase of the Bank Shares (the "Sale"), which except as set forth in this Agreement includes all operations and assets of the Bank, shall be effectuated pursuant to an order of the Bankruptcy Court (the "Sale Order") approving such Sale under Section 363 and other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

G.    The Sale excludes the Bank's ownership interest in its Subsidiary, AmeriNational Community Services, Inc., which shall be sold by the Bank and the ACS Transaction Dividend (as hereinafter defined) made to the Company prior to Closing.

H.    Immediately following Closing of the Sale, the Buyer will merge the Bank with and into the Buyer pursuant to Sections 302A.651 and 49.33 to 49.41 of the Minnesota Statutes and 12 U.S.C. § 1828(c) and thereafter make the Equity Contribution.

NOW, THEREFORE, in consideration of the foregoing and further in consideration of the mutual covenants, agreements and representations contained in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and

103791916v7

subject to the conditions set forth below, the parties, intending to be legally bound, agree as follows:

# ARTICLE 1.
# INTERPRETATION

1.1   <u>Definitions</u>.  In this Agreement, unless the context requires otherwise, or unless specifically provided herein:

(a)   "<u>Accounting Standards</u>" means GAAP, as modified by applicable regulatory accounting principles applied on a consistent basis.

(b)   "<u>Acquired Company Contracts</u>" is defined in Section 6.5(b)

(c)   "<u>ACS</u>" means the Bank's Subsidiary, AmeriNational Community Services, Inc., a Minnesota corporation.

(d)   "<u>ACS Transaction</u>" means a sale transaction subject to and contemplated by a stock purchase agreement among the Company, the Bank and a buyer (including, without limitation, a Qualified Bidder), if any, providing for the sale of all of the issued and outstanding shares of capital stock of ACS.

(e)   "<u>ACS Transaction Agreement</u>" means a stock purchase agreement setting forth the terms of an ACS Transaction.

(f)   "<u>ACS Transaction Dividend</u>" means a dividend by the Bank to the Company in the amount of (a) the sale price realized by the Bank with respect to the ACS Transaction, minus (b) $9,692,080.

(g)   "<u>Adjusted Book Value</u>" is defined in Section 2.3.

(h)   "<u>Affiliate</u>" means, with respect to any Person, any other Person controlling, controlled by or under common control with, such Person, with "control" for such purpose meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or voting interests, by contract or otherwise.

(i)   "<u>Agreement</u>" is defined in the introductory paragraph.

(j)   "<u>Alternative Transaction</u>" means the Sale transaction subject to and contemplated by that certain separate stock purchase agreement by and between the Company and the Buyer dated October 21, 2014, subject to the terms of the Prior Agreement and this Agreement, the parties hereto may pursue as an alternative to the Sale transaction subject to and contemplated by this Agreement.

(k)   "<u>Alternative Transaction Agreement</u>" means the stock purchase agreement setting forth the terms of an Alternative Transaction.

(l)    "<u>Approval Date</u>" is defined in Section 3.1.

(m)    "<u>Assessments</u>" is defined in Section 6.17(b).

(n)    "<u>Auction</u>" is defined in the recitals.

(o)    "<u>Bank</u>" is defined in the recitals.

(p)    "<u>Bank Balance Sheet</u>" is defined in Section 2.6.

(q)    "<u>Bank Shares</u>" is defined in the recitals.

(r)    "<u>Bankruptcy Case</u>" is defined in the recitals.

(s)    "<u>Bankruptcy Code</u>" is defined in the recitals.

(t)    "<u>Bankruptcy Court</u>" is defined in the recitals.

(u)    "<u>Bankruptcy Rules</u>" is defined in the recitals.

(v)    "<u>BHCA</u>" means the Bank Holding Company Act of 1956, as amended.

(w)    "<u>Board Resignations</u>" is defined in Section 6.5(b).

(x)    "<u>Books and Records</u>" means all files, ledgers and correspondence, all manuals, reports, notes, memoranda, invoices, receipts, accounts, accounting records and books, financial statements and financial working papers and all other records and documents of any nature or kind whatsoever, including those recorded, stored, maintained, operated, held or otherwise wholly or partly dependent on discs, tapes and other means of storage, including any electronic, magnetic, mechanical, photographic or optical process, whether computerized or not, and all software, passwords and other information and means of or for access thereto, belonging to the Bank or any Subsidiary or relating to the Business.

(y)    "<u>Broker</u>" means Carl Marks Securities LLC.

(z)    "<u>Broker Fees</u>" means the fees and expenses payable by the Company to the Broker in connection with this Agreement or any of the transactions contemplated hereby, including the Sale.

(aa)    "<u>Burdensome Condition</u>" means any restraint, limitation, term, requirement, provision or condition imposed by any Governmental Authority that would (i) reasonably be expected to be materially burdensome on, or impair in any material respect the benefits of the Contemplated Transactions to, the Buyer and its Affiliates; (ii) cause any Person other than the Buyer to be deemed in control of the Bank; (iii) require modification of, or impose any material limitations or restrictions on, the activities, governance or legal structure of the Buyer or its Affiliates; or (iv) require a contribution of capital to the Buyer or the Buyer's Holding Company following, or in connection with,

Closing and the merger of the Bank with and into the Buyer that would cause the (1) Tier 1 Leverage Ratio of the Buyer to exceed 8%, or (2) Consolidated Tier 1 Leverage Ratio of the Buyer's Holding Company to exceed 7.10%; *provided, however*, that the following shall not be deemed to be a "Burdensome Condition": (y) those restraints, limitations, terms, requirements, provisions or conditions specifically applicable to the Bank or ACS by reason of their condition as of the date hereof; and (z) any restraint, limitation, term, requirement, provision or condition that applies generally to bank holding companies, banks and mortgage servicers as provided by statute, regulation, or written and publicly available supervisory guidance of general applicability to the Company or the Bank, in each case, as in effect on the date hereof.

(bb)    "Business" means the business currently carried on by the Bank.

(cc)    "Business Day" means any day other than a Saturday, Sunday or any federal holiday in the United States.

(dd)    "Buyer" is defined in the introductory paragraph.

(ee)    "Buyer Required Approvals" is defined in Section 5.4.

(ff)    "Buyer's Certificate" is defined in Section 7.1(a).

(gg)    "Buyer's Holding Company" means Deerwood Bancshares, Inc., a Minnesota corporation, the sole shareholder of the Buyer.

(hh)    "Call Reports" means the Bank's Consolidated Reports of Condition and Income (FFIEC Form 041) or any successor form of the Federal Financial Institutions Examination Council.

(ii)    "Charter Documents" means the charter, articles or certificate of incorporation, bylaws and any other constituent document of a corporate entity.

(jj)    "Closing" means the completion of the sale and purchase of the Bank Shares in accordance with Article 2.

(kk)    "Closing Date" is defined in Section 3.1.

(ll)    "Code" shall mean the Internal Revenue Code of 1986, as amended.

(mm)    "Company" is defined in the introductory paragraph.

(nn)    "Company Contracts" is defined in Section 4.25.

(oo)    "Company Employee Plans" is defined in Section 4.16.

(pp)    "Company's Certificate" is defined in Section 7.2(a).

(qq)    "Confidentiality Agreement" is defined in Section 10.1.

103791916v7

(rr)     "Consent" means any approval, consent, ratification, waiver or other authorization.

(ss)     "Consolidated Tier 1 Capital" means (i) the sum of common stockholders' equity, non-cumulative perpetual preferred stock (including any related surplus) and minority interests in consolidated subsidiaries of a bank holding company, minus (ii) all intangible assets of the bank holding company and unrealized gain or loss on securities, all determined in accordance with applicable Consolidated Financial Statements for Holding Companies – FR Y-9C preparation instructions and required adjustments, if any.

(tt)     "Consolidated Tier 1 Leverage Ratio" means Tier 1 Capital of a bank holding company, divided by the bank holding company's total consolidated assets, less disallowed intangible assets, as of the specified date, determined in accordance with applicable Consolidated Financial Statements for Holding Companies – FR Y-9C preparation instructions and required adjustments, if any.

(uu)     "Contemplated Transactions" means all of the transactions between the Company and the Buyer contemplated by this Agreement.

(vv)     "Contracts" means all contracts, agreements, instruments, leases, indentures and commitments, whether written or oral, including without limitation, non-competition, non-solicitation and confidentiality agreements.

(ww)     "Deposit" is defined in Section 2.4.

(xx)     "Determination Date" is defined in Section 2.3.

(yy)     "Disclosure Schedule(s)" means the schedules delivered by the Company to the Buyer concurrently with the execution and delivery of this Agreement.

(zz)     "Effective Time" is defined in Section 3.1.

(aaa)    "Encumbrance" means, with respect to any asset, whether or not registered or registrable or recorded or recordable, and regardless of how created or arising: (i) a lien, encumbrance, adverse claim, charge, execution, security interest or pledge against such asset, or a subordination to any right or claim of others in respect thereof; (ii) a claim or interest against such asset or the owner thereof; (iii) an option or other right to acquire any interest in such asset; (iv) an interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset; or (v) any other encumbrance of whatsoever nature or kind against such asset, other than, with respect to the Bank Shares, transfer restrictions imposed by federal or state securities laws.

(bbb)    "Environmental Law" is defined in Section 4.28(c).

(ccc)    "Equity Contribution" means a contribution of capital to the Buyer and/or the Buyer's Holding Company following, or in connection with, Closing and the merger of the Bank with and into the Buyer in such amount required by the FDIC, the Federal

Reserve Board or the Minnesota Department of Commerce that would not result in a Burdensome Condition.

(ddd) "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

(eee) "FDIC" means the Federal Deposit Insurance Corporation, or any successor thereto.

(fff) "Federal Reserve Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

(ggg) "Final Order" means any order or judgment of the Bankruptcy Court or other court having jurisdiction over any matter, provided, that such order is in effect and has not been reversed, stayed, or vacated pursuant to applicable law or by an order of the Bankruptcy Court or other court of competent jurisdiction.

(hhh) "Hazardous Substances" is defined in Section 4.28(d).

(iii) "GAAP" means generally accepted accounting principles as in effect in the United States.

(jjj) "Governmental Authority" means any federal, state, municipal, county or regional government or governmental or regulatory authority, domestic or foreign, and includes any department, commission, bureau, board, administrative agency or regulatory body of any of the foregoing or any non-governmental regulatory body that provides standards for certification.

(kkk) "Governmental Authorization" means any Consent, approval, license, registration, permit or waiver issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

(lll) "Knowledge" of the Company, or words of similar import, including without limitation, the Company being aware of a fact or circumstance, means the actual knowledge as of the date of this Agreement, after reasonable inquiry, of any executive officer or director of the Company or the Bank.

(mmm) "Leased Real Property" is defined in Section 4.20(b).

(nnn) "Legal Requirement" means, with respect to any Person, any (i) federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, rule, regulation, statute, treaty, or administrative pronouncement having the force of law, (ii) Order, or (iii) other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority, in each case, that is binding upon or applicable to such Person, as amended, unless expressly specified otherwise.

(ooo)   "Loan Documents" is defined in Section 4.12.

(ppp)   "Loan Files" is defined in Section 4.12.

(qqq)   "Loan Loss Reserve Adjustment" is defined in Section 2.3.

(rrr)   "Loan Loss Reversal Limit" is defined in Section 2.3.

(sss)   "Loans" is defined in Section 4.12.

(ttt)   "Material Adverse Effect" means (a) any fact, effect, event, change, occurrence or circumstance that, by itself or together with other facts, effects, events, changes, occurrences or circumstances, has had or could reasonably be expected to have, individually or in the aggregate, a material and adverse effect on (1) the business, regulatory status, any Regulatory Agreement, assets, liabilities (including deposit liabilities), profits, prospects, condition (financial or otherwise) or results of operations of the Bank or the Business, taken as a whole, or (2) the ability of the Company to timely consummate the Contemplated Transactions and fulfill its respective obligations hereunder; or (b) any other act or omission that could reasonably be expected to materially impair the ability to operate the Business in the Ordinary Course, including after the Closing; *provided, however,* that none of the following shall be taken into account in determining whether there has been a "Material Adverse Effect" under (a)(1) or (b): (i) generally applicable changes after the date hereof in GAAP or applicable regulatory accounting requirements, (ii) changes after the date hereof in laws, rules or regulations of general applicability to companies or banks in the U.S. banking industry, (iii) changes after the date hereof in global, national or regional political conditions or general economic or market conditions (including changes in prevailing interest rates, credit availability and liquidity, currency exchange rates, and price levels or trading volumes in the United States or foreign securities markets) affecting the U.S. banking industry generally and not specifically relating to the Bank or its Subsidiaries, (iv) any outbreak or escalation of hostilities, or declared or undeclared acts of war or terrorism, (v) with respect to the Bank, any pre-Closing restrictions or conditions imposed on the Bank as of the date of this Agreement pursuant to the Regulatory Agreements to which the Bank is a party as of the date of this Agreement and that have been provided to the Buyer in writing prior to the date hereof, and (vi) conditions resulting from or attributable to the filing of the Bankruptcy Case; except, with respect to clauses (i), (ii), (iii) and (iv), to the extent that the effects of such change are disproportionately adverse to the business, regulatory status, any Regulatory Agreement, assets, liabilities (including deposit liabilities), profits, prospects, condition (financial or otherwise) or results of operations of the Bank, taken as a whole, or the Business, taken as a whole, as compared to other banks organized in the United States or any of its States.

(uuu)   "Material Permit" is defined in Section 4.5.

(vvv)   "Notice of Sale" means a notice of the sale of the Bank Shares and the Sale Hearing.

103791916v7

(www) "Order" means any order, judgment, decree, decision, ruling, writ, assessment, charge, stipulation, injunction or other determination of any Governmental Authority, or any arbitration award entered into by an arbitrator, in each case having competent jurisdiction to render such determination.

(xxx)    "Ordinary Course of Business" or "in the Ordinary Course" means the conduct of the Business in substantially the same manner as the Business was operated on the date of this Agreement, including operations in conformance with the Bank's practices and procedures as of such date.

(yyy)    "OREO" is defined in Section 4.20(a).

(zzz)    "Outside Date" is defined in Section 8.1(b).

(aaaa)    "Owned Real Property" is defined in Section 4.20(a).

(bbbb)    "Performance Plan" is defined in Section 4.21.

(cccc)    "Permits" means all permits, licenses, registrations, consents, authorizations, approvals, privileges, waivers, exemptions, orders, certificates, rulings, agreements and other concessions from, of or with Governmental Authorities or other regulatory bodies.

(dddd)    "Person" means an individual, legal personal representative, corporation, limited liability company, partnership, firm, trust, trustee, syndicate, joint venture, unincorporated organization or Governmental Authority.

(eeee)    "Prior Agreement" is defined in the Recitals.

(ffff)    "Proceedings" means any actions, claims, demands, lawsuits, assessments, arbitrations, judgments, awards, decrees, orders, injunctions, prosecutions and investigations, or other proceedings.

(gggg)    "Purchase Price" is defined in Section 2.2.

(hhhh)    "Real Property" is defined in Section 4.20(a).

(iiii)    "Regulatory Agreement" is defined in Section 4.17.

(jjjj)    "Sale" is defined in the Recitals.

(kkkk)    "Sale Election" means a hearing in the Bankruptcy Case to consider the Bankruptcy Court's approval of the Sale.

(llll)    "Sale Hearing" is defined in Section 6.6(a).

(mmmm)    "Sale Motion" is defined in Section 6.6.

(nnnn) "Sale Order" means the order of the Bankruptcy Court described and identified as the Sale Order in the Recitals and substantially in the form attached as Exhibit A with such changes as are reasonably acceptable to the Company and the Buyer.

(oooo) "Stalking Horse Bidder Fee" is defined in Section 6.16.

(pppp) "Subsidiary" includes any corporation or other entity of which a majority of the capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time, directory or indirectly, owned by such a party.

(qqqq) "Surveys" is defined in Section 6.17(a).

(rrrr) "Tax" or "Taxes" means (i) all federal, state, local and foreign taxes, charges, fees, imposts, levies or other like assessments, including all income, gross receipts, alternative or add-on minimum, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, recapture, real and personal property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest, penalties, additions to tax or additional amounts imposed by any taxing authority, and (ii) any liability for the payment of any amounts of the type described in clause (i) of another Person as a result of being a member of an affiliated, consolidated, combined or unitary group for any period (including any arrangement for group or consortium tax relief or similar arrangement).

(ssss) "Tax Returns" means all returns, statements, reports, documents, declarations, forms, designations, claims for refund, and other information and filings (including elections, disclosures, schedules and estimates), and any attachments, addenda or amendments thereto (whether or not a payment is required to be made with respect to any such return or other document) relating to Taxes.

(tttt)    "Tax Sharing Agreement" is defined in Section 4.13(d).

(uuuu) "Tier 1 Capital" means (i) the sum of common stockholders' equity, non-cumulative perpetual preferred stock (including any related surplus) and minority interests in consolidated subsidiaries of a financial institution, minus (ii) all intangible assets of the financial institution and unrealized gain or loss on securities, all determined in accordance with applicable Call Report preparation instructions and required adjustments, if any.

(vvvv) "Tier 1 Leverage Ratio" means Tier 1 Capital of a financial institution, divided by the financial institution's total consolidated assets, less disallowed intangible assets, as of the specified date, determined in accordance with applicable Call Report preparation instructions and required adjustments, if any.

(wwww)      "Title Commitments" is defined in Section 6.17(a).

1.2     Currency.  Except where otherwise expressly proved, all monetary amounts in this Agreement are stated and shall be paid in United States currency.

1.3     Governing Law.  This Agreement and the agreements contemplated hereby shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the Bankruptcy Code and the substantive laws of the State of Minnesota, in each case without regard to the conflict of laws principles thereof or any other jurisdiction.

## ARTICLE 2.
## PURCHASE OF BANK SHARES

2.1     Purchase and Sale of the Bank Shares.  Subject to the terms and conditions set forth in this Agreement, and subject to the entry by the Bankruptcy Court of the Sale Order, the Company agrees to sell, assign and transfer to the Buyer, and the Buyer agrees to purchase from the Company, on the Closing Date, all right, title and interest of the Company in the Bank Shares and, if designated by the Buyer in accordance with Section 6.5(b) and to the extent assignable, the Contracts of the Company that relate to the Business, effective as of and from the Closing, free and clear of all Encumbrances, for the Purchase Price.

2.2     Purchase Price.

(a)     The consideration to be paid by Buyer to the Company for the Sale shall be the amount equal to (1) the product of (A) 69.99%, multiplied by (B) the Adjusted Book Value of the Bank as of the Determination Date, minus (2) the Loan Loss Reserve Adjustment (as may be modified pursuant to Section 2.2(b), the "Purchase Price") and shall, subject to the terms and conditions hereof, be payable by the Buyer to the Company as set forth in Section 2.5 below.  Buyer shall also make the Equity Contribution.  A sample calculation of the Purchase Price is as follows: based on the Bank's Call Report dated June 30, 2014 and such date as the assumed Determination Date and assuming a reversal of the Bank's allowance for loan and lease losses of $750,000 requiring a Loan Loss Reserve Adjustment: (a) $24,902,000 (Adjusted Book Value), which equals the sum of (i) $200,000 (common stock), (ii) $67,733,000 (surplus), (iii) ($41,360,000) (undivided loss), and (iv) ($1,671,000) (accumulated comprehensive loss), multiplied by (b) 69.99%, minus (c) a Loan Loss Reserve Adjustment of $429,375, resulting in a Purchase Price of $17,000,000.

(b)     In the event that the Bank does not receive approval from the Federal Reserve, FDIC or any other applicable Governmental Authority to make the ACS Transaction Dividend, the Purchase Price shall be increased by an amount equal to (1) the Purchase Price as determined pursuant to Section 2.2(a), plus (2) the total of (A) the sale price realized by the Bank with respect to the ACS Transaction, minus (B) 9,692,080; provided, that the Buyer shall not be required to pay the increased Purchase Price pursuant to this Section 2.2(b) if such increased Purchase Price results in a Burdensome Condition with respect to the Buyer and, in such event, the Buyer may either (i) terminate this Agreement and receive a refund of its Deposit, or (ii) waive its right to terminate this Agreement and consummate the Contemplated Transactions; provided, further, that the Purchase Price shall be reduced by an amount equal to the excess, if any, of Tax incurred

by the Buyer over the Tax that would have been incurred if the Bank had made the ACS Transaction Dividend and the Purchase Price would not have been increased under this Section 2.2(b).

2.3    Adjusted Book Value.  The "Adjusted Book Value" of the Bank means (a) the sum of the balances, determined as of the Determination Date, on the Bank Balance Sheet for the Bank's common stock, surplus, undivided profits, plus or minus (as applicable) year to date net income or loss (net of distributions, including the ACS Transaction Dividend) and accumulated other comprehensive income (adjusted in accordance with Accounting Standard Codification 320), but excluding (i) loan loss reserve accounts, and (ii) any intangible assets, minus (b) any reversal of the Bank's allowance for loan and lease losses in excess of the Loan Loss Reversal Limit during the period beginning July 1, 2014 through the Closing Date, minus (c) the sum of (i) any payment made, or cost or expense accrued, by the Bank after the Determination Date, but before the Closing, that is not otherwise permitted, or that is prohibited, by the terms of this Agreement, and (ii) the amount of any cost or expense that should have been incurred or accrued by the Company or the Bank prior to Closing to bring the Company and the Bank into compliance with the terms of this Agreement, but which cost or expense was not incurred or accrued.  The maximum amount that will be considered as a reduction in the Bank's loan loss reserve accounts for purposes of calculating the Adjusted Book Value is $750,000 (the "Loan Loss Reversal Limit").  For purposes of this Agreement, the "Loan Loss Reserve Adjustment" will be 57.25% of the amount of any reversals of the Bank's allowance for loan and lease losses during the period beginning July 1, 2014 through the Closing Date up to the Loan Loss Reversal Limit.  A sample calculation of the Loan Loss Reserve Adjustment is as follows: (a) $750,000 (reversal of the Bank's allowance for loan and lease losses), multiplied by (b) 57.25%, resulting in a Loan Loss Reserve Adjustment of $429,375.  For avoidance of doubt, the preceding sample calculation would not change in the event that reversal of the Bank's allowance for loan and lease losses exceeded $750,000 during the period beginning July 1, 2014 through the Closing Date.  The "Determination Date" shall be the last day of the month immediately preceding the month in which the Closing Date occurs.

2.4    Deposit.  Concurrently with the execution and delivery of the Prior Agreement, the Buyer has delivered to Lindquist & Vennum LLP, counsel to the Company, an amount equal to $250,000 (the "Deposit"). The Deposit was paid in immediately available funds by wire transfer or a cashier's check to be deposited and held in a non-interest bearing account until the Sale. The parties hereby agree that if the transaction contemplated herein is not consummated as set forth in this Agreement pursuant to Sections 8.1(a), 8.1(b), 8.1(c), 8.1(e), 8.1(g), 8.1(h) 8.1(i) or 8.1(j) of this Agreement, the Deposit shall be immediately refunded to the Buyer upon written demand. In the event that the transaction contemplated herein is not consummated for any reason other than specifically described hereinabove, the Company shall be entitled to retain all of the Deposit as liquidated damages.   In the event the transaction contemplated herein is consummated, the Deposit shall be applied to payment of the Purchase Price and shall be disbursed in immediately available funds to the Company on the Closing Date.

2.5    Payments.  On the Closing Date, the Buyer shall pay the Company by wire transfer of immediately available funds, to an account designated by the Company (as debtor-in-possession) in writing prior to the Closing Date, an amount equal to the Purchase Price less the amount of the Deposit in exchange for assignment of the Bank Shares to the Buyer.

2.6     Closing Balance Sheet.  Within three (3) Business Days following the Approval Date, the Company shall (a) prepare and deliver to the Buyer a balance sheet of the Bank as of the Determination Date (the "Bank Balance Sheet"), and (b) deliver to the Buyer a Purchase Price calculation based upon the Bank Balance Sheet.  The Bank Balance Sheet shall be prepared in accordance with the Accounting Standards; *provided*, that the Bank Balance Sheet may make adjustments in the allowances and reserves for loan losses (i) in the Ordinary Course of Business consistent with past practices, (ii) in accordance with the Bank's ALLL Policy in effect on the date of this Agreement, and (iii) following a determination by the Bank's Board of Directors that, based on the quality of the Bank's loan portfolio, such adjustments are appropriate.  The Buyer shall notify the Company of any disputes regarding the Bank Balance Sheet or Purchase Price calculation prior to the Closing Date. Any unresolved disputes regarding the Bank Balance Sheet or the Company's Purchase Price calculation which arise prior to the Closing Date shall be submitted to an independent accounting firm mutually agreeable to the Buyer and the Company for a binding resolution. Cost of retaining the independent accounting firm shall be paid 50% by the Buyer and 50% by the Company.  The accounting firm may only consider those items and amounts set forth in the Bank Balance Sheet as to which the Company and the Buyer have disagreed within the time periods and on the terms specified above.  The disputed amount shall be deposited in an escrow account as mutually agreed upon by the Buyer and the Company so as not to delay the Closing Date and such amount shall be paid pursuant to the resolution of the independent accounting firm.  Notwithstanding the foregoing, if the disputed amount exceeds $500,000, the Buyer shall not be required to deposit any amount into escrow.

**ARTICLE 3.**
**CLOSING; CLOSING DELIVERIES**

3.1     Closing.  Subject to the satisfaction of the conditions set forth in this Agreement (or the waiver thereof by the party entitled to waive such condition), the closing of the sale and purchase of the Bank Shares (the "Closing") will take place at the offices of Lindquist & Vennum LLP, 80 South Eighth Street, Suite 4200, Minneapolis, Minnesota, at 10:00 a.m. on a date mutually agreeable to the parties within five (5) Business Days of the receipt of all necessary regulatory approvals, expiration of any applicable regulatory waiting periods and expiration of all periods of appeal with respect to the Sale Order (the "Approval Date").  The date on which the Closing actually is held is referred to in this Agreement as the "Closing Date." Except as otherwise set forth in this Agreement, the Company and the Buyer intend that the Company shall operate the Bank consistent with past practices to and including 11:59 p.m., central time, on the Closing Date ("Effective Time") and that the Buyer shall operate the Bank for its own account after the Effective Time.  Following Closing, the Buyer will merge the Bank with and into the Buyer pursuant to Sections 302A.651 and 49.33 to 49.41 of the Minnesota Statutes and 12 U.S.C. § 1828(c).

3.2     Closing Deliveries.  On or prior to the Closing Date, the Buyer and the Company shall execute and/or deliver to the below parties the following sums, items, documents, instruments and agreements, together with such other items, documents, instruments and agreements as the other party (or its counsel) may reasonably request to consummate the purchase and sale contemplated hereby:

(a)    <u>The Company's Closing Deliverables</u>.  At the Closing, the Company will deliver the following to the Buyer (and/or the following shall have occurred):

(i)    Share certificate(s) evidencing all of the Bank Shares being purchased and sold hereunder, free and clear of all Encumbrances, duly endorsed or otherwise accompanied by duly executed assignments separate from certificate sufficient to transfer ownership of the certificates and the shares of stock evidenced thereby to the Buyer;

(ii)    Certified copies of a resolution of the directors of the Company approving the completion of the Contemplated Transactions including the sale of the Bank Shares and the execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement in such form and content as the Buyer may reasonably require;

(iii)    The Company's Certificate;

(iv)    The Board Resignations required under Section 6.5(c);

(v)    The pay-off or confirmation letter from the Broker regarding the Broker's Fees required under Section 6.15;

(vi)    The Bankruptcy Court shall have entered the Sale Order in such form as reasonably acceptable to Buyer and such Sale Order shall be unstayed, and shall not have been amended, modified, reversed, vacated or subject to a pending appeal;

(vii)    Evidence reasonably acceptable to the Buyer that the Bank has consummated the ACS Transaction and made the ACS Transaction Dividend; and

(viii)    The execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement in such form and content as the Buyer may reasonably require.

(b)    <u>The Buyer's Closing Deliverables</u>.  At the Closing, the Buyer will deliver the following to the Company:

(i)    The Purchase Price established in accordance with Section 2.1 by an appropriate wire transfer in immediately available funds to be received by a depository institution, previously selected by the Company, and to be receipted within the business transaction date by such depository institution on the Closing Date;

(ii)    The Buyer's Certificate; and

(iii)    The execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered by the Buyer pursuant to this Agreement in such form and content as the Company may reasonably require.

# ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in a corresponding section or subsection, as applicable, of the Disclosure Schedules, the Company makes the following representations and warranties to the Buyer as of the date hereof and as of the Closing Date; *provided, however*, that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only as of such date. The inclusion of an item in the Disclosure Schedules shall not be deemed an admission by the Company that such item represents a material fact, event, or circumstance or has had or would be reasonably expected to have a Material Adverse Effect. Disclosure in any section of the Disclosure Schedules shall apply only to such section of such disclosure schedule, except to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is relevant to another section of such Disclosure Schedules. The Company will have the right until the Closing to update, supplement or amend any section of the Disclosure Schedules with respect to any matter arising or discovered after the date of this Agreement that, if existing or known on the date of this Agreement, would have been set forth or described in such Disclosure Schedules.

4.1    Organization, Standing and Power.

(a)    Status of the Company. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Minnesota and, except as set forth in Schedule 4.1(a), has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as it is now being conducted. The Company is registered as a bank holding company with the Federal Reserve Board.

(b)    Status of the Bank. The Bank is a direct and wholly-owned Subsidiary of the Company and is a Minnesota state chartered bank duly organized, validly existing and in good standing under the laws of the State of Minnesota, with all requisite power, authority and charters necessary or required by law to carry on its Business in the State of Minnesota in the manner in which the Business is now being conducted. The Bank is duly qualified to do business and is in good standing in each jurisdiction in which its ownership of properties or conduct of business requires such qualification except where the failure to be so qualified has not had and would not reasonably be expected to have a Material Adverse Effect. Complete and correct copies of the Charter Documents of the Bank, as currently in effect, have been made available or delivered to the Buyer.

4.2    Insured Status. The Bank is an insured bank under the provisions of Chapter 16 of Title 12 of the United States Code relating to the FDIC, and no act or default on the part of the Bank has occurred which might adversely affect the status of the Bank as an insured bank under said Chapter.

103791916v7

4.3    Authority; Approvals.  Except as provided in <u>Schedule 4.3</u>, and subject to entry of the Sale Order, the Company has the full legal right, corporate power and authority to enter into this Agreement, carry out its obligations under this Agreement and consummate the Contemplated Transactions. The execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement, and the completion and performance of the Contemplated Transactions have been duly authorized by all necessary corporate action on the part of the Company, and this Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement have been duly executed and delivered by the Company and, subject to the entry of the Sale Order, constitute a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their respective terms. No other corporate proceedings, including any stockholder approvals, are necessary for the execution and delivery by the Company of this Agreement, the performance by it or of its obligation hereunder or thereunder or the consummation by it of the Contemplated Transactions.

4.4    Capital Structure.

(a)    Ownership. The authorized capital stock of the Bank consists of 20,000 shares of common stock, of which 20,000 shares are currently issued and outstanding, and which constitute 100% of the issued and outstanding capital stock of the Bank.  All of the outstanding shares of capital stock of the Bank are directly and beneficially owned by the Company and have been duly authorized and validly issued, are fully paid and non-assessable and were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities and are free and clear of all Encumbrances except as set forth on <u>Schedule 4.4(a)</u>.

(b)    Outstanding Stock Rights.  The Bank has no outstanding subscriptions, warrants, options, calls or commitments relating to its capital stock, or any obligations or securities convertible into or exchangeable for Bank Shares.

(c)    Bank's Subsidiaries. Other than ACS (which will not be a Subsidiary of the Bank following Closing), and except as set forth on <u>Schedule 4.4(c)</u>, the Bank does not have any Subsidiaries or own beneficially, directly or indirectly, any capital stock or equity interest in, or any interests convertible into or exchangeable or exercisable for any class of equity securities or similar interests of any corporation, bank, business trust, association or similar organization, and is not, directly or indirectly, a partner in any partnership or party to any joint venture.  ACS does not have any Subsidiaries.

4.5    Permits.  The Bank holds all Permits required and material to conduct its Business as now conducted. All of the Permits which are material to the Company's and the Bank's Business, including all Permits required from the FDIC and the Minnesota Department of Commerce in connection with the Business (each, a "Material Permit") are validly issued, are in full force and effect and are being complied with by each party in all material respects. Except as provided in <u>Schedule 4.5</u>, no notice of breach or default in respect of any Material Permit has been received by the Bank and there are no proceedings in progress, pending or threatened which would reasonably be expected to result in the cancellation, revocation, suspension or adverse

15

alteration of any of them, and the Company is not aware of any existing matters or state of facts which is reasonably likely to give rise to any such notice or proceeding.

4.6     Regulatory Reports. The Bank has duly filed with the Federal Reserve Board, the Minnesota Department of Commerce and any other applicable Governmental Authorities, as the case may be, in correct form in all material respects the reports, returns and filing information data required to be filed under any applicable Legal Requirement, including any and all federal and state banking authorities, and such reports were complete and accurate in all material respects and in compliance in all material respects with any applicable Legal Requirement as of their respective dates (or, if amended, as of the date of such amendment).

4.7     Deposits.   All of the deposits held by the Bank (including the records and documentation pertaining to such deposits) have been established and are held in compliance in all material respects with (i) all applicable policies, practices and procedures of the Bank, and (ii) all applicable Legal Requirements, including anti-money laundering, anti-terrorism, or embargoed persons requirements.

4.8     Financial Statements.   The Company has furnished or made available to the Buyer true and complete copies of the Call Reports of the Bank for the periods ending December 31, 2013 and June 30, 2014. Except as provided in Schedule 4.8, the financial statements contained in such Call Reports (i) are true, accurate and complete in all material respects, (ii) have been prepared in accordance with Accounting Standards, except as may be otherwise indicated in the notes thereto and except for the omission of footnotes, and (iii) fairly present in all material respects the financial condition of the Bank as of the respective dates set forth therein and the results of operations and stockholders' equity for the respective periods set forth therein, subject to year-end adjustments (none of which are reasonably expected to be material). Since June 30, 2014, there has been no change in the financial condition of the Bank that has resulted in, or could be reasonably likely to result in, a Material Adverse Effect. The financial statements contained in the Call Reports of the Bank to be prepared after the date of this Agreement and prior to the Closing (A) will be true, accurate and complete in all material respects, (B) will have been prepared in accordance with the Accounting Standards, except as may be otherwise indicated in the notes thereto and except for the omission of footnotes, and (C) will fairly present in all material respects the financial condition of the Bank as of the respective dates set forth therein and the results of operations and stockholders' equity for the respective periods set forth therein, subject to year-end adjustments (none of which are reasonably expected to be material).

4.9     Books and Records.   The Books and Records have been and are being maintained in the Ordinary Course of Business in accordance and, except as provided in Schedule 4.8, compliance with the Accounting Standards and Legal Requirements in all material respects.  The Books and Records are complete in all material respects.

4.10    Liabilities.   Except as provided in Schedule 4.10, the Bank has no material liability or obligation, accrued, absolute, contingent or otherwise and whether due or to become due, that are not reflected in or disclosed in the Company's and the Bank's financial statements or the appropriate Call Reports, except (a) those liabilities and expenses incurred in the Ordinary Course of Business and consistent with prudent business practices since the applicable dates of such financial statements or Call Reports, (b) those liabilities that individually or in the

16

aggregate, are not material, and (c) those liabilities arising from this Agreement and the Contemplated Transactions, which will be satisfied by the Bank or the Company prior to Closing.

4.11   <u>Litigation</u>.  Except as set forth on <u>Schedule 4.11</u>, and except for matters before the Bankruptcy Court and matters disclosed in the schedules, statements and filings by the Company with the Bankruptcy Court, there are no Proceedings pending or, to the Knowledge of the Company, threatened, against the Bank or against any of their directors, officers or employees relating to the performance of their duties in such capacities, that would reasonably be expected to have a Material Adverse Effect on the financial condition or operations of the Bank or any of its properties or the Bank Shares.

4.12   <u>Loans</u>.  As of the date of this Agreement, all outstanding loans or other evidence of indebtedness of the Bank ("<u>Loans</u>") have been made and maintained in the Ordinary Course of Business, in accordance with the Bank's customary lending standards, written loan policies, and in material compliance with all Legal Requirements. The Bank's loan files for the Loans ("<u>Loan Files</u>") contain all notes, leases and other evidences of any indebtedness, including without limitation all loan agreements, loan participation agreements and certificates, security agreements, mortgages, guarantees, UCC financing statements and similar documents evidencing collateral or other financial accommodations relating to the loans ("<u>Loan Documents</u>").  The Company has provided to the Buyer a listing of all Loans, including the principal balance, interest rate, origination date, maturity date and borrowers thereunder.  Except as disclosed to the Buyer, the Bank is not a party to any written or oral (i) loan agreement, note or borrowing arrangement, under the terms of which the obligor is sixty (60) days delinquent in payment of principal or interest or in default of any other material provisions as of the date of this Agreement or on non-accrual status; (ii) loan agreement, note or borrowing arrangement which has been classified or, in the exercise of reasonable diligence by the Bank or any regulatory agency with supervisory jurisdiction over the Bank, should have been classified as "substandard", "doubtful", "loss", "other loans especially mentioned"; or any comparable classifications by such Persons; (iii) loan agreement, note or borrowing arrangement including any loan guaranty, with any director or executive officer of the Bank or any ten percent (10%) or more shareholder of the Company, or any Person controlling, controlled by, or under common control with any of the foregoing; (iv) loan agreement, note or borrowing arrangement in violation of any Legal Requirement applicable to the Bank, which violation could result in a Material Adverse Effect on the Bank; or (v) loan agreement, note or borrowing arrangement which, at the time it was entered into, constituted a violation of the Bank's legal lending limit and which remains on the Bank's books.

4.13   <u>Tax Matters</u>.

(a)   <u>Tax Returns</u>.  The Company and the Bank have filed or caused to be filed (on a timely basis for all periods not barred by the applicable statute of limitations period) all Tax Returns (as defined below) that are or were required to be filed by either of them pursuant to all applicable laws and regulations.  All such Tax Returns filed by are true, correct, and complete in all material respects.

17

(b)     <u>Payment of Taxes</u>.  The Company and the Bank have paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to the Tax Returns or otherwise, or pursuant to any assessment received by the Company or the Bank, except such Taxes, if any, as are being contested in good faith and as to which adequate reserves (determined in accordance with GAAP) have been provided in the most recent financial statements.  The charges, accruals, and reserves with respect to Taxes on the books of the Company and the Bank are adequate (determined in accordance with GAAP) and are at least equal to such party's liability for Taxes.  To the Knowledge of the Company, there exists no proposed Tax assessment against the Company or the Bank.

(c)     <u>Withholding Taxes</u>.  All Taxes that the Company or the Bank are or were required by any applicable laws to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Authority.   No unexpired waivers executed by or with respect to the liability of the Company or the Bank of the statute of limitations with respect to any Taxes are in effect, and neither the Company nor the Bank has otherwise agreed to any extensions of time with respect to any assessment of deficiency with respect to such Taxes.

(d)     <u>Tax Sharing Agreements</u>.  The Company is not a party to or bound by any Tax sharing, allocation or indemnification agreement or similar agreement or arrangement other than the Tax Sharing Agreement, dated as of August 27, 2014, by and among the Company, the Bank and ACS (the "<u>Tax Sharing Agreement</u>"), a copy of which has been provided to Buyer.  The Tax Sharing Agreement shall be terminated as of the Closing Date and, after the Closing Date, and the Company, the Bank and ACS shall not be bound thereby or have any liability thereunder.

4.14     <u>Employment Contracts</u>.  Except as set forth on <u>Schedule 4.14</u>, the Company and the Bank have no written employment contracts (or oral employment commitments) with any of its officers or employees.

4.15     <u>Insurance Policies</u>. The Company and/or the Bank maintain insurance by insurers that are financially sound and reputable with respect to its assets and operations in such amounts that they reasonably believe are adequate for the Business, including, but not limited to, insurance coverage on all real and personal property owned or leased by the Company and the Bank against theft, damage, destruction, acts of vandalism and all other risks customarily insured against, with such deductibles as are customary for similar businesses, all of which insurance is in full force and effect. A complete list of all insurance policies maintained by the Company and the Bank is set forth in <u>Schedule 4.15</u>.   Taken together, the insurance policies (i) provide adequate insurance coverage for its assets and operations for all risks normally insured by a person carrying on the same business as the Company and the Bank; and (ii) are sufficient for compliance in all material respects with all Legal Requirements.

4.16     <u>Employee Benefit Plans</u>.

(a)     <u>Schedule 4.16(a)</u> lists all pension, retirement, supplemental retirement, stock option, stock purchase, stock ownership, savings, stock appreciation right, profit

sharing, deferred compensation, consulting, bonus, medical, disability, workers' compensation, vacation, group insurance, severance and other employee benefit incentive and welfare policies, contracts, plans and arrangements and all trust agreements related thereto, maintained by or contributed to by the Bank as of the date hereof in respect of any of the present or former directors, officers, or other employees of and/or consultants to the Bank (collectively, "Company Employee Plans").  The Company has furnished the Buyer with the following documents with respect to each Company Employee Plan:  (i) a true and complete copy of all written documents comprising such Company Employee Plan (including amendments and individual agreements relating thereto) or, if there is no such written document, an accurate and complete description of the Company Employee Plan; (ii) the most recently filed Form 5500 or Form 5500-C/R (including all schedules thereto), if applicable; (iii) the most recent financial statements and actuarial reports, if any; (iv) the summary plan description currently in effect and all material modifications thereof, if any; and (v) the most recent IRS determination letter, if any.

(b)     To the Knowledge of the Company, all Company Employee Plans have been maintained and operated in all material respects in accordance with their terms and all applicable Legal Requirements, including, without limitation, to the extent applicable, ERISA, and the Code and all contributions required to be made to the Company Employee Plans have been made or reserved.

4.17    No Regulatory Issues.  Except as disclosed on Schedule 4.17, the Bank is not subject to any formal enforcement action including, without limitation, any cease-and-desist or other order issued by, or a party to any written agreement, consent agreement with, or a party to any commitment letter or similar undertaking to, or subject to any order or directive by, or been a recipient of any extraordinary supervisory letter from, or has adopted any board resolutions at the request of any Governmental Authority (each of the foregoing, a "Regulatory Agreement").

4.18    Brokers and Finders.  Except for the Broker and the Broker's Fees, the Company and the Bank have not employed any brokers, finders, financial advisors or investment bankers or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees, in connection with this Agreement or the Contemplated Transactions.

4.19    Labor. No employee work stoppage is pending or, to the Company's Knowledge, threatened with respect to the Bank.  Except as disclosed on Schedule 4.19, the Bank is not involved in or affected by, or, to the Company's Knowledge, threatened with, any labor dispute, arbitration, lawsuit or administrative proceeding.  Employees of the Bank are not represented by any labor union nor are any collective bargaining agreements otherwise in effect with respect to such employees.

4.20    Real Property.

(a)     A list of each parcel of real property owned by (i) the Bank is set forth on Schedule 4.20(a)(i), and (ii) the Bank that as of August 31, 2014 was classified as other real estate owned as of such date is set forth on Schedule 4.20(a)(ii) (the "OREO" and, collectively with the real property described on Schedule 4.20(a)(i), the "Owned Real Property").

103791916v7

(b)     A list of each parcel of real property leased by the Bank is set forth on Schedule 4.20(b) (such real property being herein referred to as the "Leased Real Property").  Collectively, the Owned Real Property and the Leased Real Property are herein referred to as the "Real Property."

(c)     There is no pending or, to the knowledge of the Company, threatened action involving the Bank as to the title of or the right to use any of the Real Property.

(d)     Except as disclosed on Schedule 4.4(c), Schedule 4.20(a)(i) and Schedule 4.20(b), the Bank has no interest in any real estate other than as a mortgagee or secured party and other than the OREO.

(e)     To the Company's Knowledge, none of the buildings, structures or other improvements located on the Real Property encroaches upon or over any adjoining parcel of real estate or any easement or right-of-way or "setback" line and all such buildings, structures and improvements are located and constructed in conformity with all applicable zoning ordinances and building codes in all material respects or otherwise do not require the Bank to take any corrective action.

(f)     To the Company's Knowledge, none of the buildings, structures or improvements located on the Owned Real Property are the subject of any official complaint or notice by any governmental authority of violation of any applicable zoning ordinance or building code, and there is no zoning ordinance, building code, use or occupancy restriction or condemnation action or proceeding pending, or threatened, with respect to any such building, structure or improvement. The building structures and improvements located on the Owned Real Property are in generally good condition for their intended purpose, ordinary wear and tear excepted, and have been maintained in accordance with reasonable and prudent business practices applicable to like facilities.

4.21     Bills and Expenses.  As of the Closing Date, the Bank will have no material, unpaid bills or unaccrued expenses outstanding except for usual and customary expenses that are reflected on the Bank's financial statements referred to in Section 4.8, bills and expenses set forth on or contemplated by Schedule 4.21 or otherwise arising in the Ordinary Course of Business and payments required or arising in connection with employee benefit and incentive plans of the Bank, including, without limitation, the Bank's 2014 Performance Based Bank-Wide Discretionary Incentive Plan (the "Performance Plan") which is described on Schedule 4.14 and Schedule 4.16.  The performance goals for 2014 set forth in the Performance Plan have been met and employees who are beneficiaries of such plan are or will be entitled to receive payments as set forth in and contemplated by the Performance Plan in accordance with its terms which may be made prior to or contemporaneously with the Closing and such payments, or the liability therefore if unpaid, will be reflected on the Bank Balance Sheet.  For purposes of this Section 4.21, a bill or unaccrued expense involving an amount in excess of $25,000 shall be deemed "material."

4.22     Title to Assets.  Except with respect to Leased Real Property and personal property leases and except as set forth on Schedule 4.22, the Bank owns outright and has good and marketable title to all of its assets.  Except as set forth on Schedule 4.4(a), the Shares are

owned by the Company, not subject to any Encumbrance, and upon consummation of the Contemplated Transactions, the Buyer will be vested with good and marketable title to the Shares free and clear of all Encumbrances.  None of the Bank's assets are subject to any Encumbrance except with respect to the exceptions and qualifications set forth in the preceding sentence, and upon consummation of the Contemplated Transactions, the Bank will be vested with good and marketable title to its assets free and clear of all Encumbrances. The Bank's assets include all assets used in, and necessary to, the Business.  All of the Bank's assets are located at the Owned Real Property or the Leased Real Property.

4.23    Leases.  Schedule 4.23 sets forth a description of all leases of real and material leases of personal property to which the Bank is a party.  For purposes of this Section 4.23, a lease involving an amount in excess of $25,000 or a remaining term extending beyond twelve (12) months from the date of this Agreement shall be deemed "material."  The Company has delivered to Buyer true, correct and complete copies of all such lease agreements and each such lease agreement is valid and subsisting and no event or condition exists which constitutes, or after notice or lapse of time or both, would constitute a material default thereunder by the Bank. The Company has provided to the Buyer true and complete copies of all of the non-material leases to which the Bank is a party or to which any of its assets is bound.

4.24    Bank Contracts, Commitments or Agreements.  Except for, credit or deposit contracts of the Bank, Schedule 4.24 sets forth a true and complete list of all of the material Contracts to which the Bank is a party or to which any of its assets is bound. The Company has provided to the Buyer true and complete copies of all of the non-material Contracts to which the Bank is a party or to which any of its assets is bound.  Except as set forth on Schedule 4.24, the Bank is not a party to or bound by any written or oral (a) contract with any labor union, (b) employment, agency, consulting or similar contract, (c) material contract or commitment, (c) guaranty, suretyship, indemnification or contribution agreement (except as contained in the Bank's Charter Documents), (d) other contract not made in the Ordinary Course of Business, (e) contract for the purchase or sale of real or personal property, (f) contracts for the sale of credit life or disability insurance policies, or (g) contracts with any Affiliate.  For purposes of this Section 4.24, an agreement involving an amount in excess of $25,000 or a remaining term extending beyond twelve (12) months from the date of this Agreement shall be deemed "material." Each material Contract of the Bank is in full force and effect, is valid and enforceable in accordance with its terms, and the Bank is not, and, to the Company's Knowledge, no other party is, in default thereunder and there are no facts or circumstances which exist which with the giving of notice or lapse of time would constitute a default under any material Contract of the Bank.

4.25    Company Contracts.  Schedule 4.25 sets forth a true and complete list of all of the Contracts to which the Company is a party or to which any of its assets is bound (the "Company Contracts").

4.26    Fidelity Bonds.  The Bank has continually maintained fidelity bonds insuring it against acts of dishonesty by its employees in such amounts as are customary, usual and prudent for banks of its size.  No claims have been made under such bonds, and the Company is not aware of any facts which would form the basis of a claim under any such bond; nor does the

21

Company have any reason to believe that such fidelity coverage will not be renewed by the existing carrier on substantially the same terms as existing coverage.

4.27   <u>Compliance with Law</u>.  The Bank (a) has complied in all material respects with all laws, regulations and orders (including, without limitation, zoning ordinances, building codes, ERISA, the Americans with Disabilities Act, and securities, tax, environmental, civil rights, and occupational health and safety laws and regulations including, without limitation, all statutes, rules, regulations and policy statements pertaining to the conduct of a banking, deposit-taking, lending or related business, or to the exercise of trust powers) and governing instruments applicable to it and to the conduct of its business, and (b) is not in default under, and no event has occurred which, with the lapse of time or notice or both, could reasonably be expected to result in a default by the Bank under, the terms of any judgment, order, writ, decree, permit, or license of any regulatory authority or court, whether federal, state, municipal or local, and whether at law or in equity where such default could have a Material Adverse Effect on the Business.  The Bank has not received notice of any violation of any environmental, zoning, building, fire or other regulatory law, statute, ordinance or regulation relating to the Bank's property.

4.28   <u>Loan and Lease Loss Reserves and Allowances</u>.  The allowances for loan and lease losses contained in the Bank's financial statements referenced in <u>Section 4.8</u> were established in accordance with (a) the past practices and experiences of the Bank, and (b) applicable regulatory requirements.  Neither the Bank nor the Company have been notified by any regulatory agency or otherwise, in writing or otherwise, that such reserves are inadequate or inaccurate or that the practices and policies of the Bank in establishing such reserves and in accounting for delinquent and classified assets generally fail to comply with Accounting Standards or applicable regulatory requirements. The Company believes the Bank's allowance for loan and lease losses is adequate and accurate.

4.29   <u>Environmental Laws; Hazardous Substances</u>.

(a)      Each parcel of Owned Real Property:

(i)      is and has been operated by the Bank in material compliance with all applicable Environmental Laws;

(ii)      is not the subject of any written notice from any governmental authority or other person alleging the violation of or liability under any applicable Environmental Laws;

(iii)      is not currently subject to any court order, administrative order or decree arising under any Environmental Law;

(iv)      has not, to the Company's Knowledge, been used for the disposal of Hazardous Substances and does not contain any Hazardous Substances in material violation of any applicable Environmental Law; and

(v)    has not, to the Company's Knowledge, had any releases, emissions or discharges of Hazardous Substances except as permitted under applicable Environmental Laws.

(b)    With respect to all Owned Real Property, and to the Company's Knowledge, there has been no release of any Hazardous Substance, nor any release of any pollutant, toxic or hazardous waste or substance, or any other material, the release or disposal of which is regulated by any law, regulation, ordinance or code related to pollution or environmental contamination that would result in material liability under any Environmental Law.

(c)    For purposes of this Agreement, "Environmental Laws" means any federal, state or local law, statute, rule, regulation, code, rule of common law, order, judgment, decree, injunction or agreement with any federal, state or local governmental authority (i) relating to the protection, preservation or restoration of the environment (including, without limitation, air, water vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource) or to human health or safety, or (ii) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of hazardous substances, in each case as amended and now in effect. Environmental Laws include, without limitation, the Clean Air Act (42 USC § 7401, *et seq.*); the Comprehensive Environmental Response Compensation and Liability Act (42 USC § 9601, *et seq.*); the Resource Conservation and Recovery Act (42 USC § 6901, *et seq.*); the Federal Water Pollution Control Act (33 USC § 1251, *et seq.*); and the Occupational Safety and Health Act (29 USC § 651, *et seq.*).

(d)    For purposes of this Agreement, "Hazardous Substances" means any substance, whether liquid, solid or gas (i) listed, identified or designated as hazardous or toxic; (ii) which, applying criteria specified in any Environmental Law, is hazardous or toxic; or (iii) the use or disposal, or any manner or aspect of management or handling, of which is regulated under any Environmental Law.

4.30    Completeness of Disclosures.  No representation or warranty by the Company in this Agreement and no statement contained in the Disclosure Schedules or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.  To the Company's Knowledge, there is no event or circumstance which the Company has not disclosed to Buyer which could reasonably be expected to have a Material Adverse Effect.

4.31    Disclaimer of Other Representations and Warranties. EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 4, THE COMPANY MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE BANK SHARES, THE BANK OR OTHERWISE AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. THE BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT TO THE EXTENT

SPECIFICALLY SET FORTH IN THIS ARTICLE 4, THE BUYER IS PURCHASING THE BANK SHARES ON AN "AS-IS, WHERE-IS" BASIS.

## ARTICLE 5.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

In connection with and as an inducement to the Company to enter into and be bound by the terms of this Agreement, the Buyer warrants and represents to the Company that, as of the date hereof (and as of the Closing Date):

5.1    <u>Organization and Corporate Power</u>.   The Buyer is a banking corporation duly organized, validly existing and in good standing under the laws of the State of Minnesota. Subject to receiving the Buyer Required Approvals, the Buyer has all requisite power, authority, charters, licenses and franchises necessary or required by law to acquire the Bank Shares from the Company, carry out the Contemplated Transactions which it is a party, and duly observe and perform all of its obligations contained in this Agreement.

5.2    <u>Authority Relative to this Agreement</u>.   The execution and delivery of this Agreement by the Buyer and the consummation by Buyer of the transactions contemplated hereby have been (or will be prior to the Closing Date) duly authorized by all necessary organizational or corporate action on the part of the Buyer, and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement and such transactions.

5.3    <u>Execution and Enforceability; Due Diligence</u>.   This Agreement has been duly executed and delivered by the Buyer and constitutes a valid and binding obligation of the Buyer enforceable in accordance with its terms subject to the enforcement of equitable remedies, bankruptcy, insolvency, moratorium and other laws affecting the rights of creditors generally and the judicial limitations of the performance of the remedy of specific performance. The Buyer has been afforded the opportunity to conduct due diligence of the Bank, each Affiliate of the Bank and otherwise and has not, in conduct thereof, discovered a breach by the Company of any representation, warranty, covenant or agreement hereunder. Nothing contained in the foregoing representation is intended to constitute a waiver by the Buyer of any rights hereunder with respect to a representation, warranty, covenant or agreement of the Company made hereunder.

5.4    <u>Consents and Approvals</u>.   Except for the filing of applications, notices and other documents necessary to obtain, and the receipt of, regulatory approvals, exemptions or non-objections from, as applicable, the Governmental Authorities set forth on <u>Schedule 5.4</u> (the "<u>Buyer Required Approvals</u>"), no Consents or approvals of, or filings or registrations with any Governmental Authority or with any third party are necessary in connection with the execution and delivery by the Buyer of this Agreement, or the consummation by the Buyer of the Contemplated Transactions.

5.5    <u>Regulatory Approvals</u>. To the Buyer's knowledge, no facts or circumstances pertaining to the Buyer exist on the date hereof that may prevent or unreasonably delay the Buyer's receipt of the Buyer Required Approvals.

5.6    <u>Sufficient Funds</u>.   The Buyer has the requisite financial resources to undertake and perform the Buyer's obligations under this Agreement and will possess on the Closing Date

103791916v7

sufficient financial resources to consummate the Contemplated Transactions, including, without limitation, Article 2.

5.7     Investment Intent.  The Buyer is acquiring the Bank Shares for its own account and not with a view toward distribution with the meaning of Section 2(a)(11) of the Securities Act of 1933, as amended, other than in compliance with all applicable Legal Requirements, including the federal and state securities laws.

5.8     Absence of Default.  Neither the execution nor the delivery of this Agreement, the consummation of Contemplated Transactions or the fulfillment of the terms hereof will (i) conflict with, or result in a breach of the terms, conditions, or provisions, or constitute a default under any agreement or instrument under which Buyer is obligated, (ii) violate any law, rule or regulation to which the Buyer is subject, or (iii) violate the Buyer's Charter Documents.

5.9     Non-Reliance.  The Buyer acknowledges and agrees that in entering into this Agreement it has not relied and is not relying on any representations, warranties or other statements whatsoever, whether written or oral (from or by the Bank, the Company or any Person acting on their behalf) other than those expressly set out in this Agreement (or other related documents referred to herein) or in the Disclosure Schedules and that it will not have any right or remedy rising out of any representation, warranty or other statement not expressly set out in this Agreement (or other related documents referred to herein) or in the Disclosure Schedules.

# ARTICLE 6.
## COVENANTS OF THE PARTIES

6.1     Commercially Reasonable Efforts.

(a)     The Company and the Buyer will use commercially reasonable efforts to perform and fulfill all conditions and obligations to be performed or fulfilled by them related to the preparation for and submission of the bankruptcy filings under this Agreement. The Company and the Buyer will use commercially reasonable efforts to furnish to the Bankruptcy Court evidence of adequate assurance by the Buyer of its future performance under this Agreement and evidence that the Buyer has the financial wherewithal to timely close the Contemplated Transactions. The Company and the Buyer will use commercially reasonable efforts to obtain the approval of the Sale Procedures Order and the Sale Order. Subject to the approval of the Bankruptcy Court, the Company and the Buyer will use commercially reasonable efforts to perform and fulfill all conditions and obligations on its part to be performed or fulfilled under this Agreement and to cause the completion of the Contemplated Transactions in accordance with this Agreement; *provided, however,* that Buyer shall not be required to take any action that could reasonably be expected to result in the imposition of a Burdensome Condition; *provided further, however*, that the Company shall not be required to take any action or refrain from taking any action that it reasonably believes is required by any Legal Requirement or Governmental Authority.

(b)     The Buyer will provide commercially reasonable, non-financial cooperation in connection with the Company's consummation of the ACS Transaction,

including (i) executing any documents and instruments reasonably necessary to close the ACS Transaction, and (ii) allowing the Bank to make the ACS Transaction Dividend prior to or in connection with Closing; *provided that* in no event shall the Buyer, or the Bank following Closing, be obligated to pay any amounts to the Company or any other party in connection with the ACS Transaction.

(c)     Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Contemplated Transactions.

6.2    Consents and Approvals.

(a)     The Buyer and the Company shall use commercially reasonable efforts to obtain all Buyer Required Approvals and to take or cause to be taken all actions to do, or cause to be done, all things proper and advisable under any applicable Legal Requirement to consummate the Contemplated Transactions; *provided, however,* that Buyer shall not be required to take any action that could reasonably be expected to result in the imposition of a Burdensome Condition.

(b)     As promptly as practicable following the date of this Agreement and to the extent such requirements have not been previously satisfied, the Buyer, with the cooperation of the Company, shall cause to be published all required notices and prepare all necessary documentation and effect all necessary filings in connection with obtaining the Buyer Required Approvals and deliver a conformed copy of the non-confidential portions of all such documents, correspondence and applications to the Company. The Buyer and the Company will cooperate with each other and will each furnish the other and the other's counsel with all information reasonably requested concerning themselves, their Subsidiaries, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with any request for approval, application, petition or any other statement or application made by or on behalf of the Buyer, the Company or their respective Subsidiaries to any Governmental Authority in connection with the Contemplated Transactions. The Buyer and the Company shall have the right to review and discuss in advance all characterizations of the information relating to them and any of their respective Subsidiaries which appear in any filing made, or written materials submitted, in connection with the transactions contemplated by this Agreement with any Governmental Authority.

(c)     Submission of Applications for the Buyer Required Approvals. The parties agree as follows:

(i)     The Company shall provide commercially reasonable, non-financial cooperation in connection with any filing or submission and in connection with any investigation or other inquiry relating to the Buyer Required Approvals, including but not limited to the Buyer, the Company and their respective Subsidiaries cooperating and using commercially reasonable efforts to make, on a timely basis, all registrations, filings and applications with, give all

notices to, and obtain any approvals, orders, qualifications and waivers from, a Governmental Authority necessary for the consummation of the Contemplated Transactions; *provided, however,* that neither the Buyer nor any of its Affiliates shall be required to (and without the Buyer's written consent, neither the Company nor any of its Affiliates shall be permitted to, nor shall they permit any of their employees to) commence or be a plaintiff in any litigation in connection with any such registration, filing, application, notice, approval, order, qualification or waiver or take any action that could reasonably be expected to result in the imposition of a Burdensome Condition; *provided, further, however*, that the Company and its direct and indirect Subsidiaries shall not be required to pay or incur any fee, out-of-pocket cost or expense in connection with any such cooperation or efforts;

(ii)     The Buyer, at its own expense, has timely filed or caused to be filed applications for all Buyer Required Approvals identified in and contemplated by Schedule 5.4, paragraphs 1. through 3., in connection with this Agreement, the Prior Agreement and the Contemplated Transactions;

(iii)     Subject to any Legal Requirement, permit each other to review and discuss in advance, and consider in good faith the views of the other in connection with, any proposed written communication (or other correspondence or memoranda) between any such party and any Governmental Authority relating to the other party and to the Contemplated Transactions; and

(iv)     Subject to any Legal Requirement, promptly inform each other of and supply to each other any written communication (or other correspondence or memoranda) submitted to (except to the extent such submission is confidential), or received by them from, any Governmental Authority, in each case regarding any of the Contemplated Transactions.

6.3     <u>Reserved</u>.

6.4     <u>Operations Pending Closing</u>.  Except as expressly otherwise provided in this Agreement or as may be otherwise expressly required by any Governmental Authority having jurisdiction over the Bank or the Company, including the Bankruptcy Court, and except with the prior written consent of the Buyer, from the date of this Agreement to the Closing:

(a)     <u>Conduct of Business</u>. The Company shall, subject to the provisions of the Bankruptcy Code and the supervision of the Bankruptcy Court, cause the Bank to: (i) carry on and conduct the Business in all material respects in the Ordinary Course consistent with past practice; (ii) use commercially reasonable efforts to maintain and preserve intact its business organization and advantageous business relationships, including with customers, suppliers and employees, and retain the services of its key officers and employees; (iii) take no action that is intended to or would reasonably be expected to adversely affect or materially delay the ability of the Company, the Bank or the Buyer to obtain the Buyer Required Approvals or to perform its covenants and

27

agreements under this Agreement or to consummate the Contemplated Transactions; and (iv) maintain its Books and Records in the usual, regular and ordinary manner;

(b)    <u>Bank Forbearances</u>. Subject to the provisions of the Bankruptcy Code and the supervision of the Bankruptcy Court and other Governmental Authorities and subject to other provisions of this Agreement, the Company shall not, to the extent relating to or impacting the Bank and shall cause the Bank not to, in each case except with the prior written consent of the Buyer which consent shall not be unreasonably withheld, conditioned or delayed:

(i)    enter into any new line of business or materially change its lending, investment, underwriting, risk and asset liability management, and other banking and operating policies, except as required by any applicable Legal Requirement or policies imposed by any Governmental Authority;

(ii)    make any capital expenditures in excess of $25,000 individually or $50,000 in the aggregate, other than as required pursuant to Contracts already entered into and disclosed in <u>Schedule 6.4(b)(ii)</u>;

(iii)    terminate, enter into, amend, modify or waive any material provision of or renew any Contract or Material Permit other than in the Ordinary Course of Business (and other than the Tax Sharing Agreement, which shall be terminated prior to the Closing in accordance with Section 4.13(d));

(iv)    (A) adjust, split, combine or reclassify the Bank's stock, (B) sell, transfer, encumber or otherwise dispose of any of the Bank Shares beneficially owned by the Company, or (C) except in connection with an ACS Transaction upon the exercise by the Company of the Sale Election, issue, sell or otherwise permit to become outstanding, or dispose of or encumber or pledge or authorize or propose the creation of, any additional shares of the Bank's capital stock or any securities convertible into or exchangeable for such stock or any options or other rights, grants or awards with respect to the Bank's capital stock;

(v)    except for the ACS Transaction Dividend, make, declare, pay or set aside for payment any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any shares of its capital stock or redeem, repurchase or otherwise acquire or offer to redeem, repurchase, or otherwise acquire any shares of its capital stock;

(vi)    sell, transfer, mortgage, encumber or otherwise dispose of or discontinue any of its assets, deposits, businesses or properties, except for the ACS Transaction or sales, transfers, mortgages, Encumbrances or other dispositions or discontinuances in the Ordinary Course of Business consistent with past practice and except in connection with an ACS Transaction upon the exercise by the Company of the Sale Election;

(vii)    incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for

the obligations of, any other Person; *provided*, that the Bank may continue to borrow money from the Federal Home Loan Bank System, the Federal Reserve or any other Governmental Authority in the Ordinary Course of Business and in a manner (including amounts) consistent with past practice;

(viii)   make or grant any increase in contributions under any Company Employee Plan (other than with respect to increases in contributions to Employee Plans, that may be attributable to increases in the costs of such plans, such as health insurance for example, and determined to be reasonable and in the best interests of the Bank), amend in any material respect or terminate any Company Employee Plan or adopt any new Company Employee Plan;

(ix)   acquire (other than by way of foreclosure, deed in lieu of foreclosure, acquisitions of control in a fiduciary or similar capacity, or in satisfaction of debts previously contracted in good faith, in each case in the Ordinary Course of Business and consistent with past practice) all or any portion of the assets, business, deposits or properties of any other Person (including any Loans or advances or any participations therein);

(x)   merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence;

(xi)   file any application to establish, or to relocate or terminate the operations of, any branch or banking office;

(xii)   amend its Charter Documents or similar organizational documents or otherwise add, amend or modify in any respect the duties or obligations of indemnification by the Bank with respect to any of their respective directors, officers, employees, agents or other Persons;

(xiii)   implement or adopt any change in its accounting principles, practices or methods, other than as required by the Accounting Standards or other Legal Requirements or requirements of a Governmental Authority;

(xiv)   engage in (or modify in a manner adverse to the Bank) any transactions with any Person known to be a shareholder of the Company or any director or officer of the Company or the Bank (or any Affiliate, associate, or immediate family member of any such Person), other than deposit relationships in the Ordinary Course of Business consistent with past practice and extensions of credit which are on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with persons unaffiliated with the Company or the Bank and do not involve more than the normal risk of collectability or present other unfavorable features and in compliance with the Federal Reserve Board's Regulation O, as applicable;

(xv)   take or omit to take any action that would materially and adversely affect or materially delay the ability of the Buyer to obtain the

requisite regulatory approvals or otherwise materially and adversely affect the Buyer's ability to consummate the Contemplated Transactions;

(xvi)     grant any option or right to purchase or execute any agreement or otherwise commit to issue any Bank Shares or any other security (other than in connection with an ACS Transaction upon the exercise by the Company of the Sale Election or in connection with the Auction);

(xvii)    sell, transfer, lease, mortgage, pledge or otherwise dispose of or encumber any of Bank's assets or cancel any of the Bank's claims except for the OREO and, as to other assets, within the Ordinary Course of Business (other than in connection with an ACS Transaction upon the exercise by the Company of the Sale Election or in connection with the Auction);

(xviii)   fail to use commercially reasonable efforts to preserve the Bank's business, organization and goodwill and its existing relationships with its respective customers and others having business relationships with it;

(xix)     fail to maintain all Bank personal property in good condition (reasonable wear and tear excepted) or fail to maintain the OREO in substantially the same condition as of the date of this Agreement (ordinary wear and tear excepted);

(xx)      pay or commit to pay any salary, fee or other compensation at a rate in excess of that prevailing on the date of this Agreement (other than regularly scheduled employee salary increases consistent with past practice and other than the payments that may be made by the Bank prior to or contemporaneously with the Closing to employees of amounts due or becoming due under the Performance Plan and reflected on the Bank Balance Sheet);

(xxi)     fail to maintain all existing policies of insurance with respect to Bank in their present form and with their present coverage or comparable substitute policies or to maintain all fidelity bonds and/or indemnity agreements concerning the fidelity of Bank's employees;

(xxii)    except in the Ordinary Course of Business, sell securities prior to maturity, nor purchase or enter into any agreement or option to purchase (i) any municipal or tax exempt securities, or (ii) any investment securities having a maturity of greater than twenty-four (24) months;

(xxiii)   reduce the Bank's reserve for loan losses below the balance as stated in the Bank's June 30, 2014 Call Report other than in the Ordinary Course of Business, consistent with and in accordance with past practices, the policies of the Bank or as required pursuant to any regulatory examination or Regulatory Agreement of the Bank;

(xxiv)    release or agree to release any collateral securing any Loan except as required by the related Loan documents or in the Ordinary Course of Business and consistent with past practices;

(xxv)     upon reasonable prior notice and during normal business hours, fail to permit the Buyer to conduct such examination as it determines to be reasonably necessary to confirm the accuracy of the representations and warranties made hereunder and the performance by the Company of the covenants hereunder provided, the Buyer shall not be entitled to review any confidential/regulatory material or any information that is protected by legal privilege; or

(xxvi)     fail to promptly notify the Buyer in writing if the Company becomes aware of any fact or condition that causes any of the representations and warranties of any party to be inaccurate, or if the Company becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause any representation or warranty to be inaccurate had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition.

6.5     <u>Other Covenants of the Company</u>.

(a)     <u>Employees</u>.  During the period from the date hereof through and including the Closing Date, the Buyer reserves the right to interview and evaluate all employees of the Bank.

(b)     <u>Certain Company Contracts</u>.  The Company shall, at or in connection with the Closing, pursuant to Section 365 of the Bankruptcy Code assume (and take all necessary actions, excluding the payment of cure costs (if any) which shall be paid by Buyer, to effect assumption) and assign to the Buyer pursuant to Section 365 of the Bankruptcy Code or other applicable law, those Company Contracts identified by the Buyer pursuant to written notice given to the Company no later than twenty-one (21) Business Days prior to the Closing (the "<u>Acquired Company Contracts</u>").  In connection with the Bankruptcy Case, the Company shall (a) include in the Sale Motion, a request for authorization to assume and assign to the Buyer such Acquired Company Contracts, and (b) promptly serve the Sale Motion on all counterparties to the Acquired Company Contracts as reasonably requested by the Buyer. The Buyer shall be responsible for all cure costs, if any, with respect to each Acquired Company Contract.  To the extent that any Acquired Company Contract may not be assigned to the Buyer by the Company absent the waiver or consent of, or notice to, one or more Persons, the Company and the Buyer shall use their commercially reasonable efforts to obtain all such waivers or consents, or make such notices, and shall reasonably cooperate with respect thereto.  The only liabilities or obligations that will be assigned to or assumed by the Buyer with respect to the Acquired Company Contracts will be cure costs, if any, and those liabilities and obligations that first arise after Closing.

(c)     <u>Resignations</u>. With respect to each member of the Board of Directors of the Bank, the Company shall deliver to the Buyer a written resignation from each such Board of Directors member effective as of the Closing Date (the "<u>Board Resignations</u>").

(d)     <u>ACS Transaction</u>.  The Company agrees to the following with respect to the ACS Transaction and the ACS Transaction Agreement:

(i)       The ACS Transaction shall be in the form of a stock sale;

(ii)      All representations, warranties, obligations and liabilities of the Bank under the ACS Transaction Agreement or otherwise in connection with the ACS Transaction shall not survive the closing thereof and shall terminate and expire at closing;

(iii)     The ACS Transaction shall be consummated prior to or contemporaneously with the Closing of the Contemplated Transactions;

(iv)     The Bank shall obtain approval from the FDIC, the Federal Reserve and any other applicable Governmental Authority prior to, and shall make the ACS Transaction Dividend prior to or contemporaneously with, Closing; and

(v)      The Company shall provide the Buyer with copies of the ACS Transaction Agreement, and any amendments thereto, and regular status updates regarding the ACS Transaction and the proposed timing of the closing thereof.

6.6    <u>Bankruptcy Sale Motion</u>. Subject to the terms and conditions of this Agreement, the obligations of the parties under this Agreement and the Contemplated Transactions are subject to and contingent upon the approval and authorization of the Bankruptcy Court. The parties agree to cooperate and coordinate the Company's filing of a motion to the Bankruptcy Court to approve this Agreement (the "<u>Sale Motion</u>") no more than three (3) Business Days following the execution and delivery of this Agreement. The Company shall file the Sale Motion pursuant to Section 363 of the Bankruptcy Code, in form and substance reasonably acceptable to the Buyer (and shall thereafter use commercially reasonable efforts to cause the Bankruptcy Court to enter a corresponding order or orders) and, in any event, seeking: entry of the Sale Order in substantially the same form as <u>Exhibit A</u> as a Final Order, or in such other form and manner as may be reasonably acceptable to the Company and the Buyer: (i) finding that the Notice of Sale was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances; (ii) finding that the Buyer is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code; (iii) finding that the Buyer and the Company did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code; (iv) finding that the Buyer's acquisition of the Bank Shares pursuant to this Agreement shall be free and clear of all Encumbrances; (v) approving the transactions proposed by this Agreement; and (vi) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement.

6.7    <u>Sale Order</u>. The Sale Order shall be in form and substance reasonably acceptable to the Buyer.

6.8    <u>Appeal</u>. If the Sale Order is appealed by any Person, or petition for certiorari or motion for rehearing or reconsideration is filed with respect thereto, the Company agrees to take all action as may be commercially reasonably necessary to defend against such appeal, petition or motion and to obtain an expedited resolution of such appeal, petition or motion.

103791916v7

6.9     Reserved.

6.10    Reserved.

6.11    Sale Election.  The Company and the Buyer agree that the Company shall have the absolute right, power and privilege to make an election to proceed with the Sale transaction set forth in and contemplated by this Agreement or the Alternative Transaction set forth in and contemplated by the Alternative Transaction Agreement (the "Sale Election").  The Company has made the Sale Election and determined to proceed with the Contemplated Transactions.  In accordance with such Sale Election, the Buyer is entitled to the ACS Stalking Horse Bidder Fee in accordance with Section 6.16.

6.12    Sale Hearing.  The Sale Hearing to consider approval of the Sale to the Buyer will take place on December 11, 2014 in the Bankruptcy Court.

6.13    Bankruptcy Filings.

        (a)     From and after the date of this Agreement, the Company shall use commercially reasonable efforts to provide the Buyer with a copy of any papers or pleadings to be filed in the Bankruptcy Case that relate in any way to this Agreement, the Sale, the Contemplated Transaction or the Buyer at least two (2) Business Days prior to such filings.

        (b)     The Company shall provide the Buyer with prompt notice of any papers or pleadings filed by a party other than the Buyer in the Bankruptcy Case that relate in any way to this Agreement, the Sale, or the Buyer.

6.14    Plan.  The Company covenants and agrees that if the Sale Order is entered, the terms of any plan of reorganization or liquidation submitted, supported or sponsored by the Company for confirmation shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of the Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the Contemplated Transactions, including any transaction that is approved pursuant to the Sale Order.

6.15    Payment of the Broker's Fees.  At the Closing, the Company shall, subject to approval of the Bankruptcy Court, pay or shall cause to be paid to the Broker the Broker's Fees in full satisfaction of all obligations of the Company in connection with any engagement letters or other agreements of the Company with the Broker, and the Company will cause the Broker to deliver to the Bank and the Buyer a pay-off or confirmation letter in respect thereof in form and substance reasonably satisfactory to the Buyer.

6.16    Stalking Horse Bidder Fee.  In consideration for the Buyer serving as the stalking horse bidder, regardless of whether or not the Buyer makes any matching or competing bids, in the event that the Buyer and the Company have not and will not consummate the Alternative Transaction, the Company shall on the first Business Day following the date of consummation of a transaction with a successful bidder other than the Buyer, pay to the Buyer a stalking horse bidder fee in an amount equal to $350,000 (the "ACS Stalking Horse Bidder Fee") upon consummation of the Alternative Transaction. The parties intend that the ACS Stalking Horse

33

Bidder Fee shall be treated as administrative expenses in the Bankruptcy Case. The Buyer acknowledges that the Company's agreement to pay the ACS Stalking Horse Bidder Fee is subject to Bankruptcy Court approval of this Agreement, including without limitation the payment of the ACS Stalking Horse Bidder Fee from the proceeds received by the Company in connection with the consummation of the Alternative Transaction. The Company agrees to request such approval in connection with the Sale Hearing. Notwithstanding the foregoing, payment by the Company of the ACS Stalking Horse Bidder Fee under Section 6.16 of the Alternative Transaction Agreement shall satisfy the Company's corresponding obligations under this Section 6.16.

      6.17    <u>Real Estate Matters</u>. The Buyer, at its election and at its sole cost and expense, may:

      (a)    Obtain (i) title commitments of a title company acceptable to Buyer for each parcel of the Owned Real Property (including any fixtures located on such real estate) (collectively, the "Title Commitments"), and (ii) an ALTA survey acceptable to the Buyer and prepared by a licensed surveyor acceptable to the Buyer for each parcel of the Owned Real Property (collectively, the "Surveys"). The Title Commitments and Surveys shall be completed within thirty (30) days after the date of the Auction. Upon the Buyer's receipt of the Title Commitments and Surveys, the Buyer shall promptly provide the Company with copies thereof. The Buyer shall have a period of ten (10) days from the date of receipt of such Title Commitments and Surveys within which to notify the Company, in writing, of the Buyer's disapproval of any exceptions to title shown in said Title Commitments and Surveys. In the event of such disapproval, the Company shall have ten (10) days from the date of such disapproval within which to attempt to eliminate any such disapproved exceptions to title. In the event that such disapproved exceptions are not eliminated or satisfied to the reasonable satisfaction of the Buyer in such time period, the Buyer may terminate this Agreement. If this Agreement is terminated pursuant to the foregoing sentence, then this Agreement shall be of no further force or effect as of the effective date of termination and neither party shall have any further rights, duties, obligations or liabilities, at law or in equity, arising out of or related to the Contemplated Transactions.

      (b)    Obtain a Phase I environmental assessment on the Owned Real Property (the "Assessments") and the Company shall grant, or shall cause the Bank to grant, to the Buyer (or its agents) reasonable access to the Owned Real Property for the purpose of updating the Assessments or conducting new Assessments of the Owned Real Property. The Assessments shall be completed within thirty (30) days after the date of the Auction. Upon the Buyer's receipt, the Buyer shall promptly provide the Company with a copy of the Assessments. The Buyer shall have a period of ten (10) days from the date of receipt of such Assessment to review such Assessment and give written notice to the Company stating either that (i) the Assessments are approved by Buyer or (ii) such Assessments are not approved by the Buyer and the reasons therefor. If the Buyer does not give any such notice within such ten (10) day period, then any Assessment for which no notice was given shall be deemed approved by the Buyer. If the Buyer gives a notice pursuant to (ii) above which sets forth specific objections to the Assessments, then the Buyer may, at its option, terminate this Agreement effective as of the date which is twenty (20) days after

103791916v7

the date of such notice unless during such twenty (20) day period the Company corrects or satisfies such objections to the reasonable satisfaction of the Buyer. If this Agreement is terminated pursuant to the foregoing sentence, then this Agreement shall be of no further force or effect as of the effective date of termination and neither party shall have any further rights, duties, obligations or liabilities, at law or in equity, arising out of or related to the Contemplated Transactions.

## ARTICLE 7.
## CONDITIONS TO CLOSING

7.1    <u>Conditions to Performance of the Company</u>.    All of the agreements and obligations of the Company under this Agreement are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent, any or all of which may be waived, in whole or in part, in writing by Company:

(a)    <u>Representations and Warranties of the Buyer</u>.    All representations and warranties of the Buyer set forth in this Agreement shall be true and correct in all material respects as of the Closing Date to the same extent and with the same effect as if made at and as of such date; the Buyer shall have performed and complied in all material respects with all of the agreements, covenants and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and the Buyer shall have delivered to the Company a certificate, dated as of the Closing Date, to all such effects (the "<u>Buyer Certificate</u>").

(b)    <u>Performance of Obligations of the Buyer</u>.    The Buyer shall have (i) performed in all material respects all obligations required under this Agreement to which it is party which are to be performed by it on or before the Closing Date (except with respect to any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement), (ii) delivered all certificates, instruments, and other documents required herein or otherwise in a form and substance reasonably satisfactory to the Company required to effect the transactions contemplated hereby and (iii) the Company shall have received a certificate signed by a duly authorized officer of the Buyer to such effect.

(c)    <u>Regulatory Approval</u>.    Any regulatory approval required by applicable law or regulation shall have been obtained and all waiting and appeal periods prescribed by applicable law or regulation shall have expired.

(d)    <u>No Violation of Orders</u>.    No preliminary or permanent injunction or other order of any court or Governmental Authority that declares this Agreement invalid or unenforceable in any material respect or which prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)    <u>No Litigation</u>.    There shall not be pending by any Governmental Authority any suit, action or proceeding, challenging or seeking to restrain, prohibit, alter or materially delay the consummation of any of the transactions contemplated by this Agreement.

103791916v7

(f)    <u>No Termination</u>.    Neither the Buyer nor the Company shall have terminated this Agreement as permitted herein.

(g)    <u>Sale Order</u>.  The Sale Order shall have been entered by the Bankruptcy Court approving the Sale to the Buyer and shall have become a Final Order and shall be in full force and effect and not stayed as of the Closing Date.

(h)    <u>ACS Transaction</u>.    The Bank shall have consummated the ACS Transaction; *provided that*, Seller shall authorize and direct the Bank to consummate the ACS Transaction upon satisfaction of all conditions precedent to the Bank's obligations to close pursuant to the ACS Transaction Agreement.

7.2    <u>Conditions to Performance of the Buyer</u>.  All of the agreements and obligations of the Buyer under this Agreement are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent, any or all of which may be waived, in whole or in part, in writing by the Buyer:

(a)    <u>Representations and Warranties of the Company</u>.  All representations and warranties of the Company set forth in this Agreement shall be true and correct in all respects as of the Closing Date to the same extent and with the same effect as if made at and as of such date; the Company shall have performed all agreements and covenants and satisfied all conditions on its part to be performed or satisfied hereunder on or prior to the Closing Date; and the Company shall have delivered to the Buyer a certificate, dated as of the Closing Date, to all such effects (the "<u>Company Certificate</u>").

(b)    <u>Regulatory Approval</u>.  Any regulatory approval required by applicable law or regulation shall have been obtained and all waiting and appeal periods prescribed by applicable law or regulation shall have expired.  No approvals, licenses or Consents granted by any regulatory authority shall contain any Burdensome Condition.

(c)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order of any court or Governmental Authority that declares this Agreement invalid or unenforceable in any material respect or which prevents the consummation of the transactions contemplated hereby shall be in effect.

(d)    <u>No Litigation</u>.  There shall not be pending by any Governmental Authority any suit, action or proceeding, challenging or seeking to restrain, prohibit, alter or materially delay the consummation of any of the Contemplated Transactions.

(e)    <u>No Termination</u>.  Neither the Buyer nor the Company shall have terminated this Agreement as permitted herein.

(f)    <u>Sale Order</u>.  The Sale Order shall have been entered by the Bankruptcy Court approving the Sale to the Buyer and shall have become a Final Order and shall be in full force and effect and not stayed as of the Closing Date.

(g)    <u>No Material Adverse Change</u>.  No change shall have occurred and no circumstances shall exist which has had or might reasonably be expected to have a

Material Adverse Effect on the financial condition, results of operations, business or prospects of the Bank.

(h)    ACS Transaction.    The Bank shall have consummated the ACS Transaction and the Bank shall have made the ACS Transaction Dividend.

# ARTICLE 8.
# TERMINATION

8.1    Termination. This Agreement may be terminated only in accordance with this Section 8.1.  This Agreement may be terminated at any time before the Closing, as follows:

(a)    by mutual written consent of the Company and the Buyer;

(b)    in the event that the Closing has not occurred on or before February 28, 2015, or such later date as may be agreed in writing by the parties (the "Outside Date"); *provided*, that no party may terminate this Agreement under this Section 8.1(b) until such party has provided written notice of its intent to terminate and the Closing has not occurred on or before the date that is thirty (30) days following delivery of such notice; *provided, further*, that the right to terminate this Agreement pursuant to this Section 8.1(b) shall not be available to a party whose failure to perform any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date;

(c)    by the Buyer if there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Company which breach, either individually or in the aggregate with other breaches by the Company, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Section 7.2(a) or (b), as the case may be, and which is not cured within thirty (30) days following written notice to the Company thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided,* that the Buyer is not then in material breach of any of the covenants, agreements, and warranties set forth in this Agreement on the part of the Buyer);

(d)    by the Company if there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Buyer which breach, either individually or in the aggregate with other breaches by the Buyer, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Section 7.1(a) or (b), as the case may be, and which is not cured within thirty (30) days following written notice to the Buyer thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided,* that the Company is not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement on the part of the Company);

(e)      by either the Company or the Buyer, if the Auction has occurred and the Buyer is not the successful bidder; *provided, that* in such event, the provisions of Section 6.16 shall apply;

(f)      by either the Buyer or the Company, with ten (10) days prior written notice or such shorter period as required by a court or Governmental Authority, or any applicable Legal Requirement, if any Governmental Authority shall finally determine that the subject of this Agreement violates any applicable Legal Requirement and the terms of this Agreement cannot be amended to meet the Legal Requirements to the satisfaction of such Governmental Authority;

(g)      by either the Company or the Buyer, if the Buyer or any of its Affiliates receives written notice from or is otherwise advised by a Governmental Authority that it will not grant (or intends to rescind or revoke if previously approved) any of the Buyer Required Approvals or receives written notice from or is otherwise advised by such Governmental Authority that it will not grant any such Buyer Required Approval on the terms contemplated by this Agreement without imposing a Burdensome Condition;

(h)      immediately and without further action by either party upon the appointment of a receiver for the Bank by any Governmental Authority;

(i)      by the Buyer if after notice and hearing the Bankruptcy Court will not enter the Sale Procedures Order in a form reasonably satisfactory to the Buyer; or

(j)      by the Buyer, if the Bankruptcy Court has not entered the Sale Order approving the Sale to the Buyer by forty-five (45) days after entry of the Sale Procedures Order, if such Sale Order has been entered but is stayed or has been reversed or vacated on such date, or if such Sale Order has been entered but has been amended or modified in a manner materially adverse to the Buyer without the prior written consent of the Buyer on or before such date.

8.2      Effect of Termination.  In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall become null and void and have no effect (other than the provisions which shall expressly survive termination), and except for the payment of the Deposit in accordance with this Agreement, neither the Company nor the Buyer, or their respective Affiliates or respective representatives, shall have any liability whatsoever with respect to this Agreement (*provided, however*, for purposes of clarity and avoidance of doubt, that the provisions of the Confidentiality Agreement shall expressly survive termination).

## ARTICLE 9.
## SURVIVAL

9.1      Survival.  None of the representations and warranties, covenants and agreements of the Company and the Buyer made in this Agreement shall survive the Closing Date; *provided, however*, that any covenant or agreement in this Agreement which, by its terms, is to survive the Closing Date, shall survive the Closing Date for the duration of such covenant or agreement.

103791916v7

9.2     Specific Performance.  The Company, on the one hand, and Buyer, on the other hand, each acknowledges that in case of any breach of their covenants or other obligations, the other would suffer immediate and irreparable harm, which money damages would be inadequate to remedy, and accordingly, in case of any such breach each non-breaching party shall be entitled to obtain specific performance and other equitable remedies, in addition to other remedies provided in this Article 9.

9.3     Covenant Not to Sue.

(a)     On and after the Closing Date, the Buyer on the one hand, and the Company, on the other hand, each covenants and agrees not to sue or otherwise bring any action against the other and each of the current and former directors, officers, employees, agents, managers, advisors, attorneys and representatives (in their capacity as such and in no other capacity) of the other with respect to any and all claims based in whole or in part upon any act, omission, transaction, event or other occurrence taking place at any time on or before the Closing Date, with the exception of acts, omissions, transactions, events or occurrences resulting from or involving the intentional misconduct, the intentional breach of any covenant set forth herein or fraud, in each case of any such Persons, as determined by a Final Order of the Bankruptcy Court or other court of competent jurisdiction.

(b)     Notwithstanding any other term in this Agreement to the contrary, the waivers, covenants and agreements contained in this Section 9.3 shall survive the Closing and shall bind and inure to the benefit of, as the case may be, the Buyer and its successors and assigns and the Company, its Affiliates, and its estate, creditors, successors and assigns, including, without limitation, any trustee in any case under Chapter 7 of the Bankruptcy Code.

**ARTICLE 10.**
**GENERAL PROVISIONS**

10.1     Access to Employees, Books and Records.  From and after the date hereof to the Closing Date or the date on which this Agreement is terminated pursuant to Article 8 hereof, the Company shall cause the Bank and its Subsidiaries to grant reasonable access to the Buyer (or its agents) to the premises, properties, employees, books and records of the Bank and its Subsidiaries, to make copies thereof and extracts therefrom but excluding any such information protected by legal privilege which if disclosed would violate said privilege, to determine the truth and accuracy of the representations and warranties of the Company contained herein and to confirm that the Company has performed or complied with all of the agreements and covenants to be performed or complied with by it hereunder and for any other purpose related to this Agreement or Contemplated Transactions. The Buyer agrees that all such information provided to it by the Company, the Bank, the Subsidiaries, or their employees, will be used by it only in connection with this Agreement and for no other purpose and that all such information shall be treated confidentially. Until Closing, all information provided to the Buyer shall remain subject to that certain Confidentiality Agreement by and between the Company and the Buyer (the "Confidentiality Agreement").  Nothing set forth in this Section shall be construed to limit the obligations, representations and warranties of the Company in this Agreement. The Buyer agrees to promptly disclose in writing any violation of any representation, warranty, covenant or agreement by the Company disclosed in any review of information pursuant to this Section.

39

10.2   <u>Legal and Other Fees and Expenses</u>.   Except with respect to the Expense Reimbursement, unless otherwise specifically provided herein, the Buyer and the Company will pay their respective legal, accounting and other professional fees and expenses incurred by each of them in connection with the negotiation and settlement of this Agreement, the completion of the Contemplated Transactions and other matters pertaining hereto.

10.3   <u>Parties in Interest and Assignment</u>. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the personal representative, successors and permitted assigns of the Company and the Buyer, it being understood and agreed, however, that neither party may assign this Agreement without the prior written approval of the other party and that any such assignment shall in no way relieve the party making such assignment from its responsibilities and obligations under this Agreement; *provided* that Buyer may assign its rights under this Agreement to a wholly-owned Subsidiary of Buyer if Buyer deems such assignment necessary to consummate the transactions described in Recital E to this Agreement.

10.4   <u>Notices</u>.   All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been given when personally delivered or deposited in the United States mail, mailed first class, registered or certified, postage prepaid, addressed as follows:

103791916v7

      (a)     If to the Buyer:

           Deerwood Bank
           14986 Lynwood Drive
           P.O. Box 2905
           Baxter, MN 56425
           Attention:  John L. Ohlin

           with a copy to:

           Stinson Leonard Street LLP
           150 South 5th Street, Suite 2300
           Minneapolis, MN 55402
           Attention:  Adam D. Maier, Esq.

or at such other address as the Buyer or its attorney shall have advised the Company in writing; and

      (b)     If to the Company:

           American Bancorporation
           1060 Dakota Drive
           Mendota Heights, MN 55120
           Attention: Russell N. Gaydos

           with a copy to:

           Lindquist & Vennum, LLP
           4200 IDS Center
           80 South 8th Street
           Minneapolis, MN 55402
           Attention:  George H. Singer, Esq.

or at such other address as the Company or its attorney may have advised the Buyer in writing. Any such notice, request, demand or other communication given as aforesaid will be deemed to have been given, in the case of delivery by hand or registered mail, when delivered, or, in the case of delivery by facsimile transmission, when a legible facsimile is received by the recipient, in each case, if delivered or received before 5:00 p.m. local time on a Business Day, or on the next Business Day if delivered or received on a day which is not a Business Day or after 5:00 p.m. local time on a Business Day.

    10.5   Further Assurances.  From time to time (whether before or after the Effective Time and without further consideration), the Buyer or the Company, as the case may be, shall cause to be executed and delivered to the other party all such other instruments and shall take or cause to be taken such further or other action as may reasonably and in good faith be deemed by the other party to be necessary or desirable in order to further assure the performance by the Buyer or the Company, as the case may be, of any of their respective obligations under this Agreement or under applicable law.

10.6    No Partnership or Joint Venture.  No activity of the Buyer whether before or after the Effective Time shall state or imply that the Company and/or the Bank is in any way involved as a partner, joint venturer or otherwise in the business of the Buyer.

10.7    Entire Agreement.  This Agreement expresses the whole agreement between the parties with respect to the purchase and sale contemplated hereby, there being no representations, warranties or other agreements (oral or written) not expressly set forth or provided for herein. The Confidentiality Agreement is not superseded by this Agreement and shall remain in full force and effect in accordance with its terms until Closing notwithstanding the execution and any subsequent termination of this Agreement.

10.8    Third-Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their successors and permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and their successors and such permitted assigns, any legal or equitable rights hereunder; *provided, however*, that the Indemnified Parties shall be deemed to be third-party beneficiaries of the provisions of Section 6.3.

10.9    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed by a party by electronic transmission of the party's signature, and said electronic copy shall have the same force and effect as any originally-signed document delivered in person.

10.10    Changes.  Any and all agreements by the parties hereto to amend, change, extend, revise or discharge this Agreement, in whole or in part, shall be binding upon the parties to such agreement, even though such agreements may lack legal consideration, provided such agreements are in writing and executed by the party agreeing to be bound thereby.

10.11    Headings, etc. The various headings in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any paragraph or provision hereof or any Schedule annexed hereto. References in this Agreement to any such paragraph or Schedule are to such paragraph or Schedule of or to this Agreement, and all references to this Agreement shall expressly include any such Schedule. All Schedules referred to herein are hereby incorporated by reference and made a part of this Agreement as though fully set forth herein.

10.12    Construction.  Wherever possible, each provision of this Agreement and each related document shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or any related document shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement or such related documents.

10.13    Waiver.  No failure on the part of either party to exercise, and no delay in exercising, any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise

thereof or the exercise of any other right or remedy granted hereby or by any related document or by law.

10.14  Public Statements.  The Company or the Buyer, as the case may be, shall approve in writing, prior to the issuance, the form and substance of any press release relating to any matters relating to this Agreement issued by the other.  Nothing contained herein shall restrict or prohibit the Buyer or the Company from issuance of press releases or the filing of any information that, based on the advice of counsel, are required by applicable Legal Requirements (including filings  necessary or desirable as part of the Auction or to obtain authorizations and approvals from the Bankruptcy Court) and information necessary for compliance with the same or prohibit the Buyer from advertising.

10.15  Governing Law.  This Agreement shall be deemed to be a contract made under the internal laws of the State of Minnesota (without regard to its conflicts of laws principles), and for all purposes it, plus any related or supplemental documents and notices, shall be construed in accordance with and governed by the internal laws of such state (without regard to its conflicts of laws principles).

10.16  Jurisdiction.  The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Contemplated Transactions shall be brought in the United States Bankruptcy Court for the District of Minnesota, so long as such court shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Minnesota, and each of the parties hereby irrevocably consents to the jurisdiction of such court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may not or hereafter have to the laying of the venue of any such suit, action or proceeding in such court or that any such suit, action or proceeding brought in such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of such court.

10.17  Waiver of Jury Trial.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

*[Signature page follows.]*

103791916v7

**IN WITNESS WHEREOF**, the Company and the Buyer have executed and delivered to the other party this Agreement effective as of the day and year first above written.

AMERICAN BANCORPORATION       DEERWOOD BANK

_____    _____

By:  Russell N. Gaydos             By:  John L. Ohlin
Its:  Chief Restructuring Officer     Its:  President and CEO

[SIGNATURE PAGE TO AMENDED AND RESTATED STOCK PURCHASE AGREEMENT]

**IN WITNESS WHEREOF**, the Company and the Buyer have executed and delivered to the other party this Agreement effective as of the day and year first above written.

AMERICAN BANCORPORATION                    DEERWOOD BANK

By:  Russell N. Gaydos                     By:  John L. Ohlin
Its:  Chief Restructuring Officer          Its:  President and CEO

[SIGNATURE PAGE TO AMENDED AND RESTATED STOCK PURCHASE AGREEMENT]

DISCLOSURE SCHEDULES

To

AMENDED AND RESTATED
STOCK PURCHASE AGREEMENT

by and between

AMERICAN BANCORPORATION

and

DEERWOOD BANK

December 18, 2014

This document constitutes the Disclosure Schedule (the "<u>Disclosure Schedule(s)</u>") to the Amended and Restated Stock Purchase Agreement (the "<u>Agreement</u>"), dated December 18, 2014 by and between American Bancorporation, a Minnesota corporation (the "<u>Company</u>"), and Deerwood Bank, a Minnesota banking corporation (the "<u>Buyer</u>").

The section numbers below correspond to the section numbers of the representations and warranties in the Agreement; *provided*, *however*, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement where such disclosure would be appropriate. Information disclosed in a particular Section of the Disclosure Schedules shall be deemed to qualify, and constitute exceptions to, the representations and warranties of the Company contained in the Agreement notwithstanding the absence of a reference to the Disclosure Schedules. In addition, disclosure of a matter in response to a representation and warranty containing materiality or other qualifications or limitations does not constitute a representation or warranty or acknowledgment by the Company that such matter is material or otherwise falls within such qualifications or limitations.

Unless otherwise defined in the Disclosure Schedules, all capitalized terms used in the Disclosure Schedules have the same meanings assigned to them in the Agreement.

Schedule 4.1(a)

(Power)

The Company is a debtor in a bankruptcy proceeding subject to Chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. and is subject to the jurisdiction of the Bankruptcy Court.   The Agreement and Contemplated Transactions are subject to the approval of the Bankruptcy Court and the Company's corporate power and authority or limited by the Bankruptcy Code and Bankruptcy Rules.   The Company is also subject to that certain Regulatory Agreement with the Federal Reserve (see Schedule 4.17).

Schedule 4.3

(Authority)

See Schedule 4.1(a).

Schedule 4.4(a)

(Encumbrances)

        The Bank Shares are subject to Encumbrances in favor of Hennepin Capital, LLC
("Hennepin") pursuant to one or more pledges, security agreements, notes, assignments and
instruments that secure indebtedness owed by the Company to Hennepin.   Hennepin has
possession of the certificates representing the Bank Shares.

Schedule 4.4(c)

(<u>Ownership Interests</u>)

The Bank owns a 47.7% interest in Dakota Financial Center, LLP ("DFC") and leases its branch location at 1060 Mendota Drive, Mendota Heights, MN 55120 from DFC.

Schedule 4.5

(Material Permits)

ACS maintains licenses in states in which it does business that requires a mortgage servicer to obtain a license.  Those licenses are subject to annual renewal and inspection.  In the license application and license renewal processes in some or all of the states within which the ACS does business, ACS is required to disclose or provide notice whether any owner, director, affiliate or similar related party is or has been involved in a bankruptcy proceeding.  Due to the commencement of the Bankruptcy Case, ACS is required to disclose the bankruptcy filing of the Company.  None of the Company, the Bank or ACS is able to describe conclusively the impact of the Bankruptcy Case on ACS's license retention, renewal or procurement process.  The existence of the Bankruptcy Case could cause states within which ACS operates or proposes to operate to cancel or suspend its licenses or refuse to renew or issue licenses to ACS, in which case ACS would not hold all Permits required or material to the conduct of its business.  This could lead to a loss of business or render ACS unable to obtain new business, either of which could have a materially adverse impact on ACS and the Bank. There are 11 existing jurisdictions (not necessarily the same jurisdictions for which above servicing licenses are held) in which ACS needs to obtain debt collector licenses or registrations and will need to make first time applications to the applicable states.

The Buyer will be required to obtain Government Authorizations and Consents with respect to certain Permits in connection with the consummation of the Agreement and the Contemplated Transactions.  (see Schedule 5.4)

Schedule 4.8

(Financial Statements)

The Bank's allowance for loan and lease loss provision ("ALLL") is not in accordance with generally accepted accounting principles (GAAP). Specifically, the Bank believes its ALLL is over reserved.

Schedule 4.10

(<u>Liabilities</u>)

Obligations and liabilities arising under Contracts to which the Bank is obligated or otherwise bound, including those set forth on Schedule 4.14, 4.15, 4.16, 4.17, 4.20(b), 4.21 and 4.23.  Obligations and liabilities arising under Performance Plans or otherwise set forth in or contemplated by Section 4.21.

Schedule 4.11

(Litigation)

1.     The Bank is a defendant in two legal proceedings.  The first is a suit commenced by Steven Leuthold, The Steven Leuthold Family Foundation and Freeborn County Humane Society that was initiated in March 2012 alleging, among other things, that the Bank allowed a customer's misdirection and misapplication of escrowed funds (Civ. No. 24-CV-13-1125).  The second is a suit commenced by Deutsche Bank National Trust Co. as Trustee of the IndyMac INDX Mortgage Loan Trust 2005-AR4, Mortgage Pass-Through Certificates, Series 2005-AR4 that was initiated in April 2014 seeking a determination of mortgage priority (Civ. No. 19HA-CV-14-1057).

2.     See Schedule 4.19 (Labor and Proceedings).

3.     The United States Department of Justice ("DOJ") has instituted a criminal investigation of a developer in Florida in relating to several developments, some of which were underwritten by ACS.  ACS has responded to a subpoena requesting documents and information. Personnel of ACS have been interviewed by representatives of the DOJ. ACS has recently received an additional subpoena requesting materials and documents in connection with another development underwritten by ACS and believes that it is a material witness in the matter.

Schedule 4.14

(Employment Contracts)

1.      The Bank has retention agreements with the Bank's Chief Executive Officer/President and its Senior Vice President/Commercial Banking Manager.  The Bank has non-solicitation agreements with certain commercial bankers.

2.      The Bank has established performance based, bank-wide discretionary incentive plans for the Bank's management and other employees.

3.      ACS has retention agreements with its officers.

4.      ACS has established performance based, incentive plans for its management and other employees.

Schedule 4.15

(<u>Insurance Policies</u>)

1.      Chubb Group of Insurance Companies (Property & Casualty and Financial Institution Policy)

2.      Federal Insurance Company (Workers' Compensation, Commercial Excess, Employers Liability & Umbrella Insurance)

3.      Great Northern Insurance Company (Commercial & Auto Insurance Policy)

4.      Houston Specialty Insurance Company (Insured Persons Liability & Company Indemnification Policy)

5.      Travelers Insurance Company (Cyber Insurance Policy)

6.      ACS's Mortgage Bankers Bond and Mortgagee E&O (Lloyds of London)

Schedule 4.16

(<u>Employee Benefit Plans</u>)

1.     See incentive plans described in Schedule 4.14 and Performance Plans.

2.     Medical Insurance Plan (Medica), includes HSA.

3.     Dental Insurance Plan (Delta Dental of Minnesota).

4.     Long-Term Disability Plan (Lincoln National Life Insurance Company).

5.     Short-Term Disability Plan.

6.     Flexible Spending Plan.

7.     Life & AD&D Insurance (Sun Life).

8.     Voluntary Life Insurance (Sun Life).

9.     401(k) Profit Sharing Plan (Securian Retirement).

10.    Tuition Reimbursement.

11.    PTO, Banked Sick Time & Holidays.

Schedule 4.17

(Regulatory Agreements)

Written Agreement by and among the Company, American Bank of St. Paul and the
Federal Reserve Bank of Minneapolis dated July 22, 2009.

Schedule 4.19

(Labor Disputes and Proceedings)

ACS is a respondent in connection with an EEOC Charge of Discrimination brought against it alleging claims of sex, age and disability discrimination under Title VII of the Civil Rights Act, the Americans with Disabilities Act ("ADA") and age discrimination under The Age Discrimination in Employment Act ("ADEA") based upon its failure to hire the charging party, a male, for a position with ACS in 2013.  ACS is contesting the allegations in its response and has requested that the charge be dismissed.

Schedule 4.20(a)(i)

(Owned Real Property)

The Bank owns the following Real Property:

1.    217 South Newton, Albert Lea, MN 56007

2.    195 North Broadway, Alden, MN 56009

3.    14295 Cedar Avenue, Apple Valley, MN 55124

4.    7055 Cahill Avenue, Inver Grove Heights, MN 55076

5.    2310 Seventh Street W., Saint Paul, MN 55116

ACS owns the following Real Property:

1.    8121 E. Florence Avenue, Downey, CA 90240

Schedule 4.20(a)(ii)

(OREO)

# Other Real Estate Owned (OREO)

**As of:**                    **8/31/2014**

| Address | Description |
| --- | --- |
| XXX 215th Street W<br>Lakeville, MN | Raw Land<br>(Industrial) |
| 1011 Robert Street S<br>West St. Paul, MN | Commercial<br>(Restaurant) |
| 298-300 University Ave W<br>Saint Paul, MN 55103 | Mixed-Use<br>(Retail/Apt) |
| Sparks, NV | Commercial<br>(land) |
| 2005 Stevens Street<br>Albert Lea, MN  56007 | Residential<br>(Rental) |
| 90652 290th  St.<br>Austin, MN 55912 | Ag/Farm land |
| 3437 Centerville Rd<br>Vadnais Heights, MN | Commercial Lot |
| 10756 Zetterberg Rd<br>Grantsburg, WI 54840 | Residential |
| 10764 Zetterberg Rd<br>Grantsburg, WI 54840 | Residential |

Schedule 4.20(b)

(Leased Real Property)

The Bank leases real property pursuant to real estate lease agreements at the following location:

1.        1060 Mendota Drive, Mendota Heights, MN 55120

ACS leases real property pursuant to real estate lease agreements at the following locations:

1.        217 S. Newton Avenue, Albert Lea, MN 56007

2.        921 E. Fort Ave., Suite #120, Baltimore, MD 21230

3.        5300 W. Cypress Street, Suite #261, Tampa, FL 90240

Schedule 4.21

(Bills and Expenses)

ACS has approximately $85,000 in committed costs related to the remodel of the Albert Lea, Minnesota location as of the date hereof that ACS expects to pay in approximately the next 60 days. In addition, the Bank and ACS have engaged legal counsel to assist with certain corporate governance and regulatory matters and have incurred and expect incur fees and costs in connection with services rendered.

Schedule 4.22

(Title to Assets)

1.      The Bank borrows funds from the Federal Home Loan Bank of Des Moines ("FHLB")
and pledges investment property, securities, instruments and deposit accounts which the Bank
owns or has in interest as collateral including, without limitation, its interest in FHLB stock,
funds on deposit with FHLB. (See UCC Filing Nos. 20039963208, 20081257299, 20091701194,
20133146475, 20133313692).

2.      ACS services loans of its customers under arrangements which may contemplate
assignments or transfers as part of the relationship. Fannie Mae has filed a financing statement
covering all loans that ACS assigns, transfers or sells to Fanie Mae together with all promissory
notes and associated documents, instruments, files, records and associated rights in mortgages,
deeds of trust, security agreements and other security devices. (See UCC Filing No.
201229261536).

Schedule 4.23

(Leases)

The Leased Real Properties set forth on Schedule 4.20(b) are each subject to lease agreements consisting of the following:

1.      Lease Agreement between the Bank and Dakota Financial Center, LLP originally dated September 1, 1998 as amended by that certain Lease Modification and Extension Agreement dated December 1, 2012 for premises located at 1060 Dakota Drive, Mendota Heights, Minnesota 55120.

2.      Lease Agreement by and between the Bank and ACS dated April 24, 2014 for premises located at 217 South Newton Avenue, Albert Lea, Minnesota 56007.

3.      Lease Agreement by and between the Foundry Federal, LLC and ACS dated May 12, 2010 for premises located at 921 E. Fort Avenue, Suites 120-125, Baltimore, Maryland 21230.

4.      Lease Agreement by and between CHPCI Holdings LLC and ACS for premises located at 5300 West Cypress Street, Suite 263, Tampa, Florida 90240.

5.      The Bank and ACS are each subject to a number of personal property leases generally consisting of leases for copiers, computers and other items of personal property (including, without limitation, that certain lease agreement with BTI Communications Group Ltd. related its telephone system and related items of personal property for its premises located in Downey, CA, see Schedule 4.24).

6.      ACS is in the process of entering into a lease for a data replication system which includes a capital expenditure component that would amount to approximately $50,000.

Schedule 4.24

(Contracts)

1.      Tax Sharing Agreement.

2.      Regulatory Agreement (see Schedule 4.17).

3.      Leases disclosed in Schedule 4.23.

4.      The Bank and ACS are each a third-party beneficiary under certain confidentiality agreements delivered by interested parties to the Company in connection with the Contemplated Transactions.

5.      See agreements and plans with employees described in Schedule 4.14.

6.      The Bank is a party to that certain limited partnership agreement relating to its ownership interest in DFC (see Schedule 4.4(c)).

7.      The following vendor contracts between the Bank and the parties identified below:

| Vendor | Contract Pertains to |
|---|---|
| Diebold | bank equipment and ATM maintenance |
| Fidelity Information Services, LLC | various services |
| Fiserv | core software, hardware, and ancillary products |
| Garda | armored car service |
| Harland | checks and document prep software |
| Insight Storage Solutions | off-site records management |
| Ipswitch/Standard Networks | secure file transfer host |
| Marco | managed IT services |
| Dell Secureworks | intrusion prevention management |
| Security Products Company | alarm systems and monitoring |
| SynTel LLC | tax statement mailing |
| Zayo | data lines, VOIP system, and server colocation hosting |
| Zix Corp. | E-mail securitization |

8.      The Bank maintains various agreements with Federal Home Loan Bank of Des Moines (see Schedule 4.22).

9.      The following vendor contracts between ACS and the parties identified below:

| Vendor | Contract Pertains to |
|---|---|
| Agilis | Lock box services |
| Agility Recovery Services | Disaster recovery |
| Inatech | Servicing system software maintenance |

| BTI | Managed services agreement Shoretel phone system |
|---|---|
| FIS | Document management system |
| Great America Networks | MPLS network |
| Lereta Tax Service | Tax service on loans serviced |
| MMC | Module to servicing system |
| Service Director fKa Interlinq | Servicing system software |

9.      ACS is a party to a number of material Contracts with its clients/customers providing for loan servicing (see Schedule 4.22) which are not assignable without the counterparties' written Consent ("ACS Customer Contracts").

Schedule 4.25

(Company Contracts)

1.      The Company is a party to certain confidentiality agreements delivered by interested parties to the Company in connection with the Contemplated Transactions.

2.      Tax Sharing Agreement.

3.      Regulatory Agreement (see Schedule 4.17).

4.      See Schedule 4.15 (Policies).

5.      See bankruptcy schedules filed by the Company in connection with the Bankruptcy Case for an identification of other Contracts to which the Company is a party including, but not limited to, Contracts evidencing obligations in favor of Hennepin Capital, LLC (see Schedule 4.4) and in favor of holders of subordinated trust preferred securities (TruPS).

6.      Financial Advisory Agreement between the Company and Carl Marks Securities LLC.

Schedule 5.4

(Buyer Required Approvals)

1.      Federal Deposit Insurance Corporation.

2.      Minnesota Department of Commerce.

3.      Board of Governors of the Federal Reserve System.

4.      ACS maintains certain licenses and other Permits in the states in which it does Business that require a mortgage servicer such as ACS to obtain a Permit.  In connection with the Agreement and the Contemplated Transactions, the Buyer will be required to make filings and obtain Governmental Authorizations and Consents with respect to the ACS licenses and other Permits.

Schedule 6.4(b)(ii)

(Capital Expenditures)

See Schedule 4.21 (item 6.) and Schedule 4.23.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

     American Bancorporation

          Debtor.

Bky Case No: 14-31882 (KAC)

Chapter 11

### CERTIFICATE OF SERVICE

     Nicole Bucher, of the City of St. Paul, County of Ramsey, State of Minnesota, states that on December 19, 2014 she served the following document:

1.     Unsworn Declaration of Russell Gaydos in Support of Debtor's Motion for Sale of Assets (Docket No. 42),

upon:

Alesco Preferred Funding II, Ltd.
Cohen & Company Financial Management
LLC
c/o Peter Addei
Circa Centre, 2929 Arch Street
17th Floor
Philadelphia, PA 19104


via U.S. Mail to the address listed above and electronically by Notice of Electronic Filing upon all parties who have requested service in this case by filing the same via ECF with the Bankruptcy Court in the District of Minnesota..

                        /e/ Nicole Bucher
                        Nicole M. Bucher